UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMIE GARMAN, BLAIRE TOLEMAN, and MICHELLE BALL, on behalf of themselves and all similarly situated, c/o Emery Celli Brinckerhoff Abady Ward & Maazel LLP, One Rockefeller Plaza, 8th Floor, New York, New York 10020 <br><br> *Plaintiffs*, <br><br> v. <br><br> KASHYAP P. PATEL in his official capacity as Director of the Federal Bureau of Investigation, 935 Pennsylvania Avenue, N.W., Washington, D.C. 20535; <br><br> FEDERAL BUREAU OF INVESTIGATION, 935 Pennsylvania Avenue, N.W., Washington, D.C. 20535; <br><br> PAMELA J. BONDI, in her official capacity as Attorney General of the United States, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530; and <br><br> U.S. DEPARTMENT OF JUSTICE, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530, <br><br> *Defendants*. | Civil Action No. <br><br> **CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## OVERVIEW

1.      Plaintiffs are a proposed class of former career Federal Bureau of Investigation ("FBI") employees who have faithfully served our country—doing the right thing, the right way, for the right reasons—while scrupulously and quietly hewing to the ethos of the FBI, "Fidelity, Bravery, Integrity."  Defendants, the current Director of the FBI, Kashyap P. Patel, and Attorney General Pamela J. Bondi, have, since the beginning of 2025, embarked on a public campaign to oust Plaintiffs from federal service because Defendants perceived them to be political

1

opponents—as if fidelity to the law and the proper execution of assignments were somehow hostile partisan acts.

2.      Defendants' antagonism to the career FBI civil service is not newfound. Over the past five years, Defendants Patel and Bondi were personally embroiled, as fact witnesses or attorneys representing adverse parties, in investigations brought by the FBI, through the FBI's career employees. And now, by virtue of presidential appointment to the pinnacle of federal law enforcement, Defendants are abusing their positions to claim victories that eluded them on the merits. Defendants' mission—in their own words—is retribution. They began their terms of office by compiling lists of FBI employees whom they perceived to be "enemies"—due to assigned investigative work, private comments, personal friendships, immutable characteristic, or other absurd measure—and publicly initiating mass firings on a rolling basis, without due process. The firings were timed to drive headlines and curry favor with political supporters. For Plaintiffs Jamie Garman, Blaire Toleman, and Michelle Ball, and for many members of the proposed class, the first time their names entered the public consciousness was when a senior government official falsely accused them on television or social media of being corrupt, biased, or unethical for doing the lawful work that they were assigned. The proposed class members' true legacy of service— disrupting terrorist plots, gang violence, and grift; for decades; without fear or favor; at great sacrifice to themselves and their families—will never make it onto the internet.

3.      Despite the entitlement to power that Defendants claim, they are circumscribed by the United States Constitution. And their actions stand in flagrant violation of the First and Fifth Amendments, and Article II. Plaintiffs Jamie Garman, Blaire Toleman, and Michelle Ball bring this lawsuit on behalf of themselves and a proposed class of all similarly situated former FBI employees to seek redress for Defendants' unconstitutional decimation of non-

2

partisan law enforcement and to prevent Defendants from further debasing an institution Plaintiffs believe in.

## PARTIES

4.      **Plaintiff Jamie Garman** joined the FBI after graduating from law school with high honors, litigating at an international law firm, clerking for a federal district judge, and serving as an Assistant United States Attorney ("AUSA") in the Southern District of Florida for five years, including as an Organized Crime and Drug Enforcement Task Force attorney assigned to a High Intensity Drug Trafficking Area.  During her almost eight years of exemplary and unblemished FBI service, she investigated and disrupted major health care frauds, opioid trafficking, and public corruption by members of both political parties and those who were politically unaffiliated.  She received numerous merit bonuses and recognitions both as an AUSA and an FBI agent.  They included awards from the Department of Labor Inspector General and the U.S. Treasury Inspector General, as well as two FBI Medals of Excellence (the first in 2021 for "exceptional performance of duties" in connection with a pill mill investigation and the second in 2023 "for unparalleled work ethic and commitment to investigative excellence through doing the right thing, the right way").  She has been rated an Exemplary Performer—the top rating—six of the seven years of her FBI career.  From April 2022 to April 2024, she served as a Special Agent ("SA") on a federal public corruption squad in the Washington Field Office ("WFO") that was assigned to provide FBI support to an investigation into alleged interference with the 2020 presidential election, which was brought under the ambit of Department of Justice Special Counsel John L. ("Jack") Smith.

5.      On October 31, 2025, the FBI removed Plaintiff Garman from federal service without notice of any charges against her and without giving her the opportunity to respond.

The firing coincided with (i) Plaintiff Garman's filing of protected whistleblower disclosures, and (ii) publication by Senate Judiciary Chair Charles E. Grassley of secret grand jury material that the FBI had produced to the U.S. Senate Judiciary Committee and which identified Plaintiff Garman by name.  At the time of her firing, Plaintiff Garman was serving as a Supervisory Special Agent ("SSA") Associate Division Counsel ("ADC") in the WFO advising FBI WFO leadership and staff on a range of legal, ethics, and policy matters, and reviewing and providing feedback on proposed FBI policy changes.  Days before her termination, the FBI notified Plaintiff Garman she had been selected in a competitive process for another SSA/ADC position.  Plaintiff Garman had expected to spend the remainder of her career at the FBI.

6.      **Plaintiff Blaire Toleman** amassed almost 14 years of exemplary and unblemished federal service with the FBI, where she investigated and disrupted terrorist plots, gang violence, and public corruption by members of both political parties and those who were politically unaffiliated.  She received numerous FBI merit bonuses, the 2015 Federal Law Enforcement Foundation Investigator of the Year Award, the 2018 Homeland Security Ridge Award, and the 2024 FBI Medal of Excellence for "leadership" and "always doing the right thing, the right way, for the right reason."  She uniformly earned positive performance ratings, and in the last four out of five years prior to her summary removal from federal service, received Exemplary Performer ratings—the highest rating available.  From February 2022 to March 2024, Plaintiff Toleman served as the SSA over a federal public corruption squad at WFO that was assigned to provide FBI support to an investigation into alleged interference with the 2020 presidential election that was brought under the ambit of Department of Justice Special Counsel Jack Smith.

7.      On November 3, 2025, the FBI informed Plaintiff Toleman that it would be removing her from federal service, only to retract her termination later that same day.  The next

day, the FBI fired her again.  The FBI never provided her with notice of any charges against her or the opportunity to respond.  She was serving as SSA of a financial fraud squad in the FBI's Chicago Field Office at the time of her firing.  Plaintiff Toleman had expected to spend the remainder of her career at the FBI.

8.      **Plaintiff Michelle Ball** amassed ten years of exemplary and unblemished federal service with the FBI, where she disrupted foreign intelligence threats and investigated public corruption by members of both political parties and those who were politically unaffiliated. She received numerous FBI merit bonuses and recognitions, including a Citation for Special Achievement, the FBI Medal of Excellence, and nomination for the Director's Award for her involvement in a foreign influence investigation that led to the arrest and conviction of a foreign covert operative.  She uniformly earned positive performance ratings and received the FBI's top Exemplary Performer rating for the past five years preceding her removal from federal service. From the summer of 2019 until February 2024, she served as an SA on a federal public corruption squad at WFO that was assigned to provide FBI support on an investigation into alleged interference with the 2020 presidential election, which was ultimately brought under the ambit of Department of Justice Special Counsel Jack Smith.  Throughout her FBI career, Plaintiff Ball has not participated in political activities or maintained any political affiliations.  During her tenure as a federal public corruption agent, she voluntarily abstained from voting in federal elections.

9.      On October 7, 2025, the FBI removed Plaintiff Ball from federal service without notice of any charges against her or the opportunity to respond.  Her firing was timed to coincide with Defendant Bondi's testimony before the Senate Judiciary Committee.  At the time of her firing, Plaintiff Ball was serving as an SA and volunteering for collateral duty as a public affairs officer in the FBI's New Orleans Office.  She was assigned to the public corruption squad

and leading sensitive public corruption investigations against federal, state, and local elected officials.  Following her dismissal, Plaintiff Ball received a letter from the FBI Human Resources Division stating she separated from the FBI in good standing and without any open disciplinary or administrative action.  Plaintiff Ball had expected to spend the remainder of her career at the FBI.

10.    **Defendant Kashyap P. Patel** is the Director of the FBI.  On November 30, 2024, President Donald J. Trump nominated him to serve as the ninth FBI Director.  Defendant Patel was confirmed by the U.S. Senate on February 20, 2025.[1]  Prior to his current position, Defendant Patel had been adverse to the FBI and a fact witness in FBI investigations.  While serving as a Congressional aide, he helped author a report that accused FBI officials investigating links between the President's associates and Russian officials as abusing their authority.[2]  In November 2022, Defendant Patel was summoned to testify before a Grand Jury investigating the President's alleged unlawful retention of classified documents after his term of office.[3]  Around that period, the FBI subpoenaed Defendant Patel's toll records amidst the federal investigation into the President.[4]  (Toll records are information about calls or messages to or from a phone, such as the phone number of the caller or recipient, the date, and the length of the call.  Toll records do not include the contents of any calls or messages.)

---

[1] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Nov. 30, 2024, 6:47 PM), https://truthsocial.com/@realDonaldTrump/posts/113574572759738919; Kashyap P. Patel, Nomination No. PN12-35, 119th Cong. (2025), https://www.congress.gov/nomination/119th-congress/12/35.

[2] Memorandum from HPSCI Majority Staff to HPSCI Majority Members (Feb. 2, 2018), https://static01.nyt.com/packages/pdf/20180202_memo/HMTG-115-IG00-20180129-SD001.pdf; Ryan Goodman, *No Claim to Fame: Kash Patel and False or Misleading Statements About the 2016 Russia Investigation*, JUST SECURITY (Jan. 29, 2025), *https*://www.justsecurity.org/107134/kash-patel-2016-russia-investigation/.

[3] Paula Reid, *Trump adviser Kash Patel testified to grand jury investigating Mar-a-Lago documents*, CNN (Nov. 4, 2022), https://www.cnn.com/2022/11/04/politics/kash-patel.

[4] Jana Winter, *Exclusive: FBI obtained Kash Patel and Susie Wiles phone records during Biden administration*, REUTERS, (Feb. 25, 2026), https://www.reuters.com/world/us/fbi-obtained-kash-patel-susie-wiles-phone-records-during-biden-administration-2026-02-25/.

11.    On April 1, 2022, Defendant Patel published a children's book entitled, "The Plot Against the King," which is a fantastical telling of how an all-knowing wizard resembling Defendant Patel disrupted an evil plot by characters resembling FBI officials to take down "King" Donald J. Trump.  Defendant Patel is reputedly one of the President's most devoted loyalists.  Defendant Patel presides over the FBI, where he makes employment decisions about the very personnel who worked on the investigations that are referenced in his Congressional report and children's book, fell under the purview of Special Counsel Jack Smith, and/or sought his testimony and information as a fact witness.  He maintains an office in Washington, D.C.

12.    **Defendant Pamela J. Bondi** is the Attorney General of the United States. President Trump nominated her on November 21, 2024, and she was confirmed by the U.S. Senate on February 4, 2025.[5]  Prior to her current position, she had been adverse to the FBI and had personal involvement in events that were the subject of FBI investigations.  She, too, is reputedly one of the President's most devoted loyalists.  In or about 2019, Defendant Bondi served as legal counsel to President Trump, defending him during impeachment proceedings brought in the U.S. Senate.[6]  In 2020, she served as an advisor to President Trump's 2020 presidential campaign, "helping file a string of unsuccessful lawsuits alleging voter fraud and pushing to delegitimize vote counting in Pennsylvania."[7]  She told Fox News at the time, "We do have evidence of cheating."[8] The President's alleged efforts to interfere in the 2020 presidential election—which included filing

---

[5] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Nov. 21, 2024, 6:28 PM), https://truthsocial.com/@realDonaldTrump/posts/113523536267976149; Pamela Bondi, Nomination No. PN11-2, 119th Cong. (2025), https://www.congress.gov/nomination/119th-congress/11/2.

[6] *Pam Bondi at President-Elect Trump's First Impeachment Trial*, CSPAN, (Dec. 25, 2024), https://www.c-span.org/program/public-affairs-event/pam-bondi-at-president-elect-trumps-first-impeachment-trial/653612.

[7] Peter Charalambous & Alexander Mallin, *Pam Bondi to face questions on loyalty to Trump, lobbying ties in AG confirmation hearing*, ABC NEWS, (Jan. 15, 2025), https://abcnews.com/Politics/pam-bondi-face-questions-loyalty-trump-lobbying-ties/story?id=117640295.

[8] Fox and Friends, *Pam Bondi on Trump campaign filing lawsuits amid election uncertainty*, FOX NEWS, (Nov. 5, 2020), at 00:40-00:42, https://www.foxnews.com/video/6207361765001.

baseless lawsuits to impede the peaceful transition of power—fell within the ambit of Department of Justice Special Counsel Jack Smith's appointment and investigation.

13.     In 2023, Defendant Bondi told Fox News: "When Republicans take back the White House, and we will be back in there in 18 months or less, you know what's going to happen?  The Department of Justice, the prosecutors will be prosecuted—the bad ones—the investigators will be investigated."[9]  Defendant Bondi presides over the Department of Justice, where she makes employment decisions about the very personnel who worked on matters to which she was adverse as a private citizen.  She maintains an office in Washington, D.C.

14.     **Defendant Federal Bureau of Investigation ("FBI")** is a federal agency and subordinate component of Defendant United States Department of Justice.

15.     **Defendant United States Department of Justice ("Department of Justice" or "DOJ")** is an agency of the United States government with headquarters in Washington, D.C.

### JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).

17.     The Court has authority to enter a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and injunctive relief under the Court's inherent equitable powers.

---

[9] Charalambous & Mallin, *supra* note 7.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1)(B). A substantial part of the events giving rise to the claims herein occurred in this District, Defendants include agencies and officers of the United States sued in their official capacities, and all Defendants have offices or headquarters in the District.

**CLASS ACTION ALLEGATIONS**

19. Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(2) on behalf of themselves and all others who are similarly situated.

20. Plaintiffs seek to represent the following proposed class: All FBI employees who have been terminated since January 1, 2025, or who will be terminated, by Defendants on the basis of perceived political affiliation, without being afforded due process. The proposed class does not include FBI employees who must bring claims to the Merit Systems Protection Board in the first instance.

21. On information and belief, the proposed class includes at least 50 FBI employees who have already been terminated under the circumstances set forth herein, and the size of the proposed class will grow because Defendants continue to terminate FBI employees for the same reasons in the same manner.

22. The claims in this action turn on common questions of fact or law that are capable of class-wide resolution. *See* Fed. R. Civ. P. 23(a)(2). The legality of Defendants' terminations is a common question capable of resolution in one stroke.

23. Plaintiffs' claims are typical of the claims of those of the proposed class as a whole. *See* Fed. R. Civ. P. 23(a)(3). Each proposed class member's claim arises from the same course of events (Defendants' illegal terminations) and each class member has experienced the

9

same injury (the termination of their employment and resulting violations of their rights under the First and Fifth Amendments) if relief is denied.

24.    Plaintiffs will fairly and adequately represent the proposed class.  *See* Fed. R. Civ. P. 23(a)(4).  They do not have conflicts with other members of the proposed class, and they are committed to seeking relief that will benefit all members of the proposed class equally: declarations that Defendants' actions are unconstitutional and unlawful, and an order affording class members due process, reinstatement, and other associated relief.  Plaintiffs are aware of their obligations as class representatives and willing to dedicate time and effort to pursue this matter on behalf of every member of the proposed class.

25.    Plaintiffs are represented by counsel with extensive experience in constitutional law and class actions and who are committed to zealously representing the proposed class.  *See* Fed. R. Civ. P. 23(a)(4), 23(g).

26.    Declaratory relief is appropriate under Rule 23(b)(1)(A) because Defendants have engaged in an ongoing course of conduct that is illegal as to all members of the proposed class, and separate actions by individual class members would create a risk of inconsistent results.  *See* Fed. R. Civ. P. 23(b)(1)(A).

27.    Additionally, Defendants have acted on grounds that apply generally to the proposed class, namely, violating their rights under the First and Fifth Amendments and subjecting all class members to the same unlawful terminations.  Final injunctive and corresponding declaratory relief is therefore appropriate with respect to the Class as a whole.  *See* Fed. R. Civ. P. 23(b)(2).

## FACTS

**Employment at the FBI is Highly Selective and FBI Employees
Dedicate Their Lives to Service**

28.     Plaintiffs and proposed class members, former FBI employees, are career, non-partisan law enforcement professionals who were accepted for employment with the FBI on account of their merit, skill, and qualification—not fealty to any political party, movement, or figure.

29.     The application and selection process to become an FBI employee is rigorous and can require written assessments, interviews, physical fitness tests, a background investigation and polygraph examination, a certain level of educational attainment, and work experience.

30.     Public service with the FBI is highly demanding and can come at great personal sacrifice, including threats of physical danger, relocation, long hours, and difficult assignments.

31.     The FBI makes significant investments to train, equip, and retain their personnel.  For example, new SAs must complete a multi-month, specialized field training course in Quantico, Virginia.

32.     FBI employees receive extensive tactical, technological, ethical, legal, and use of force training throughout their FBI careers.

33.     FBI employees generally expect to spend most of their careers with the FBI, investing in the institution, their careers, and the public's safety.

34.     FBI employees reach retirement eligibility after 25 years of service (before they reach 50 years old) or 20 years of service (after they reach 50 years old).

35.    The promise of retirement benefits after decades of service is part of the bargain of FBI service as something that FBI employees rely upon and the FBI expects to confer.

36.    The FBI's recruitment website advertises that a career as an agent is a way to "SECURE YOUR FUTURE" and "a secure retirement with pension."[10]

**Fidelity to the FBI's Mission Requires Insulation from Political Interference**

37.    Once hired, FBI employees swear or affirm an oath of office before beginning their service to "support and defend the Constitution of the United States" and "bear true faith and allegiance to the same," and to "well and faithfully discharge the duties" of their office.

38.    FBI employees do not owe political allegiance to the President of the United States as a condition of their employment.

39.    FBI employees do not owe political allegiance to the Attorney General as a condition of their employment.

40.    FBI employees do not owe political allegiance to any political party.

41.    Swearing allegiance to the President of the United States would violate an FBI employee's oath of office.

42.    Swearing allegiance to the Attorney General would violate an FBI employee's oath of office.

43.    Swearing allegiance to the FBI Director would violate an FBI employee's oath of office.

44.    Swearing allegiance to a political party would violate an FBI employee's oath of office.

---

[10] Special Agent Overview, fbijobs.gov, https://fbijobs.gov/special-agents#salary-and-benefits (last accessed Mar. 30, 2026).

12

45. Career FBI employees do not serve at the pleasure of the President of the United States.

46. Career FBI employees do not serve at the pleasure of the Attorney General.

47. Career FBI employees do not serve at the pleasure of the FBI Director.

48. Part of the FBI's mission is to follow the facts without fear or favor.

49. Political interference in FBI employee decision-making undermines the FBI's ability to follow the facts without fear or favor.

50. The Constitution, federal law, and policy seek to insulate the FBI's activities and practices from political interference, and make clear that partisan beliefs or political affiliation are not required for employment within the FBI

51. The First Amendment to the United States Constitution prohibits the FBI from retaliating against FBI employees for their personal political beliefs.

52. The First Amendment to the United States Constitution also prohibits the FBI from retaliating against FBI employees on the basis of the FBI's perception—whether accurate or not—of employees' political beliefs or affiliation.

53. The Hatch Act prevents FBI employees from running for partisan political office, soliciting political contributions, and using their official authority to interfere with elections. *See* 5 U.S.C. §§ 7321–7326.

54. The FBI Whistleblower Protection Act prevents the FBI from disciplining or firing employees for reporting to their chain of command what they believe to be a violation of any law, gross mismanagement, or abuse of authority, among other violations. *See* 5 U.S.C. § 2303.

55.    The FBI maintains an Ethics and Integrity Program Policy Guide (the "Ethics Guide") that requires FBI employees to observe the highest standards of ethical conduct in their personal and professional lives.[11]  The Ethics Guide is binding on all FBI employees and incorporates relevant ethics rules from the Office of General Ethics, DOJ, and the FBI, including the FBI's Code of Conduct, the FBI's Core Values, and the FBI Motto.

56.    Pursuant to the Guide, FBI employees "have a responsibility, both to the United States and to its citizens, to place loyalty to the Constitution and public service above private gain."[12]

57.    The FBI Core Values require FBI employees to exhibit "[r]igorous obedience to the Constitution" which "ensures that individually and institutionally [the FBI and its employees] always remember that constitutional guarantees are more important than the outcome of any single interview, search for evidence, or investigation."[13]

58.    FBI employees have an affirmative obligation to report wrongdoing, including corruption.[14]

59.    The disciplinary and other policies require FBI employees to accept all lawful assignments based on the needs of the FBI.

60.    FBI employees are not permitted to refuse lawful assignments based on personal or political preferences.

61.    If an FBI employee were to refuse a lawful assignment, he or she would face discipline up to termination for being insubordinate or failing to perform prescribed duties.

---

[11] FBI Ethics and Integrity Program Policy Directive and Policy Guide, FEDERAL BUREAU OF INVESTIGATION, (Dec. 8, 2020), https://vault.fbi.gov/fbi-ethics-and-integrity-program-policy-guide.
[12] *Id.* at 3.1.
[13] *Id.* at 3.4(a)-(b).
[14] *Id.* at 4.1.1.1(b)(11).

14

**FBI Employees Hold Reasonable and Legitimate Expectations
of a Property Interest in Their Employment**

62.    Employment with the FBI is conditioned on non-partisan, merit-based systems of hiring, evaluation and promotion, and discipline.

63.    Making employment decisions according to merit, pursuant to articulable standards, and after the employee receives due process helps insulate the FBI from political interference and allows FBI employees to do their jobs without fear or favor.

64.    FBI employees rely on these protections when deciding to dedicate their careers to public service with the FBI.

65.    FBI employment is not at will.

66.    Congress has passed several laws, and Defendants DOJ and FBI have instituted several internal policies and procedures that restrict the circumstances and methods by which the FBI's Senior Executive Service ("SES") employees—career senior executives in the FBI—may be disciplined or terminated from federal service. *See, e.g.*, 5 U.S.C. § 3131 *et seq.*; *id.* § 7543(a)-(b) (non-probationary SES members); § 3592(a)(1) (probationary SES members).

67.    The Civil Service Reform Act (the "CSRA") seeks to instill non-partisan, merit-based principles into the federal civil service, and prohibits, among other things, discrimination against federal employees on the basis of political affiliation and violations of the merit systems principles. *See* 5 U.S.C. §§ 2301; 2302(b).

68.    Some FBI employees are covered by CSRA protections. *See, e.g.*, 5 U.S.C. § 7511(b)(8) (protections for preference-eligible veterans).

69.    The FBI has voluntarily extended most of the civil service protections contained in the CSRA to all employees—including Plaintiffs and proposed class members—

through its internal policies and regulations, and in particular, its protections from discrimination based on political affiliation and due process rights.

70.     FBI employees receive regular employment reviews with standardized benchmarks in addition to feedback from supervisors to gauge their performance.

71.     FBI employees enjoy various employment protections under federal law and policy, including that they can only be removed from federal service for limited, job-related performance or misconduct following an administrative inquiry.[15]

72.     FBI employees are entitled to due process before being subjected to adverse employment action.

73.     The FBI has established "Offense Codes and Penalty Guidelines" for its internal disciplinary process that define the misconduct for which an employee may be disciplined and a range of penalties for different forms of misconduct.[16]

74.     The Offense Codes and Penalty Guidelines "provide general categories of misconduct for which employees may be disciplined" and set forth a "Standard Penalty, a Mitigated Range, and an Aggravated Range" for each category of offense.[17]

75.     The OPR Policy Guide and the FBI disciplinary policy, among other documents, prescribe how allegations of employee misconduct should be reported, investigated, adjudicated, and disciplined, if applicable, and how those due process protections are heightened after the employee's probationary period with the agency.

---

[15] FBI, OPR, Office of Professional Responsibility Policy Guide ("OPR Policy Guide") (Sept. 8, 2021), §§ 2.2, 4.2.
[16] Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process, FEDERAL BUREAU OF INVESTIGATION, (effective Jan. 1, 2024).
[17] *Id.* at 1.

76. Due process ensures that FBI employment decisions are based on considerations of right and wrong that are substantiated by internal investigations—not based on optics.

77. When an FBI employee is accused of misconduct, the Department of Justice Office of the Inspector General ("OIG") and the FBI's Inspection Division ("INSD") receive and review the allegation to determine whether an investigation is warranted.

78. INSD will decline to open an investigation if a referral does not contain a cognizable allegation of misconduct.

79. If an investigation is warranted, it is opened by either OIG or INSD, referred to the FBI Office of Professional Responsibility ("OPR") for adjudication, and appealable to the Human Resources Branch ("HRB").

80. If an investigation is opened, the FBI must notify the employee who is the subject of the investigation.

81. Should INSD refer an investigation to OPR, it must, at the same time, request the submission of a *Douglas* factors assessment, which must in turn be provided to OPR by the employee's supervisor within two weeks.

82. The *Douglas* factors are twelve factors articulated by the Merit Systems Protection Board in *Douglas v. Veterans Administration*, to be considered before imposing any penalty, including the "employee's past work record" and "mitigating circumstances surrounding the offense." 5 M.S.P.R. 280 (1981).

83. OPR reviews the entirety of the file to determine, by a preponderance of the evidence, whether the employee violated an FBI Offense Code.[18]

---

[18] *See* OPR Policy Guide, *supra* note 15 § 4.5; Offense Codes and Penalty Guidelines, supra note 16, at 3

84.     If OPR proposes removal of a non-probationary FBI employee, an FBI employee's due process rights are clear: OPR must notify the employee, who is then entitled to "(a) review the redacted 263 [administrative inquiry] file; (b) prepare a written response; and (c) make an oral presentation to the [Assistant Director], OPR."[19]  The Assistant Director then makes a final decision for OPR.  Non-summary dismissal decisions by OPR can be appealed to the FBI's Disciplinary Review Board.

85.     The FBI policies prescribe progressive discipline with a table of FBI Offense Codes and corresponding penalty ranges.

86.     In 2021, OIG issued a report on its investigation into the FBI's administration of its disciplinary policy.  The investigation found, among other things, that FBI policy and guidance did not adequately address all potential outcomes of OPR's disciplinary process, including how to handle and document summary dismissals.[20]

87.     The OIG report recommended that the FBI update its policy concerning summary dismissals, "including the criteria for its use, as well as the procedural and oversight processes that differentiate summary dismissal from other adverse disciplinary actions."[21]

88.     As a result of the 2021 OIG Report, the FBI's current guidelines for internal disciplinary processes clarified its summary dismissal policy that is in effect today.[22]

89.     The OPR Policy Guide states: "When: (a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent

---

[19] OPR Policy Guide, *supra* note 15 §4.6.4.
[20] DOJ OIG, Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations, (Sept. 2021) ("2021 OIG Report"), https://oig.justice.gov/sites/default/files/reports/21-127.pdf (last accessed Mar. 25, 2026).
[21] *Id.* at 40.
[22] Offense Codes and Penalty Guidelines, *supra* note 16.

considerations are at stake, the Director; [Deputy Director ("DD")]; or [Assistant Director ("AD")], OPR may summarily dismiss an employee. This authority cannot be re-delegated."[23]

90.     It also states: "Summary dismissal authority is an extraordinary remedy to be exercised only in compelling or exigent circumstances."[24]

91.     The preamble to the disciplinary policy explains to FBI employees when to expect the summary termination policy may be used. It states:

> Many factors are considered by OPR in determining if a summary dismissal is appropriate, including, but not limited to, the egregiousness of the misconduct, whether the misconduct is illegal/criminal, overwhelming evidence of the misconduct, or impact on the FBI's reputation. Examples include: possession of Child Sexual Abuse Material, arrest for criminal conduct, solicitation of commercial sex acts, and theft of Bureau property. These factors and examples are illustrative, not exhaustive, and the Bureau retains the discretion to consider any factors relevant to the case.[25]

92.     The FBI's existing rules and regulations place substantive limits on the FBI Director's discretion to summarily dismiss non-probationary FBI employees.

93.     The summary termination provision does not allow the FBI Director to terminate FBI employees at any time for any reason whatsoever.

94.     The summary termination provision does not allow the FBI Director to terminate FBI employees for conducting work in accordance with FBI policy on an assigned investigation.

95.     The summary termination provision does not authorize summary dismissal outside the context of specifically enumerated instances of egregious misconduct or exigent

---

[23] *Id*. at 3.
[24] *Id.*
[25] *Id.* at 4.

19

circumstances that have been the subject of an internal investigation where the subject has received some due process.

96.    On information and belief, up until January 1, 2025, every single FBI summary termination followed an investigation, due process, and a substantiated finding of misconduct, plus an exigent and compelling circumstance.

97.    On information and belief, up until January 1, 2025, pursuant to FBI policy, all non-probationary employees that were fired for performance reasons, but not misconduct, were put on a Performance Improvement Plan prior to termination.

98.    On information and belief, beginning on January 1, 2025, the Defendants have summarily terminated members of the proposed class because of their perceived political affiliation, without legitimate investigation, finding of misconduct, pre-termination notice of charges to the employees, an opportunity for the employees to present a defense, and/or any compelling or exigent circumstances.

99.    On information and belief, Defendants' unlawful terminations of proposed class members' employment were accompanied by public statements by Defendants and their officers impugning the integrity of the proposed class members' work and character.

100.    The FBI has timed, publicized, and described firings of proposed class members in a way that furthers a political narrative wholly untethered to the quality of the agents' public service or job performance.

### DOJ and the FBI Investigate Alleged Misconduct by the President and His Political Allies

101.    On April 13, 2022, the FBI approved opening an investigation, named Arctic Frost, into an alleged conspiracy to obstruct the certification of the 2020 Presidential election (the "Arctic Frost" investigation).

20

102.    The Arctic Frost investigation was opened and approved with sufficient predication.

103.    Per policy, the Arctic Frost investigation was approved by, among others, the WFO Chief Division Counsel, the FBI General Counsel, the FBI Director, and the Attorney General.

104.    On November 18, 2022, the then-Attorney General appointed an independent attorney, Jack Smith, to serve as "Special Counsel" and lead an investigation into "whether any person or entity violated the law in connection with efforts to interfere with the lawful transfer of power following the 2020 presidential election or the certification of the Electoral College vote held on or about January 6, 2021."[26]

105.    Special Counsel Smith was staffed by a team of Department of Justice attorneys, who, under the direction of Special Counsel Smith, made strategic decisions for the investigation, and FBI employees from a federal public corruption squad who were assigned to provide investigative support.

106.    On August 1, 2023, President Trump was indicted on three counts of conspiracy and one count of obstruction and attempt to obstruct an official proceeding concerning the peaceful transfer of power following the 2020 presidential election.[27]

107.    On August 27, 2024, a Grand Jury returned a superseding indictment on the same four counts against President Trump.[28]

108.    On information and belief, the FBI approved opening an investigation into President Trump's unlawful retention of classified information.

---

[26] *See* Office of the Attorney General, Order No. 5559-2022, Appointment of John L. Smith as Special Counsel (Nov. 18, 2022).
[27] Indictment, ECF No. 1, *United States v. Trump*, No. 1:23-cr-00257 (D.D.C. Aug. 1, 2023).
[28] Superseding Indictment, ECF No. 226, *United States v. Trump*, No. 1:23-cr-00257 (D.D.C. Aug. 27, 2024).

109.    On information and belief, the opening of this investigation was based on sufficient predication.

110.    On November 18, 2022, Special Counsel Smith was tasked with leading the ongoing investigation into whether President Trump had unlawfully retained access to classified documents, and whether he obstructed that investigation.[29]

111.    This investigation, too, was staffed by a team of Department of Justice attorneys, who, under the direction of Special Counsel Smith, made strategic decisions, and FBI employees from a national security squad who were assigned to provide investigative support.

112.    On June 8, 2023, President Trump was indicted on 37 felony counts related to his alleged mishandling of classified documents.[30]

113.    On July 27, 2023, a Grand Jury returned a superseding indictment related to his alleged mishandling of classified documents that added an additional three felony charges, for a total of 40 felony counts against President Trump.

**Defendants Plan Retribution Against FBI Employees**

114.    These Special Counsel investigations, among other investigations and intelligence reports, have long enraged President Trump and his political allies, including Defendants Patel and Bondi.[31]  Without seriously engaging with or rebutting the underlying merits of the allegations at the center of these investigations, President Trump and his allies' defense is premised on sweeping, baseless accusations of misconduct by the career employees who staffed

---

[29] *See* Office of the Attorney General, Order No. 5559-2022, Appointment of John L. Smith as Special Counsel (Nov. 18, 2022), https://www.justice.gov/archives/opa/pr/appointment-special-counsel-0.

[30] Superseding Indictment, ECF No. 85, *United States v. Trump*, No. 9:23-cr-80101 (S.D. Fla. June 27, 2023).

[31] Eric Tucker & Alanna Durkin Richer, *Trump administration fires prosecutors involved in Jan. 6 cases and moves toward ousting FBI agents,* AP NEWS, (Jan. 31, 2025), https://apnews.com/article/trump-fbi-firing-a7b19a5f414ce82c6f6b5f6656000d23.

them.  President Trump made clear that upon his return to office, he expected top officials in federal law enforcement to carry out his retribution.[32]

115.    For example, in an interview he posted on Truth Social on May 15, 2023, President Trump was asked what he would do to "fix the FBI" if reelected.  He responded that when he began his first term, the FBI was "loaded up with RINOs and with Democrats" and that "we really did do a tremendous job at getting tremendous numbers out," but he also asserted that "this is the deep state" and that his administration would make "very big changes."[33]

116.    Then, President Trump installed his close political allies at the helm of the Department of Justice and FBI.

117.    President Trump nominated Defendant Patel to serve as the FBI Director on November 30, 2024, and he was confirmed by the U.S. Senate on February 20, 2025.

118.    President Trump nominated Defendant Bondi for U.S. Attorney General on November 21, 2024, and she was confirmed by the U.S. Senate on February 4, 2025.

119.    In addition to Defendants Patel and Bondi, President Trump appointed Todd Blanche, who had previously served as President Trump's personal criminal defense attorney and represented him during the election interference and classified documents cases brought by Special Counsel Smith, as Deputy Attorney General, the number two position in the Department of Justice.

---

[32] Betty Medsger, *Trump's targeting of 'enemies' like James Comey echoes FBI's dark history of mass surveillance, dirty tricks and perversion of justice under J. Edgar Hoover* (Sept. 23, 2025), https://theconversation.com/trumps-targeting-of-enemies-like-james-comey-echoes-fbis-dark-history-of-mass-surveillance-dirty-tricks-and-perversion-of-justice-under-j-edgar-hoover-265364; Peter Eisler, Ned Parker, Linda So & Joseph Tanfani, *Trump's Campaign of Retribution: At Least 470 Targets and Counting*, REUTERS, (Nov. 26, 2025), https://www.reuters.com/investigates/special-report/usa-trump-retribution-tracker/.

[33] Video posted by Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL, (May 15, 2023, 11:04 PM), at 00:01:19, https://truthsocial.com/@realDonaldTrump/posts/110376143522718835. "RINO" is an acronym for "Republican In Name Only," and, according to Merriam-Webster Dictionary, means "a member of the Republican Party who is disloyal to the party or deemed insufficiently conservative."  *RINO*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/RINO (last accessed March 30, 2026).

120. In February 2025, President Trump ordered Defendant Patel to appointed Dan Bongino as the FBI Deputy Director. Mr. Bongino was, at the time, a conservative political commentator and podcast host. Prior to his appointment, Mr. Bongino had regularly amplified disinformation and conspiracy theories about President Trump's false claim that the 2020 presidential election had been stolen.

121. Prior to his appointment, Mr. Bongino had disparaged career FBI employees on his podcast.

122. For example, on September 26, 2022, Mr. Bongino stated: "The only thing that is going to stop the FBI from doing what they're doing now, which is become full-time activists and bouncers, in many cases, thugs for the Democrat party, is imposing real material losses on them. *Fire everyone involved in this stuff. Everyone—no excuses. Disband the entity*."[34]

### Defendants Execute Policy of Retribution Against FBI Employees

123. On January 20, 2025, just after taking office, President Trump issued Executive Order No. 14147, 90 F.R. 8235, which states that "[i]t is the policy of the United States to identify and take appropriate action to correct past misconduct by the Federal Government related to the weaponization of law enforcement and the weaponization of the Intelligence Community."

124. In late January 2025, Defendants began collecting the names of FBI employees who had worked on investigations into the President.

---

[34] Letter from Richard J. Durbin, U.S. Senator & Ranking Member, S. Comm. on the Judiciary, et al., to Dan Bongino, Deputy Dir., Fed. Bureau of Investigation (Mar. 28, 2025), https://www.judiciary.senate.gov/press/dem/releases/durbin-senate-judiciary-democrats-send-letter-to-deputy-director-bongino-raising-concerns-over-his-ability-to-lead-the-fbi (emphasis added).

125.    On or about January 27, 2025, the Department of Justice fired at least 14 attorneys assigned to the Special Counsel's Office, including those who supervised and directed the FBI's work on Special Counsel Smith's election interference investigation, without providing them due process guaranteed by the Civil Service Reform Act.

126.    On or about January 30, 2025, when asked by a reporter about Department of Justice employees who might be fired, President Trump said, "If they fired some people over there, that's a good thing because they were very bad."[35]  President Trump added: "[W]e have some very bad people over there.  It was weaponized at a level that nobody's ever seen before."[36]

127.    On information and belief, at the end of January 2025, political leadership from the Department of Justice instructed FBI executives to make firings comparable to those made by the greater Department of Justice.

128.    On information and belief, on January 31, 2025, Defendants ordered the firing of at least eight senior FBI executives—including the head of WFO—and a sweeping examination of the work of thousands of other FBI employees, including all those who worked on investigations associated with the January 6 riot at the U.S. Capitol.

129.    Within the week, Defendants sought lists of FBI employees who worked on the 1,500-plus investigations into the riot at the Capitol on January 6.[37]

130.    That same month, Defendant Patel had been "'personally directing the ongoing purge' of agents at the bureau" in coordination with other members of a new "FBI

---

[35] Sarah N. Lynch & Andrew Goudsward, *Trump's DOJ Launches Purge of Jan. 6 Prosecutors, FBI Agents*, USA TODAY, (Jan. 31, 2025), https://www.usatoday.com/story/news/politics/2025/01/31/trumps-doj-purge-prosecutors-fbi-agents/78103620007/.
[36] *Id.*
[37] Memorandum from Emil Bove III, Acting Deputy Att'y Gen., U.S. Dep't of Just., to Acting Dir., Fed. Bureau of Investigation (Jan. 31, 2025), https://www.justsecurity.org/wp-content/uploads/2025/02/acting-dag-bove-memo-to-acting-director-driscoll-january-31-2025.pdf.

Director's Advisory Team." He had not yet been confirmed by the U.S. Senate to serve as FBI Director.[38]

131.    When Defendant Bondi was sworn into office in February 2025, she immediately announced her intention to investigate the purported weaponization of the Department of Justice by the prior administration and issued a series of memoranda establishing a "Weaponization Working Group," which was tasked with investigating "instances where a department's or agency's conduct appears to have been designed to achieve political objectives or other improper aims rather than pursuing justice or legitimate governmental objectives."[39]

132.    These memoranda specifically referenced Special Counsel Jack Smith's work as an instance of "[w]eaponization."[40]

133.    In February 2026, it was reported that the Weaponization Working Group was "actively looking into the areas outlined" in Defendant Bondi's memo.[41]

134.    On March 3, 2025, Defendant Bondi said during an interview: "Well, first and foremost, we got rid of the Jack Smith team. Gone. Those people are gone. We're still trying to find . . . a lot of people in the FBI and also in the Department of Justice who despise Donald Trump, despise us, don't want to be there."[42]

135.    On information and belief, on or about August 5, 2025, Defendant Patel told then-FBI Assistant Director Brian J. Driscoll that "all FBI employees who they identified had

---

[38] Press Release, U.S. SENATE COMMITTEE ON THE JUDICIARY, *Durbin: Kash Patel Has Been Personally Directing the Ongoing Purge of FBI Officials* (Feb. 11, 2025), https://www.judiciary.senate.gov/press/dem/releases/durbin-kash-patel-has-been-personally-directing-the-ongoing-purge-of-fbi-officials.

[39] Memorandum from Pamela J. Bondi, Att'y Gen., U.S. Dep't of Just., to All Department Employees (Feb. 5, 2025), https://www.justice.gov/ag/media/1388506/dl?inline.

[40] *Id.*

[41] Paula Reid & Casey Gannon, *Justice Department Prioritizes Trump "Weaponization" Review*, CNN, (Feb. 2, 2026), https://www.cnn.com/2026/02/02/politics/justice-department-trump-weaponization-priority.

[42] Hannity, *AG Pam Bondi on Epstein files: 'The public has a right to know'*, FOX NEWS, (Mar. 3, 2025), at 06:40-06:58, https://www.foxnews.com/video/6369576644112.

worked on the cases against President Trump would be removed from their jobs," and that he needed to fire agents who worked on cases against President Trump in order to keep his own position.

136.    On information and belief, during that conversation, Defendant Patel said: "the FBI tried to put the president in jail and he hasn't forgotten it."

137.    On information and belief, during that conversation, Defendant Patel also acknowledged that the firings would be in direct violation of internal FBI process, that they were likely illegal, and that he could be sued and deposed.

138.    Following the wave of terminations of proposed class members in August 2025, Defendant Patel stated during a television appearance on August 20, 2025 with Fox Business Analyst Larry Kudlow:

> [E]very single person who was found to have weaponized . . . creating a crime where one did not exist . . . the answer is definitive, there was no crime . . . there was no predicate . . . we are going to hold people accountable . . . we're gonna come find you and we're gonna put you in an investigative position . . . that will make you feel very uncomfortable [].[43]

139.    This retribution campaign cast a net far broader than those who were assigned to work on one of the Special Counsel investigations.

140.    On information and belief, Defendants have fired more than 50 FBI employees on the basis of their perceived political affiliation, without providing them any modicum of due process, and while disparaging their reputations and service in public statements around the time of the firings.

---

[43] *Kash Patel exposes the 'weaponization' of Biden's DOJ and FBI*, FOX BUSINESS, (Aug. 20, 2025), available at, https://www.youtube.com/watch?v=YMEaK3uzcuQ (*see* 14:20 timestamp).

141.    On information and belief, Defendants have fired or pushed out employees for the following reasons:

a.    Refusing to supply a list of all FBI employees who worked on January 6th-related investigations so that those employees could be fired;

b.    Being friends with other, disfavored career FBI employees;

c.    Being assigned to Special Counsel Jack Smith's investigations into alleged interference in the 2020 presidential election and the alleged unlawful retention of classified documents by the President;

d.    Refusing to fire line FBI employees due to their assignments and without any finding of misconduct or due process;

e.    The false perception that they supported the Black Lives Matter protests;

f.    Making protected disclosures about misconduct and political activities by Defendants and others within the current administration;

g.    Assignment to politically disfavored investigations;

h.    Assignment to a politically disfavored FBI squad;

i.    Being targeted by right-wing media personalities;

j.    Being flagged during Artificial Intelligence review of internal messages;

k.    Refusal to violate FBI policy when issued an unlawful directive;

l.    Being female or non-white on the mistaken assumption that these characteristics meant they were insufficiently loyal to Defendants and the President; and

m.    Displaying an LGTBQ+ pride flag.

142.    On information and belief, Defendants continue to seek out and summarily terminate FBI employees on the basis of their perceived political affiliation.

**Defendants Defame and Impugn Plaintiffs and Proposed Class Members
at the Time of Firing**

143.    Defendants have been defaming and impugning the character of Plaintiffs and the proposed class members in at least three ways.

144.    *First*, the termination letters delivered to Plaintiffs, and on information and belief to each proposed class member, signed by Defendant Patel, baselessly accused them of "weaponizing" their positions within the government, biased discharge of their duties, among other similar accusations.

145.    The baseless charge of "weaponizing" the government or bias leveled against law enforcement agents is particularly damaging to their reputations and ability to secure other employment in the field.

146.    *Second*, Defendants have defamed and impugned the character of Plaintiffs and the proposed class members—by name and the work that they did—in public statements in the news and social media.

147.    For example, on October 7, 2025, FBI Director Patel summarily terminated Plaintiff Ball and another SA who had been assigned to Special Counsel Smith's 2020 presidential election investigation the same day that Defendant Bondi testified before the Senate Judiciary Committee.[44]

---

[44] Katie Benner & Glenn Thrush, *Kash Patel Orders Firings of F.B.I. Agents Who Worked on Trump Investigations*, N.Y. TIMES, (Oct. 8, 2025), https://www.nytimes.com/2025/10/08/us/politics/kash-patel-fbi-agents.html; Ryan J. Reilly, *FBI Fires Special Agents Who Worked on Jack Smith's Trump Probe*, NBC NEWS, (Feb. 6, 2025), https://www.nbcnews.com/politics/justice-department/fbi-fires-special-agents-worked-jack-smiths-probe-trump-rcna236415.

148.     Hours prior to Defendants notifying these two agents that they would be fired, Fox News posted an article stating that two agents had already been fired.[45]

149.     The article quoted Defendant Patel as follows: "We are cleaning up a diseased temple three decades in the making—identifying the rot, removing those who weaponized law enforcement for political purposes and those who do not meet the standards of this mission while restoring integrity to the FBI.  I promised reform, and I intend to deliver it."[46]

150.     That evening, following Defendant Bondi's Congressional testimony, Defendant Patel appeared on the Fox News Hannity Show, where he said the following:

> So not only did they weaponize this law enforcement but when we got in there, and when I got in there as the FBI Director from my experience [in] Russia-gate, I knew where to look and what rooms to open and what doors to kick down. And that's what we did, we found this information—to expose the politicization by Jack Smith and the prior Department of Justice. I mean just think about it—eight sitting United States Senators—phone records were gathered and subpoenaed through the Grand Jury process and it was buried and wormholed in the hope that no one would find it—so we're just scratching the surface here but accountability is coming. ***You're darn right I fired those agents,*** you're darn right I blew up CR-15, the public corruption squad, that led the weaponization at the Washington Field Office. We're just warming up but we are running our investigations to the ground, ***we are finding every single person involved***, we will not leave a single room locked, we will go into all the prohibited access requirements and we will find the material and show the American public what we have done in this FBI . . . [.][47]

151.     Then, Patel posted on X: "Transparency is important and accountability is critical.  We promised both, and this is what promises kept looks like.  This FBI is delivering.  As a result of our latest disclosure about the baseless monitoring of members of Congress by the prior

---

[45] Rachel Wolf and Brook Singman, *FBI fires agents, dismantles corruption squad after probe unveils monitoring of GOP senators, Patel says*, FOX NEWS, (Oct. 7, 2025), https://www.foxnews.com/politics/fbi-fires-agents-dismantles-corruption-squad-after-probe-unveils-monitoring-gop-senators-patel-says.

[46] *Id.*

[47] *Patel WARNS America 'accountability is coming,'* FOX NEWS, (Oct. 7, 2025) (emphases added), available at https://www.youtube.com/watch?v=2bHcUCgAI78 (*see* 3:56 timestamp).

leadership team of the FBI, we have already taken the following actions: We terminated employees, we abolished the weaponized CR-15 squad, and we initiated an ongoing investigation with more accountability measures ahead."[48]

152.   FBI Director Patel also posted on X: "We fired those who acted unethically, dismantled the corrupt CR-15 squad, and launched an investigation.   Transparency and accountability aren't slogans, they're promises kept."[49]

153.   The White House amplified these comments. It posted on X: "@FBIDirectorKash on the government weaponization in 'Operation Arctic Frost': 'Accountability is coming . . . *we are finding every single person involved* . . . we will work with our partners in Congress, who should be furious at the prior administration's leadership and weaponization."[50]

154.   The timing of Defendants' statements about the purge of all FBI employees who were summarily terminated and the release of Plaintiffs' names in public documents and Senate Judiciary Committee hearings—all immediately prior to or following the firings of Plaintiffs Garman, Toleman, and Ball—left no dispute: they were clearly identified and defamed in the public eye as agents who "weaponized" their positions and were unfit for federal service.

155.   Defendants and other federal officials—including President Trump continue to publicly disparage and defame Plaintiffs and proposed class members as summary terminations are ongoing.

---

[48] FBI Director Kash Patel (@FBIDirectorKash), X (Oct. 7, 2025, 6:19 AM), https://x.com/FBIDirectorKash/status/1975506285656207664.
[49] FBI Director Kash Patel (@FBIDirectorKash), X (Oct. 7, 2025, 1:32 PM) https://x.com/FBIDirectorKash/status/1975615124556632540.
[50] Rapid Response 47 (@RapidResponse47), X (Oct. 7, 2025, 9:36 PM) https://x.com/RapidResponse47/status/1975737085840793946.

156.    On January 12, 2026, reposting a *Just the News* article on Arctic Frost, President Donald Trump commented, "***These FBI Agents are total Scum***, in their own way no better than the insurrectionists in Portland, Minnesota, Los Angeles, etc. Kash better get them out, NOW! Radical Left Lunatics put in by the "Auto Pen" and Obama!"[51]  Defendant Patel responded, "Thank you Mr. President. Under your leadership, ***this FBI found the corrupt actors and terminated their employment last year***.  America voted for the end of weaponized law enforcement, and that's what we are delivering."[52]

157.    On March 26, 2026, Deputy Attorney General Todd Blanche spoke at the Conservative Political Action Conference, where he said: "When it comes to the FBI . . . Director Patel has cleaned house there too.  There isn't a single man or woman with a gun, federal agent, still in that organization that had anything to do with the prosecution of President Trump."[53]

158.    *Third*, Defendants have published or caused publication of a misleading selection of confidential documents about Plaintiffs, and on information and belief, the proposed class members, so that they would be portrayed poorly in the public light.

159.    On information and belief, Defendants disclosed many of these documents to Congress with the understanding that Congress would then make them public.  Using Congress as a pass-through to the public domain would appear to insulate Defendants from criminal or civil liability for publishing grand jury secrecy information.  But it does not.

---

[51] President Donald J. Trump, TRUTH SOCIAL (Jan. 12, 2026, 4:07 PM), archived at https://trumpstruth.org/statuses/34541.
[52] FBI Dir. Kash Patel, TRUTH SOCIAL (Jan 12, 2026, 5:42 PM) available at, https://truthsocial.com/@Kash/posts/115884541495218344.
[53]*Deputy Attorney General Todd Blanche Speaks at CPAC Conference in Grapevine, Texas*, C-SPAN (Mar. 26, 2026), https://www.c-span.org/program/public-affairs-event/deputy-attorney-general-todd-blanche-speaks-at-cpac-conference-in-grapevine-texas/676402 (*see* link, at 4:33).

160.    Defendant Patel, Defendant Bondi, and former FBI Deputy Director Bongino are subject to the restrictions on disclosing grand jury information set forth in Federal Rule of Criminal Procedure 6(e).

161.    There is no Federal Rule of Criminal Procedure 6(e) exception for disclosing grand jury information to Congress without a court order.

162.    There is no Privacy Act exception for disclosing information to news outlets.

163.    Nevertheless, on information and belief, Defendant Patel has disclosed or directed the disclosure of Federal Rule of Criminal Procedure 6(e) material to Congress without court authorization.  For example:

   a.    On information and belief, in or around September 2025, Defendant Patel or an individual acting at his direction or with his authorization, disclosed a spreadsheet labeled in part "subpoenas," with notes in the spreadsheet that made it self-evident that this spreadsheet listed grand jury subpoenas from the Arctic Frost investigation to U.S. Senator Charles E. Grassley, Chair of the U.S. Senate Judiciary Committee.

   b.    On or about September 16, 2025, Senator Grassley published the "subpoena" spreadsheet.

   c.    On information and belief, in early October 2025, Deputy Director Bongino disclosed not only the existence, but also the content of grand jury subpoenas for toll records that were covered by Rule 6(e) protections—and without any valid exception—to Congress.

d. On information and belief, in or around October 2025, Defendant Patel or an individual acting at his direction or with his authorization, provided an FD-302, a document from an FBI system of record, directly to the media.

e. On October 14, 2025, *Just the News* published verbatim quotes from an FBI FD-302 regarding an interview conducted during the course of a special counsel investigation.[54]

f. On or around the same day, Defendant appeared on *Just the News* and discussed the same topic as the interview documented in the FD-302 that *Just the News* released.[55]

g. Thereafter, the same FD-302 that *Just the News* quoted verbatim on October 14, 2025, was released publicly by the House Judiciary Committee with "PRODUCED BY FBI DIRECTOR KASH PATEL" stamped at the top.[56]

h. On information and belief, in or around late October 2025, Defendant Patel or an individual acting at his direction, or with his authorization, disclosed nearly 200 financial grand jury subpoenas to Congress.

i. On October 29, 2025, Senator Grassley publicly released a selection of financial grand jury subpoenas.[57]

---

[54] John Solomon & Jerry Dunleavy, *Congress Collected 30 Million Lines of Phone Data in Trump J6 Probe, Raising Civil Liberty Concerns,* JUST THE NEWS, (Oct. 14, 2025), https://justthenews.com/government/congress/congress-collected-30-million-lines-phone-data-trump-j6-probe-raising-civil.

[55] Just the News, *No Noise: Kash Patel & Rep. Mike Kennedy*, JUST THE NEWS (video), https://justthenews.com/videos/watch-just-news-no-noise-kash-patel-and-rep-mike-kennedy (beginning at 21:00).

[56] U.S. HOUSE OF REPRESENTATIVES, COMMITTEE ON THE JUDICIARY, Requests Opening of New Investigation - Arctic Frost (FBI-HJC119-AF-000001-000198), at 32, https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/2025-11/FBI-HJC119-AF-000001-000198.pdf.

[57] Sen. Chuck Grassley, New Jack Smith Subpoenaed Records for Over 400 Republican Targets as Part of "Arctic Frost", U.S. SENATE COMM. ON THE JUDICIARY (press release), https://www.grassley.senate.gov/news/news-releases/new-jack-smith-subpoenaed-records-for-over-400-republican-targets-as-part-of-arctic-frost.

j.   In public statements, Senator Grassley alternatively suggested that these records were obtained from a whistleblower and Defendant Patel himself.

k.   On information and belief, in or around March 2026, Defendant Patel or an individual acting at his direction or with his authorization, released to Congress grand jury subpoenas, which are subject to Rule 6(e) protections.

l.   On March 24, 2026, Senator Grassley released two grand jury subpoenas for Defendant Patel's phone records, with the other records sought by the same subpoenas redacted.  Plaintiff Garman's name is not redacted in those documents.

164.   On information and belief, the only FBI employees who have access to grand jury secrecy materials associated with the Arctic Frost investigation are known to and allowed access by the FBI Director.

165.   On information and belief, the FBI's Sentinel file management system logs each time an FBI employee reviews documents in a case file.

166.   On information and belief, some of the documents from the Arctic Frost case file on Sentinel that are subject to grand jury secrecy rules have been produced to Congress.

167.   On information and belief, Defendant Patel disclosed Privacy Act-protected information to at least one news outlet without authorization.

168.   The nature of Defendants' defamatory publications, and statements made by other federal government officials reiterating and supporting Defendants' defamatory

publications, fundamentally denied Plaintiffs and the proposed class members the ability to mount a defense.

169.    For example, Plaintiffs and the proposed class members no longer have access to the information necessary to rebut the false public charges against them.  But even if they did, they still could not share it.  Much of the relevant information is protected by grand jury secrecy rules and the Privacy Act, and it cannot be disclosed without incurring criminal or civil liability.

170.    Further, the FBI has imposed a Non-Disclosure Agreement upon the Plaintiffs and proposed class members (and all FBI employees), which prohibits public disclosure of much of the information that would allow them to mount a public defense.

171.    And, Plaintiffs and the proposed class members are, by and large, private citizens without the platform or ability to rebut comments made by Defendants and other Executive Branch officials—some of the most powerful people in the country and world.  Any rebuttal attempt would come with a reasonable fear of retaliation from Defendants and their allies.

**Defendants' Unlawful and Unauthorized Summary Dismissals Have Severely Injured Plaintiffs' Professional Reputations and Prospects**

172.    Plaintiff Garman was summarily terminated via one-page letter on October 31, 2025, that falsely claimed she had "weaponized" the Department of Justice.

173.    The letter reflected no individualized assessment of the facts and circumstances specific to her, despite such an assessment being required under the FBI's internal review process.

174.    All of Plaintiffs termination letters read in relevant part as follows:

> This document provides official notice that you are being summarily dismissed from your position at the Federal Bureau of Investigation, and

> removed from the federal service, under my authority as the FBI Director, effective immediately.
>
> You have exercised poor judgment and a lack of impartiality in carrying out duties, leading to the political weaponization of the government.
>
> Pursuant to Article II of the United States Constitution and the laws of the United States, your employment with the Federal Bureau of Investigation is hereby terminated.

175. Plaintiff Garman was afforded no due process prior to her termination, and no opportunity to rebut the baseless accusations leveled by Defendants against her.

176. After her removal from federal service, Plaintiff Garman accepted a position as Of Counsel at a boutique bankruptcy and litigation firm.

177. She has been forced out of a career she loved and deprived of the financial stability she expected after retiring from the FBI after decades of service.

178. Other federal law enforcement jobs—including returning to the Department of Justice as an AUSA—are unavailable to her.

179. Plaintiff Toleman was summarily terminated via one-page letter on November 4, 2025, that falsely claimed she had "weaponized" the Department of Justice.

180. The letter reflected no individualized assessment of the facts and circumstances specific to her, despite such an assessment being required under the FBI's internal review process.

181. Plaintiff Toleman was afforded no due process prior to her termination, and no opportunity to rebut the baseless accusations leveled by Defendants against her.

182. Plaintiff Toleman was unemployed for three months following her termination which resulted not only in lost income, but also a lapse in health care coverage for her and her family.

183. While Plaintiff Toleman has found employment, it is at a lesser salary, and she was forced out of a job she loved and dedicated her life to.

184. Plaintiff Toleman was also deprived of the financial stability of a pension she worked to secure for herself and family.

185. SA Ball was summarily terminated via one-page letter dated October 7, 2025 that falsely claimed she had "weaponized" the Department of Justice.

186. The letter reflected no individualized assessment of the facts and circumstances specific to her, despite such an assessment being required under the FBI's internal review process.

187. Plaintiff Ball was afforded no due process prior to her termination, and no opportunity to rebut the baseless accusations leveled by Defendants against her.

188. Plaintiff Ball was unemployed for four months following her termination.

189. She has since obtained employment as a contractor.

190. However, she earns a lesser salary and lacks the stability and benefits associated with her position with the FBI.

191. Additionally, Defendants have deprived her of the career she felt called to pursue and for which she had a deep passion, as well as the financial security of the pension she had worked to secure for herself and her family.

192. On information and belief, because of Defendants' illegal and irregular personnel actions, the FBI did not know how to describe the separation of Plaintiffs and the proposed class members from the FBI at the time of the mass firings described herein.

193. On information and belief, as a result, the proposed class members' SF-50s contain varying reasons and justification for separation, as are required by the form.

194. The FBI delayed sending SF-50s to the proposed class members for months, which delayed their opportunity to obtain unemployment benefits commensurate with their change in employment status.

195. This delay caused additional and unwarranted hardship on these career public servants and their families.

196. Defendants' public statements about the proposed class members have impugned their integrity, trustworthiness, and professional reputation, including their eligibility for future federal service employment and law enforcement employment.

197. Defendants have not only deprived the proposed class members of their careers with the FBI, they have also damaged their professional reputations and interfered with their ability to seek alternate employment.

198. The harm Defendants have caused to the proposed class members—denying them an opportunity to clear their names—is exacerbated by several factors.

199. On information and belief, proposed class members have had difficulty finding new employment after their illegal removal from the FBI, in particular new employment in law enforcement, and have been largely cut off from other federal government employment.

200. On information and belief, when the proposed class members do find new work, it is often at lower pay, without pension, and generally incomparable to FBI service, which is unique.

201. Given the highly specialized nature of their positions at the FBI, where they worked on behalf of the United States government on sophisticated counterintelligence, counterterrorism, cybercrime, and criminal investigative matters, among others, proposed class members reasonably view their prior employment at the FBI to have no comparators.

202.    On information and belief, prospective employers have declined to hire proposed class members because the employers were unwilling to hire someone that the current administration perceives as an enemy.

203.    On information and belief, prospective employers have declined to hire proposed class members because employers believed them to be unethical, corrupt, or of a character not appropriate for sensitive positions.

**First Cause of Action**
**Violation of the First Amendment**
**Retaliation Based on Actual or Perceived Political Affiliation**
**(Against all Defendants)**

204.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

205.    The First Amendment to the U.S. Constitution guarantees all citizens "the freedom of speech" to include free expression and association.  U.S. CONST. amend. I.

206.    "[T]he First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power . . . ." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (citing *Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980)); *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996) ("Government officials may not discharge public employees for refusing to support a political party or its candidates . . . .").

207.    This prohibition extends to discharging employees on account of actual or perceived partisan support or affiliation, regardless of whether that perception is correct.  *See Heffernan v. City of Paterson*, 578 U.S. 266, 268 (2016).

208. Political support for the current administration is not a legal or appropriate requirement for the effective performance of Plaintiffs' and proposed class members' respective roles within the FBI.

209. Defendants' actions, as set forth above, constitute improper acts of political retribution, in violation of the First Amendment to the United States Constitution.

**Second Cause of Action**
**Violation of the Fifth Amendment**
**Procedural Due Process**
**(Against all Defendants)**

210. Plaintiffs hereby re-allege and incorporate by reference all paragraphs above as if fully set forth here.

211. The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V.

212. Defendants unlawfully deprived Plaintiffs of property interests without due process of law.

213. "[P]roperty interests subject to procedural due process protection are not limited by a few rigid, technical forms." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (internal quotations omitted). A government employee has a property interest where the government has "fostered rules and understandings" which entitle the employee "to believe that he would lose his job only for" specified reasons. *Ashton v. Civiletti*, 613 F.2d 923, 928 (D.C. Cir. 1979) (finding a protected property interest established by an FBI handbook provision).

214. FBI policies provide that non-probationary employees may be removed or terminated only for job-related reasons and delineate limited grounds for adverse personnel actions

41

with respect to non-probationary employees: documented unacceptable performance with attempted remediation, abuse of leave, or misconduct.

215. As non-probationary employees of the FBI, Plaintiffs and each proposed class member had a constitutionally protected property interest in his or her continued employment. Federal law and Defendant FBI's internal rules, regulations, policies, and procedures regarding employee discipline created an objectively reasonable expectation of continued employment. In particular, these sources fostered a legitimate understanding that Plaintiffs and proposed class members could be discharged only for a job-related reason warranting termination under FBI policy and procedure.

216. On information and belief, proposed class members were unlawfully deprived of their property interest without any due process. Among other things, prior to their unlawful, summary terminations, the proposed class members never received (1) notification that they were being investigated for the "political weaponization of government"—because they were never investigated; (2) an opportunity to review the government's file or respond to it, including by providing responsive evidence—because Defendants never opened an investigative file or compiled any evidence of misconduct; (3) an oral hearing; (4) an individualized assessment of their specific conduct and the *Douglas* factors; or (5) an opportunity to appeal. Moreover, proposed class members were deprived of a fair proceeding in front of an unbiased decisionmaker.

42

**Third Cause of Action**
**Violation of the Fifth Amendment**
**Liberty Interest**
**(Against all Defendants)**

217.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

218.    The Fifth Amendment's protection against deprivation of liberty without due process of law protects against adverse employment action by government officials that imposes a stigma or other disability that forecloses the government employee's freedom to take advantage of other employment opportunities.  U.S. CONST. amend. V.

219.    Government employees possess a "constitutionally protected liberty interest in professional reputation" under the Fifth Amendment.  *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1104 (D.C. Cir. 1985).

220.    Defendants' conduct has deprived Plaintiffs and proposed class members of this liberty interest without due process of law.

221.    In the course of unlawfully terminating Plaintiffs' and proposed class members' respective employment without due process of law, Defendants publicly connected the termination actions to allegations that these employees had been "weaponizing" the FBI or otherwise discharged their responsibilities corruptly, unethically, or improperly.

222.    This false and defamatory public smear impugned the professional reputation of Plaintiffs and the proposed class members, suggesting they were something other than faithful and apolitical law enforcement officials, and has caused not only the loss of proposed class members' employment but further harmed their future employment prospects.

223.    The lack of any due process accorded to Plaintiffs and the proposed class members deprived each of them of the ability to challenge the accuracy of any evidence that allegedly serves as the basis for their removal, if any, as well as to protect each of their reputations.

224.    Defendants' actions have prevented each Plaintiff and proposed class member from participating in his or her chosen profession or line of work.  The circumstances of their firings also cast an unconstitutional pall over their future professional opportunities.  By falsely signaling that Plaintiffs and the proposed class members lacked integrity in the performance of their duties, Defendants intended to and did adversely impact their reputations and employment opportunities without affording them the process to which they are entitled.

225.    As a result, Defendants have stigmatized Plaintiffs' and the proposed class members' reputations and imparted a "status change" upon them that has implicated their liberty interests.  They have each suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities.

226.    Further, Plaintiffs and the proposed class members' termination letters purported to remove them from the "federal service."  This conveys to any future employer that they are unsuitable for any position within the federal government.

227.    Plaintiffs and the proposed class members were never provided any opportunity to respond to the termination and removal actions taken by Defendants, they are entitled to, among other remedies, a name-clearing hearing regarding the false public statements regarding their actions and the basis for their respective removals.

**Fourth Cause of Action**
*Ultra Vires* **Action in Violation of Constitutional and Statutory Authority**
**and Legal Nullity**
**(Against all Defendants)**

228.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

229.    Defendants purported to terminate each of the Plaintiffs pursuant to Defendant Patel's asserted "authority as the FBI Director" and under "Article II of the United States Constitution and the laws of the United States."  The letters of termination were signed by Defendant Patel on letterhead sent from the "Office of the Director."

230.    Defendants also purported to terminate each of the proposed class members pursuant to Defendant Patel's asserted "authority as the FBI Director" and under "Article II of the United States Constitution and the laws of the United States."  On information and belief, the letters of termination were signed by Defendant Patel on letterhead sent from the "Office of the Director."

231.    To the extent that these terminations were premised on an invocation of authority under Article II to the United States Constitution, the terminations are *Ultra Vires* and/or a Legal Nullity.  Article I, Section 8, of the Constitution grants Congress the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  U.S. CONST. art. I, § 8.

232.    Article II, Section 2 states that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. CONST. art. II, § 2.

233.    Defendants are not authorized to wield Article II authority to remove FBI employees from federal service.

234.    Article II does not authorize Defendants or the President to remove career FBI employees from federal service.

235.    Article II does not authorize Defendants to violate the proposed class members' rights under the First and Fifth Amendments to the United States Constitution, as discussed above.

**Fifth Cause of Action**
**Declaratory Judgment Act**
**28 U.S.C. §§ 2201 and 2202**
**(Against All Defendants)**

236.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

237.    Plaintiffs and proposed class members are entitled to declaratory relief on the basis of all claims identified.  There is a substantial and ongoing controversy between Plaintiffs and Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that the Defendants do not have authority to remove Plaintiffs or the proposed class members without affording each of them all rights and protections set forth by applicable statutes and regulations, the United States Constitution, and the First and Fifth Amendments thereto.

238.    Plaintiffs and proposed class members are further entitled to declaratory relief to establish that their terminations were a legal nullity.

239.    Plaintiffs and proposed class members have suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court award them and all others similarly situated the following relief:

a. A declaration that Defendants' actions violated Plaintiffs' and the proposed class members' First Amendment rights and an order of appropriate relief;

b. A declaration that Defendants' actions violated Plaintiffs' and the proposed class members' Fifth Amendment due process rights and an order of appropriate relief, to include, but not be limited to, a name-clearing hearing;

c. An order requiring Defendants to immediately reinstate Plaintiffs and the proposed class members and enjoin Defendants from taking any further adverse personnel action against each of them without providing appropriate procedural due process as required by the Fifth Amendment;

d. An award of the costs of this action and reasonable attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, or any other applicable law; and

e. Such other relief as the Court may deem just and proper.

Dated:      March 31, 2026

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

  /s/ Daniel M. Eisenberg
Andrew G. Celli, Jr.*
Matthew D. Brinckerhoff*
Daniel M. Eisenberg
Rachael Wyant*

One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
acelli@ecbawm.com
mbrinckerhoff@ecbawm.com
deisenberg@ecbawm.com
rwyant@ecbawm.com

*Attorneys for Plaintiffs*

*\*Application for admission pro hac vice forthcoming.*

PETERS BROVNER LLP

  /s/ Mark G. Peters
Mark G. Peters*
Lesley Allison Brovner*

139 Fulton St., Suite 132
New York, New York 10038
(917) 639-3270
mpeters@petersbrovner.com
lbrovner@petersbrovner.com

*Attorneys for Plaintiffs*

48