**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JAMIE GARMAN, *et al.*, <br><br><br> Plaintiffs, <br><br> -against- <br><br><br><br> KASHYAP P. PATEL, *et al.*, <br><br> Defendants. | No. 1:26-cv-1086-JMC <br><br> **Oral Argument Requested** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020

Peters Brovner LLP
139 Fulton St., Suite 132
New York, New York 10038

i

TABLE OF CONTENTS

PAGE NO.

PRELIMINARY STATEMENT ...................................................................................1

FACTS .........................................................................................................................4

    I.    PLAINTIFFS' DISTINGUISHED AND UNBLEMISHED CAREERS WITH THE FBI .........................................................................................................4

    II.    PLAINTIFFS EXPECTED TO SPEND THEIR CAREERS WITH THE FBI ........5

    III.    PLAINTIFFS ARE ASSIGNED TO A NOW-POLITICALLY DISFAVORED INVESTIGATION AND FORCED INTO THE PUBLIC DOMAIN ...................6

    IV.    DEFENDANTS' RETALIATORY ANIMUS TOWARD PLAINTIFFS................7

    V.    REMOVAL FROM FEDERAL SERVICE AND ONGOING HARM ..................10

ARGUMENT................................................................................................................12

    I.    PLAINTIFFS STATED A FIRST AMENDMENT RETALIATION CLAIM ...............................................................................................................12

        A.    The First Amendment Prohibits Government Employers from Firing a Career Employee Because of the Employee's Affiliation or Beliefs, Real or Perceived ...................................................................................13

        B.    Plaintiffs Have Met Their Pleading-Stage Burden ....................................14

    II.    PLAINTIFFS STATED A FIFTH AMENDMENT DEPRIVATION OF PROPERTY INTEREST CLAIM...........................................................................17

        A.    Fifth Amendment Property Interests Can Derive from Agency Policies and Practices ..........................................................................................18

        B.    The FBI's Policies and Practices Create a Property Interest in Continued Employment...........................................................................................19

    III.    PLAINTIFFS STATED FIFTH AMENDMENT DEPRIVATION OF LIBERTY INTEREST CLAIMS......................................................................................23

        A.    Plaintiffs Stated a "Reputation Plus" Liberty Interest Claim.....................24

        B.    Plaintiffs Stated a "Stigma Plus" Liberty Interest Claim...........................27

    IV.    PLAINTIFFS STATED AN *ULTRA VIRES* AND LEGAL NULLITY CLAIM ...............................................................................................................29

    V.    PLAINTIFFS STATED A CLAIM FOR DECLARATORY RELIEF..................31

CONCLUSION ........................................................................................................32

TABLE OF AUTHORITIES

**Cases**

*Alexis v. District of Columbia,*
    77 F. Supp. 2d 35 (D.D.C. 1999) ................................................................ 25

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................... 12

*Ashton v. Civiletti,*
    613 F.2d 923 (D.C. Cir. 1979) ............................................................. 17, 19

*Bd. of Regents of State Colleges v. Roth,*
    408 U.S. 564 (1972) ............................................................................. 18, 24

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................... 12

*Brady v. Off. of Sergeant at Arms,*
    520 F.3d 490 (D.C. Cir. 2008) ................................................................. 17

*C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.,*
    310 F.3d 197 (D.C. Cir. 2002) ........................................................... 31, 32

*Circuit City Stores v. Adams,*
    532 U.S. 105 (2001) ................................................................................... 21

*Clark v. Library of Congress,*
    750 F.2d 89 (D.C. Cir. 1984) ................................................................... 15

*Comm. on Judiciary, U.S. House of Reps. v. Miers,*
    558 F. Supp. 2d 53 (D.D.C. 2008) ........................................................... 31

*Corr. Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ..................................................................................... 29

*DiRuzza v. Cnty. of Tehama,*
    206 F.3d 1304 (9th Cir. 2000) .................................................................. 15

*Doe v. U.S. Dep't of Just.,*
    753 F.2d 1092 (D.C. Cir. 1985) ..................................................... 23, 24, 27

*Esparraguera v. Department of the Army,*
    101 F.4th 28 (D.C. Cir. 2024) ................................................................... 23

*Farah v. Esquire Mag.,*
    736 F.3d 528 (D.C. Cir. 2013) ................................................................. 26

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010)...................................................................................... 29

*Galli v. New Jersey Meadowlands Comm'n*,
    490 F.3d 265 (3d Cir. 2007).......................................................................... 14

*Garrow v. Gramm*,
    856 F.2d 203 (D.C. Cir. 1988)....................................................................... 19

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)....................................................................................... 21

*Hall v. Ford*,
    856 F.2d 255 (D.C. Cir. 1988)....................................................................... 18

*Harmon v. Liss*,
    116 A.2d 693 (D.C. 1955) ........................................................................ 25, 26

*Harrison v. Bowen*,
    815 F.2d 1505 (D.C. Cir. 1987)..................................................................... 26

*Heffernan v. City of Paterson*,
    578 U.S. 266, (2016)...................................................................................... 13

*Hettinga v. United States*,
    677 F.3d 471 (D.C. Cir. 2012)....................................................................... 12

*Jefferson v. Harris*,
    170 F. Supp. 3d 194 (D.D.C. 2016) .................................................... 24, 27, 28

*Jewell v. Jagadesan*,
    2026 WL 686105 (D.D.C. Mar. 11, 2026)....................................................... 25

*Jimenez Fuentes v. Torres Gaztambide*,
    807 F.2d 236 (1st Cir. 1986).................................................................... 13, 14

*Kartseva v. Dep't of State*,
    37 F.3d 1524 (D.C. Cir. 1994)................................................................. 27, 28

*Kizas v. Webster*,
    707 F.2d 524 (D.C. Cir. 1983)....................................................................... 18

*Langeman v. Garland,*
    88 F.4th 289, 294 (D.C. Cir. 2023)........................................................... 22, 26

*Langley v. Hot Spring Cnty., Ark.*,
    393 F.3d 814 (8th Cir. 2005) ........................................................................ 15

*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949)..................................................................................... 29

*Mazaleski v. Treusdell*,
562 F.2d 701 (D.C. Cir. 1977)..................................................................... 26

*McCabe v. Barr*,
490 F. Supp. 3d 198 (D.D.C. 2020) ........................................................ 13, 30

*Metz v. BAE Sys. Tech. Sols. & Servs.*,
774 F.3d 18 (D.C. Cir. 2014)....................................................................... 32

*Morin v. Tormey*,
626 F.3d 40 (2d Cir. 2010)........................................................................... 14

*Mt. Healthy City School District Board of Education v. Doyle*,
429 U.S. 274 (1977)..................................................................................... 15

*Neiman-Marcus v. Lait*,
13 F.R.D. 311 (S.D.N.Y. 1952) ................................................................... 25

*O'Donnell v. Barry,*
148 F.3d 1126 (D.C. Cir. 1998)............................................................... 25, 28

*O'Hare Truck Serv., Inc. v. City of Northlake*,
518 U.S. 712 (1996)..................................................................................... 13

*Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*,
631 F.2d 953 (D.C. Cir. 1980)..................................................................... 18

*Orange v. D.C.*,
59 F.3d 1267 (D.C. Cir. 1995)..................................................................... 25

*Perry v. Sindermann*,
408 U.S. 593 (1972)..................................................................................... 18

*Poindexter v. Bd. of Cnty. Comm'rs of Cnty. of Sequoyah*,
548 F.3d 916 (10th Cir. 2008) ..................................................................... 15

*Rodriguez-Reyes v. Molina-Rodriguez*,
711 F.3d 49 (1st Cir. 2013)........................................................................... 15

*Rutan v. Republican Party of Ill.*,
497 U.S. 62 (1990)....................................................................................... 13

*Schilling v. Rogers*,
363 U.S. 666 (1960)................................................................................. 31, 32

vi

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020).................................................................................................. 31

*Seized Prop. Recovery, Corp.*,
   502 F. Supp. 2d 50 (D.D.C. 2007)...................................................................... 31, 32

*Souther v. Patel*,
   No. 25 Civ. 150 (N.D. Ga. June 17, 2026) ........................................................... 19, 31

*Stilwell v. City of Williams*,
   831 F.3d 1234 (9th Cir. 2016) ................................................................................. 14

*Stone v. F.D.I.C.*,
   179 F.3d 1368 (Fed. Cir. 1999)................................................................................ 18

*Thompson v. District of Columbia*,
   832 F.3d 339, (D.C. Cir. 2016)................................................................................ 15

*Welch v. Ciampa*,
   542 F.3d 927 (1st Cir. 2008).................................................................................... 14

**Rules**

Fed. R. Civ. P. 25(d) ................................................................................................... 8

**PRELIMINARY STATEMENT**

Plaintiffs Jamie Garman, Blaire Toleman, and Michelle Ball were long-tenured, career agents with the Federal Bureau of Investigation ("FBI") who devoted decades of their lives to federal public service. They served us at the highest level and received top accolades for it—both from the FBI itself and its external law enforcement partners. Their exemplary contributions continued up until the days of their summary terminations in the fall of 2025.

What links Plaintiffs beyond their unblemished record of service was their assignment to the FBI's "Arctic Frost" investigation, which concerned alleged attempts to interfere with the results of the 2020 presidential election and was later brought within the ambit of Department of Justice Special Counsel John L. "Jack" Smith. On Arctic Frost and otherwise, Plaintiffs followed every rule and law and discharged their duties ethically and responsibly. There was never any investigation or determination that so much as suggested otherwise.

But Plaintiffs' association with Arctic Frost meant that Defendants, the current Director of the FBI, the current Attorney General, the FBI, and the Department of Justice ("DOJ"), viewed Plaintiffs as the enemy. Despite Plaintiffs' roles as career, non-partisan agent-level federal law enforcement officers, Defendants lumped Plaintiffs in with all of their other political enemies and subjected them to their campaign of retribution just the same. In the months that preceded Plaintiffs' summary removal from federal service, Defendants caused Plaintiffs' names to enter the public domain through allied members of Congress and friendly media, creating an indelible link between Plaintiffs and the Arctic Frost investigation. Then, Defendants launched a very public, caustic campaign against Plaintiffs and others, repeatedly accusing them of corruption, criminal misconduct, insurrection-adjacent activities, and more. None of this had any basis in fact. But it was the purported justification for removing Plaintiffs from federal service on a rolling basis

1

via one-page letters signed by Defendant FBI Director Kashyap P. Patel, who invoked Article II and accused Plaintiffs of "weaponization."

Defendants were motivated to fire Plaintiffs because of Plaintiffs' beliefs or associations, real or perceived. Defendants did not provide Plaintiffs with any due process. Plaintiffs had no notice of charges levied against them, no opportunity to rebut them, and no opportunity to clear their names. Defendants have caused Plaintiffs deep and ongoing reputational and related harm.

* * *

Plaintiffs now come before this Court to seek redress for Defendants' violations of their Constitutional rights under the First and Fifth Amendments. *First*, Defendants' decision to remove Plaintiffs from federal service, based in whole or in part on Plaintiffs' beliefs or association, real or perceived, violated the First Amendment. Defendants do not cite a single relevant First Amendment case in their motion to dismiss this claim. Any analysis of the patronage line of cases against the Complaint's extensive record of First Amendment retaliation would make clear that Plaintiffs have met their pleading-stage burden.

*Second*, Defendants deprived Plaintiffs of their property interest in continued employment without due process in violation of the Fifth Amendment. Defendants' motion misconstrues the nature of Plaintiffs' claim, arguing against the strawman that there is no statutory for-cause removal protection that would entitle Plaintiffs to procedural due process. But Defendants have glossed over a well-developed body of law, from the Supreme Court in *Perry v. Sindermann* down to the D.C. Circuit in *Ashton v. Civiletti*, that makes clear a property interest in continued employment can derive from a government employer's policies and practices. Indeed, in *Ashton*, the D.C. Circuit identified this basis for a property interest in continued FBI employment, specifically.

2

*Third*, Defendants' public campaign of retribution stigmatized Plaintiffs' good names, reputations, and honor, baselessly injuring their reputations and professional prospects, without any opportunity for Plaintiffs to clear their names. Defendants dispute that Plaintiffs' allegations give rise to a Fifth Amendment injury of Plaintiffs' liberty interests; but the Complaint should be construed liberally with inferences drawn in Plaintiffs' favor, and Defendants' arguments here are premature.

Finally, to the extent that Plaintiffs were removed from federal service pursuant to Article II, Defendants' actions were *ultra vires*. Defendants' motion declares that the President has Article II authority over the Executive Branch and can delegate it, but these arguments are not specific to Plaintiffs' claim and premature for adjudication at the motion to dismiss phase. The pleadings are devoid of basic facts that would support Defendants' position, such as whether the President himself removed Plaintiffs from federal service (not in the Complaint), whether the President conferred Article II removal authority to Defendant Patel (not in the Complaint), or whether Article II was actually the basis of Defendants' employment decisions (the termination letters are ambiguous). Further, Article II confers no authority to remove Plaintiffs, who were career, line-level employees, subordinate to and supervised by principal and/or inferior officers. There is no legal authority for the positions that Defendants have taken here.

Defendants' motion to dismiss the Complaint should be denied.

3

## FACTS

### I.    PLAINTIFFS' DISTINGUISHED AND UNBLEMISHED CAREERS WITH THE FBI

Plaintiffs Jamie Garman, Blaire Toleman, and Michelle Ball (each "Plaintiff" or "Plaintiffs") were long-tenured, career agents with the FBI who devoted decades of their lives to federal public service.

Plaintiff Garman joined the FBI after graduating from law school with high honors, clerking for a federal district judge, and serving as an Assistant United States Attorney for five years. ECF No. 1, Complaint ("Compl.") ¶ 4. Over her nearly eight years of service with the FBI, she served as a Special Agent and Supervisory Special Agent, Associate Division Counsel. Compl. ¶¶ 4-5. Plaintiff Garman received exemplary employment reviews, the FBI Medal of Excellence—one of the Bureau's top awards—twice, and awards from other federal agencies that partnered with the FBI on investigations. *Id.*

Plaintiff Toleman amassed 14 years of exemplary federal service with the FBI, where she served as a Special Agent and Supervisory Special Agent. Compl. ¶ 6. She received top employment reviews and awards throughout her FBI career, including the FBI Medal of Excellence, and awards from other federal agencies and stakeholders that partnered with the FBI on investigations. *Id.*

Plaintiff Michelle Ball amassed ten years of exemplary service with the FBI, where she served as a Special Agent, investigating alleged violations of criminal law under the supervision of senior leaders at the Bureau, and when applicable, attorneys at the Department of Justice. Compl. ¶ 8. Plaintiff Ball received top employment reviews, the FBI Medal of Excellence, and other internal and external recognitions for her work. *Id.*

4

## II.    PLAINTIFFS EXPECTED TO SPEND THEIR CAREERS WITH THE FBI

In order to be accepted for employment at the FBI, Plaintiffs underwent a rigorous screening process with multiple assessments and background checks.  *Id.* ¶ 29.  Then, they swore or affirmed an oath of office, "to 'support and defend the Constitution of the United States' and 'bear true faith and allegiance to the same,' and to 'well and faithfully discharge the duties' of their office."  *Id.* ¶ 37.

FBI employment is highly regulated.  FBI employees receive extensive, rigorous, and continuing training and education that could prepare them for difficult assignments that could, at times, place them in physical jeopardy.  *Id.* ¶¶ 29-30.  The FBI has a broad set of internal policies that prescribe the boundaries of lawful investigative techniques, ethics, and discipline, and other conduct.  *Id.* ¶¶ 55-61, 73-75.  Both FBI policies and federal law prohibit FBI employees from engaging in certain political activities or allowing politics to influence their work.  *Id.* ¶¶ 37-53.

The FBI's discipline policies make it clear to employees that they can expect to be disciplined or removed from federal service on account of misconduct, but not otherwise.  *Id.* ¶ 71.  Specifically, the Discipline Policy permits summary dismissal "[w]hen[] (a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent considerations are at stake."  Compl. ¶ 89 (quoting Office of Professional Responsibility ("OPR") Policy Guide at 3).  The policy identifies factors and examples that the agency may consider, including "egregiousness of the misconduct, whether the misconduct is illegal/criminal, overwhelming evidence of the misconduct, or impact on the FBI's reputation."  Compl. ¶ 91 (quoting OPR Policy Guide at 4).  Examples of misconduct warranting summary termination include "possession of Child Sexual Abuse Material, arrest for criminal conduct, solicitation of commercial sex acts, and theft of Bureau property."  *Id.*

Plaintiffs sought to spend their careers with the FBI. They understood that if they properly discharged their responsibilities, they could remain at the FBI long enough to reach mandatory retirement age, and the pension that comes with it. FBI employees reach retirement eligibility after 25 years of service (before they reach 50 years old) or 20 years of service (after they reach 50 years old). The promise of retirement benefits is part of the bargain of FBI service that FBI employees rely upon, and that the FBI expects to provide. *Id.* ¶¶ 34-35. Indeed, the FBI's advertisement to prospective employees states: "'SECURE YOUR FUTURE' with 'secure retirement with a pension.'" *Id.* ¶¶ 33-36.

### III.    PLAINTIFFS ARE ASSIGNED TO A NOW-POLITICALLY DISFAVORED  INVESTIGATION AND FORCED INTO THE PUBLIC DOMAIN

During their FBI employment, Plaintiffs Garman, Toleman, and Ball had each worked out of a federal public corruption squad in the Washington Field Office ("WFO"), CR-15, that was assigned to provide FBI support to an investigation into alleged interference with the 2020 presidential election, known as "Arctic Frost." Compl. ¶¶ 4, 6, 8, 101, 150-152. FBI policies do not permit agents to refuse a lawful assignment. Compl. ¶¶ 59-61

On or about November 18, 2022, the then-Attorney General appointed Jack Smith as Special Counsel and charged him with, among other things, investigating "whether any person or entity violated the law in connection with efforts to interfere with the lawful transfer of power following the 2020 presidential election or the certification of the Electoral College vote held on or about January 6, 2021." Compl. ¶¶ 101-104. Thereafter, the Arctic Frost investigation was brought under the ambit of Special Counsel Smith. *Id.*

Plaintiffs diligently and ethically discharged their responsibilities as Special Agents or Supervisory Special Agents on this investigation, following all rules and laws, obtaining guidance and approval from supervising officials every step of the way, and eschewing politics or

politicization in their entirety, but Defendants have come to perceive Plaintiffs as political adversaries. *Id.* ¶ 1. Agent-level FBI employees, such as Plaintiffs, would traditionally remain invisible to the public. But on or about October 26, 2025, Plaintiffs' names started appearing in documents published by the news media in right-wing outlets like *Just the News*, or by members of the U.S. Congress allied with the current administration. *See id.* ¶¶ 159-163.[1] News outlets and members of Congress claimed they received internal records—sometimes associated with non-public Grand Jury proceedings—from the FBI itself or purported FBI whistleblowers from the FBI. Compl. ¶¶ 158-163. Document disclosures included out-of-context excerpts from the Arctic Frost casefile strung together in apparent support of a specific political narrative, seemingly designed to paint Plaintiffs, and the Arctic Frost investigation, in a poor light. *See id.* ¶¶ 158, 163, 166. Through these disclosures, each of Plaintiffs' names became part of the public domain in connection with Arctic Frost.

## IV.   DEFENDANTS' RETALIATORY ANIMUS TOWARD PLAINTIFFS

Plaintiffs' names entered the public domain around the same time as Defendants Patel and Blanche,[2] then-Attorney General Pamela J. Bondi, and the President of the United States, made clear their plans to carry out a retribution campaign against their perceived enemies, including those at DOJ and the FBI who worked on now-disfavored investigations. For example:

- On or about January 30, 2025, when asked by a reporter about DOJ employees who might be fired, President Trump said: "If they fired some people over there, that's a good thing because they were very bad." President Trump added: "[W]e have some very bad people over there. It was weaponized at a level that nobody's ever seen before." *Id.* ¶ 126.

---

[1] *See also* Jerry Dunleavy, *Arctic Frost probe targeting Trump conservatives born at highest levels of Biden White House, DOJ*, JUST THE NEWS, (Oct. 26, 2025), https://justthenews.com/government/federal-agencies/biden-white-house-and-doj-fbi-leaders-involved-launch-arctic-frost.

[2] Current Attorney General Todd Blanche has been automatically substituted for Pamela J. Bondi as a Defendant. *See* Fed. R. Civ. P. 25(d).

7

- On or about August 5, 2025, Defendant Patel told then-FBI Assistant Director Brian J. Driscoll that "all FBI employees who they identified had worked on the cases against President Trump would be removed from their jobs," and that he needed to fire agents who worked on cases against President Trump. He went on to explain that "the FBI tried to put the president in jail and he hasn't forgotten it." *Id.* ¶¶ 135-136.

- In February 2025, Attorney General Bondi created a "Weaponization Working Group," whose mandate was specifically to target the "weaponization" carried out by the Special Counsel investigations; in March 2025, Bondi stated during a Fox News interview: "Well, first and foremost, we got rid of the Jack Smith team. Gone. Those people are gone. We're still trying to find . . . a lot of people in the FBI and also in the Department of Justice who despise Donald Trump, despise us, don't want to be there." *Id.* ¶¶ 131-134.

- Hours before terminating several FBI agents in October 2025, Defendant Patel made the following public statement: "We are cleaning up a diseased temple three decades in the making—identifying the rot, removing those who weaponized law enforcement for political purposes . . . ." *Id.* ¶¶ 148-149.

- In March 2026, Defendant Blanche announced in a statement: "When it comes to the FBI . . . Director Patel has cleaned house there too. There isn't a single man or woman with a gun, federal agent, still in that organization that had anything to do with the prosecution of President Trump." *Id.* ¶ 157.

- In October 2025, Defendant Patel said on Fox News: "[W]hen I got in there as the FBI Director . . . we found this information—to expose the politicization by Jack Smith and the prior Department of Justice. . . . [W]e're just scratching the surface here but accountability is coming. *You're darn right I fired those agents, you're darn right I blew up CR-15*, the public corruption squad, that led the weaponization at the Washington Field Office. We're just warming up but we are running our investigations to the ground, *we are finding every single person involved . . . ." Id.* ¶ 150 (first emphasis added). Of note, the White House X account reposted that message with text above it that stated: "Accountability is coming" and that officials were "finding every single person involved." *Id.* ¶¶ 150–153. (Each Plaintiff had been assigned to CR-15, the federal public corruption unit in the WFO, *id.* ¶¶ 4-8, and an investigation brought under the purview of former Special Counsel Smith*, id.* ¶¶ 101-107.)

Defendants did what they said they were going to do. Since Defendants assumed their positions, they have fired more than 50 FBI employees, including Plaintiffs Garman, Toleman, and Ball, on the basis of their perceived political affiliation or belief, without providing them any modicum of due process, and while disparaging their reputations and service in public statements

8

around the time of the firings. *Id.* ¶ 140. Many of these other FBI employees had worked on the Arctic Frost investigation or another investigation brought under Special Counsel Smith. *Id.* ¶¶ 140-141. Defendants' retaliatory conduct and defamatory public statements include, but are not limited to:

- Defendants disclosed many of the documents identifying Plaintiffs by name to media and members of Congress, and specifically to the Senate Judiciary Committee, with the understanding that members of Congress would then make them public. *Id.* ¶ 159.

- Defendants sent letters to Plaintiffs accusing them of having "exercised poor judgment and a lack of impartiality . . . leading to the political weaponization of the government." *Id.* ¶ 174; *accord* Defendants' Memorandum of Law in Support of Motion to Dismiss ("Def. Br.") at 1, 3, 5. Defendants publicly repeated these accusations in the months preceding and following Plaintiffs' terminations. Compl. ¶¶ 135, 138, 147-154.

- Defendants accused Plaintiffs of acting "unethically." For example, on October 7, 2025, on the same day the FBI terminated Plaintiff Ball, Defendant Patel posted on X: "We fired those who acted unethically, dismantled the corrupt CR-15 squad, and launched an investigation. Transparency and accountability aren't slogans, they're promises kept." *Id.* ¶ 152. Defendants terminated Plaintiff Garman three weeks later, and Plaintiff Toleman approximately one week after that. *Id.* ¶¶ 172, 179.

- On or about October 7, 2025, Defendant Patel accused Plaintiffs and others of concealing their own purported misconduct by hiding investigative records, announcing on Fox News: "I mean just think about it . . . phone records were gathered and subpoenaed through the Grand Jury process and it was buried and wormholed in the hope that no one would find it—so we're just scratching the surface here but accountability is coming." *Id.* ¶ 150.

- On January 12, 2026, Defendant Patel endorsed the President's characterization of Plaintiffs as "insurrectionists" on TRUTH SOCIAL. The President posted: "These FBI Agents [referring to agents who had been assigned to the Arctic Frost investigation overseen by Special Counsel] are total Scum, in their own way no better than the insurrectionists in Portland, Minnesota, Los Angeles, etc. Kash better get them out, NOW! Radical Left Lunatics put in by the 'Auto Pen' and Obama!" *Id.* ¶ 156. Defendant Patel responded, "Thank you Mr. President. Under your leadership, *this FBI found the corrupt actors and terminated their employment last year*." *Id.* (emphasis added).

9

- President Trump and the White House regularly amplified the defamatory and disparaging comments directed at FBI employees perceived to be enemies of the administration. *See id.* ¶¶ 153, 156.

Baseless accusations—of "corruption," being insurrectionist-adjacent, "unethical" conduct, hiding evidence, and "politicization" or "weaponization" of law enforcement—are particularly devastating when levied by the federal government's highest-ranking officials against career law enforcement officers who had been assigned to work on public corruption, terrorism, and other sensitive matters.

### V.     REMOVAL FROM FEDERAL SERVICE AND ONGOING HARM

On October 7, 2025, the FBI removed Plaintiff Ball from federal service via one-page termination letter from Defendant Patel, which purported to "remove[] [her] from federal service" immediately, pursuant to Article II and his "authority as the FBI Director." *Id.* ¶¶ 147, 174.  The letter stated: "You have exercised poor judgment and a lack of impartiality in carrying out duties, leading to the political weaponization of the government." *Id.* ¶ 174.  Plaintiff Ball received no notice of any charges against her or the opportunity to respond. *Id.* ¶ 9.  On October 31, 2025, the FBI removed Plaintiff Garman with the same letter in the same way. *Id.* ¶¶ 172, 174.  On November 3, 2025, the FBI informed Plaintiff Toleman that it would be removing her from federal service, only to retract her termination later that same day. *Id.* ¶ 7.  The next day, the FBI fired her again, in the same way as the FBI fired Plaintiffs Ball and Garman. *Id.* ¶ 174.  To this day, there has never been any factual determination that they have violated any law or FBI rule. *See id.* ¶¶ 4-9.

After their respective removals from federal service, the FBI provided Plaintiffs with delayed and inconsistent paperwork memorializing their departure from federal government service. *See id.* ¶¶ 193-194.  Defendants did not know how to explain or justify the employment action they had just undertaken. *See id.*

10

Ultimately, Plaintiff Garman accepted a position as Of Counsel at a boutique bankruptcy and litigation firm. *Id.* ¶ 176. She has been forced out of a career she loved and deprived of the financial stability she expected after retiring from the FBI with decades of service; other federal law enforcement jobs—including returning to DOJ as an AUSA—are unavailable to her. *Id.* ¶¶ 177-178. Plaintiff Toleman was unemployed for three months following her termination, which resulted not only in lost income but also a lapse in health care coverage for her and her family. *Id.* ¶ 182. While Plaintiff Toleman has found employment, it is at a lesser salary; she was forced out of a job she loved and to which she dedicated her life. *Id.* ¶ 183. Plaintiff Ball was unemployed for four months following her termination. *Id.* ¶ 188. She has since obtained employment as a contractor, but earns a lesser salary and lacks the stability and benefits associated with her position with the FBI. *Id.* ¶¶ 189-190. More damaging, however, is that Defendants have deprived her of an incomparable public service career that was her calling. *Id.* ¶ 191. Plaintiffs have been unable to find law enforcement employment with the federal government and had difficulty finding alternative employment altogether. *Id.* ¶¶ 197-200. Plaintiffs' employment at the FBI has no comparators. *Id*. ¶ 201.

As a result of Defendants' conduct, Plaintiffs have been widely and publicly identified as agents who were "removed from the federal service" and who had allegedly politicized and "weaponized" their roles. *Id.* ¶¶ 150-154, 174. Because their termination letters contained no individualized assessments of their supposed conduct, and Plaintiffs had no opportunity to clear their names, *see id.* ¶¶ 173, 180, 186, these defamatory statements have had lasting, damaging impacts, including lower-paid or less stable replacement work and faced reluctance from potential employers.

11

## ARGUMENT

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests" to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). Courts must construe the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (citation omitted). Well-pleaded factual allegations are "entitled to [an] assumption of truth," and a claim is "plausible on its face" when the facts pled allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (quoting *Twombly*, 550 U.S. at 556, 570). Taken as true, a complaint's factual allegations need only "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## I.   PLAINTIFFS STATED A FIRST AMENDMENT RETALIATION CLAIM

Plaintiffs were exemplary career FBI employees. There was no performance-based reason to remove them from federal service. What links Plaintiffs was assignment to a now-politically disfavored investigation, and a perception by Defendants, as made clear from Defendants' own public statements, that Plaintiffs' objective and nonpartisan discharge of their law enforcement responsibilities made them political adversaries of the current administration. Defendants' decision to fire career FBI employees due to their affiliations or beliefs—real or perceived—gives rise to Plaintiffs' First Amendment retaliation claim.

12

A.    **The First Amendment Prohibits Government Employers from Firing a Career Employee Because of the Employee's Affiliation or Beliefs, Real or Perceived**

Where, as for Plaintiffs, party affiliation or partisanship is not a job requirement,[3] the First Amendment prohibits discharge of public employees for "not being supporters of the political party in power . . . ." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (citing *Elrod v. Burns*, 427 U.S. 347 (1976)); *Branti v. Finkel*, 445 U.S. 507 (1980)). *See also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996) ("Government officials may not discharge public employees for refusing to support a political party or its candidates . . . ."); *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 239 (1st Cir. 1986) ("[A] patronage system involving the wholesale dismissal of public employees for partisan reasons, applied without regard to an employee's responsibilities," violates the First Amendment) (citing *Elrod*, 427 U.S. at 367).

This prohibition extends to discharging employees on account of perceived partisan support, non-support, or affiliation, regardless of whether that perception is correct. The First Amendment protects the employee "even if . . . the employer makes a factual mistake about the employee's behavior." *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016) (cleaned up). The government's motive for taking adverse employment action "is what counts []." *Id. See also McCabe v. Barr*, 490 F. Supp. 3d 198, 212 (D.D.C. 2020) (discussing First Amendment claim based on retaliation for perceived political affiliation).

Defendants argue—without citation to any relevant First Amendment legal authority—that Plaintiffs have not stated a First Amendment retaliation claim because they did not allege removal based on "actual or perceived affiliation with any political party or organization" or "how they

---

[3] Defendants do not dispute that Plaintiffs were government employees in positions where party affiliation or belief was not "an appropriate requirement" for carrying out their duties. *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996). Defendants have waived any argument to the contrary which, in any event, is meritless.

13

voted or which candidates they supported in any election." *See* Def. Br. at 4.  But no court has adopted Defendants' cramped view; to the contrary, all that have reached this issue have expressly permitted, or at least contemplated, the claims that Plaintiffs assert here. *See, e.g.*, *Welch v. Ciampa*, 542 F.3d 927, 939 (1st Cir. 2008) ("We can discern no principled basis for holding that an employee who supports an opposition group is protected by the First Amendment but one who chooses to remain neutral is vulnerable to retaliation."); *Morin v. Tormey*, 626 F.3d 40, 44 (2d Cir. 2010) ("The right to be free from retaliation based on political affiliation is not limited to members of an opposing political party, but *extends to those who are perceived by those retaliating to be apolitical or insufficiently politically loyal.*") (emphasis added); *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 272 (3d Cir. 2007) ("[T]he right not to have allegiance to the official or party in power itself is protected under the First Amendment, irrespective of whether an employee is actively affiliated with an opposing candidate or party."); *Stilwell v. City of Williams*, 831 F.3d 1234, 1240 (9th Cir. 2016) (describing *Heffernan* as "holding that whether the protected speech was actually engaged in by the employee is not determinative because it is the perception of the employer as to whether that protected activity occurred that matters to a First Amendment retaliation claim").

Plaintiffs' First Amendment rights are not contingent on whether they are Democrats, Republicans, or neither; whether they vote for Democrats, Republicans, or neither; or whether they support the President's opponents or no politician at all.  *Contra* Def. Br. at 4.  It is the patronage practice that causes the First Amendment injury, *see Jimenez Fuentes*, 807 F.2d at 239, which is particularly grievous here in the case of career federal law enforcement agents.

### B.    Plaintiffs Have Met Their Pleading-Stage Burden

At the pleading stage, the First Amendment plaintiff's burden is minimal.  A plaintiff must only allege that her political affiliation was a "substantial" or "motivating" factor behind the

adverse employment action.  *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977).  *See also Clark v. Library of Congress*, 750 F.2d 89, 101 (D.C. Cir. 1984) (same).  The retaliatory animus need only be a single motivating factor, or one of many factors.  *See, e.g.*, *Langley v. Hot Spring Cnty., Ark.*, 393 F.3d 814, 817 (8th Cir. 2005) ("*a motivating factor*") (emphasis in original)); *DiRuzza v. Cnty. of Tehama*, 206 F.3d 1304, 1314 (9th Cir. 2000) (same); *Poindexter v. Bd. of Cnty. Comm'rs of Cnty. of Sequoyah*, 548 F.3d 916, 919 (10th Cir. 2008) ("motivating factors") (cleaned up).  After discovery, the burden shifts to the government defendant to show a legitimate basis for the employment action.  *See Thompson v. District of Columbia*, 832 F.3d 339, 347 (D.C. Cir. 2016) (shifting burden on motion for summary judgment).

Courts routinely find that circumstantial allegations—such as politically charged questioning, public statements targeting employees affiliated with a prior administration, temporal proximity to a regime change, lack of a nondiscriminatory explanation, and replacement by loyalists—support a plausible inference of animus.  *See Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 56–57 (1st Cir. 2013).  Likewise, allegations that officials affirmatively sought information about employees' political affiliations "must . . . be given credence" at the pleading stage.  *Id.* at 55 (finding that the "political atmosphere" and "the frenzy to discover the political affiliations of agency employees," viewed in plaintiffs' favor, supported a plausible finding of defendants' knowledge of plaintiffs' political affiliations).

Here, Plaintiffs have satisfied their pleading-stage burden.  *First*, the Complaint alleges that Plaintiffs were exemplary performers and that there was no performance or merit-based reason to remove them from federal service.  *See* Compl. ¶¶ 1-8.  *Second*, each Plaintiff was an FBI

employee assigned to investigations that Defendants and their political allies had publicly cast as disfavored, partisan, or against the current administration. *Id.*; *see also id.* ¶¶ 141(a)-(m).

*Third*, the Complaint alleges that Defendants' decisions to remove Plaintiffs from federal service were infected by political animus, citing, among other things, statements by Defendants themselves targeting Plaintiffs and other FBI agents as "corrupt," "scum," untrustworthy, "bad" people who "despise" the current administration, and who must be permanently removed from federal service, *see supra* pages 7-9. Defendant Patel even told the then-Acting Director that "all FBI employees who they identified had worked on the cases against President Trump would be removed from their jobs," explaining that "the FBI tried to put the president in jail and he hasn't forgotten it." Compl. ¶¶ 135-137.

*Fourth*, the timing of Defendant Patel's appointment and the rapid termination of agents, like Plaintiffs, who were assigned to the Arctic Frost investigation, is additional evidence of causation between political retaliation and an adverse employment action. *See BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015). Around January 2025, the FBI began collecting the names of FBI employees who had worked on investigations adverse to the current administration's interests, *see* Compl. ¶¶ 124-129. Around this same time, then-Attorney General Bondi announced the "Weaponization Working Group," which specifically cited investigations by then DOJ Special Counsel Jack Smith, which included Arctic Frost, as examples of "weaponization." Compl. ¶¶ 131-132. After Defendant Patel was confirmed as FBI Director, over the following months, Defendants initiated a series of rolling, public terminations of FBI employees, Plaintiffs included. *Id.* ¶¶ 124-129. This pattern of terminations is precisely the type of "witch-hunt" that gives rise to a plausible inference of retaliatory animus at the pleading stage. *See Rodriguez-Reyes*, 711 F.3d at 55.

16

*Fifth*, that Defendants deviated from regular employment practices to terminate Plaintiffs supports Plaintiffs' allegations that the purported rationale for their terminations was pretextual. *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008) ("[C]hanges and inconsistencies in the stated reasons for the adverse action" or "the employer's failure to follow established procedures or criteria" can show pretext). The Complaint alleges that Defendants purported to terminate Plaintiffs under Defendant Patel's asserted "authority as the FBI Director" and under "Article II of the United States Constitution and the laws of the United States," through letters signed by Patel on Office of the Director letterhead. Compl. ¶¶ 174, 229. Never before had the FBI, through its Director, terminated line agents without affording them due process by invoking Article II authority. *Id.* ¶¶ 96-97. This irregularity and the obvious pretext for Plaintiffs' terminations is further supported by Defendants' delays and inconsistencies in processing their separation paperwork. *Id.* ¶¶ 193-194. Defendants did not know how to explain or justify the employment action they had just taken. *See id*. ¶¶ 192-194.

Defendants' motion to dismiss Plaintiffs' First Amendment claim should be denied.

## II.    PLAINTIFFS STATED A FIFTH AMENDMENT DEPRIVATION OF PROPERTY INTEREST CLAIM

Plaintiffs allege that they have a property interest in their continued employment with the FBI, and that removing them from federal service without due process violated the Fifth Amendment. Defendants argue that Plaintiffs had no property interest because Plaintiffs do not enjoy statutory "for cause" employment protection. But statutory employment protection is not necessary to create a property interest: it can derive from policy or practice, particularly, as here, where the FBI's policies and practices make clear that non-probationary employees can only be removed for job-related reasons. The D.C. Circuit has already found as much. *See Ashton v. Civiletti*, 613 F.2d 923, 928 (D.C. Cir. 1979). FBI policy does not authorize termination of

17

Plaintiffs any time for any reason, as Defendants contend. And if Plaintiffs have a property interest in their employment, they are entitled to some procedural due process. They received none. Defendants' motion should be denied.

### A.    Fifth Amendment Property Interests Can Derive from Agency Policies and Practices

A government employee may have a protected property interest in his or her employment where a "legitimate claim of entitlement" to continued employment exists. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Such "protected property interests can arise not only through operation of statute and regulation, but also through agency-fostered policies or understandings and the implicit [] overall workings of a particular government employer." *Kizas v. Webster*, 707 F.2d 524, 539 (D.C. Cir. 1983) (cleaned up). *See also Stone v. F.D.I.C.*, 179 F.3d 1368, 1374 (Fed. Cir. 1999) (property interest arises when the government gives an employee "assurances of continued employment or conditions dismissal only for specific reasons . . .").

Fifth Amendment property interests in employment are "not limited by a few rigid, technical forms," and are secured by "existing rules or understandings." *Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972) (property interest derived from "the existence of rules and understandings, promulgated and fostered by state officials," notwithstanding the absence of an explicit contractual "for cause" provision) (quoting *Bd. of Regents*, 408 U.S. at 577). The key inquiry is whether a plaintiff had a "legitimate expectation" to the benefit in question. *See Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988). And then, the degree of due process must be commensurate with the nature of the property interest. *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 967 (D.C. Cir. 1980).

Defendants argue that there can be no property interest unless "for cause" employment protections are enshrined in statute. *See* Def. Br. at 7-8 (citing exclusion of most FBI employees

18

from the Civil Service Reform Act, and discussing interpretation of statutory removal protections in *Garrow v. Gramm*, 856 F.2d 203, 206-07 (D.C. Cir. 1988). But that is not right. The D.C. Circuit and at least one other federal court have already recognized FBI employees' Fifth Amendment property interests in their continued employment, wholly untethered to any explicit "for cause" statutory removal protection.

In *Ashton v. Civiletti*, the FBI fired the plaintiff-employee for non-performance-based reasons, without due process. 613 F.2d at 928. The D.C. Circuit explained that because the FBI had fostered rules and understandings "which, by entitling appellant to believe that he would lose his job only for a job-related reason . . . [the plaintiff had] a property interest in his position such that he could be fired only under the procedural protections of the Due Process Clause." *Id.* The *Ashton* Court affirmed that the FBI's then-policies and practices created a Fifth Amendment property interest, despite no statutory removal protections for the FBI's employees. *Id.*

Similarly, and recently, in *Souther v. Patel*, the District Court for the Northern District of Georgia denied the FBI's motion to dismiss a *pro se* former employee's Fifth Amendment due process claim because the employee had plausibly alleged a property interest in continued employment based on his reasonable reliance on FBI policies and practices, which reflected, among other things, statutory ethics law. *See* Order on Mot. Dismiss, No. 25 Civ. 150, at *19 (N.D. Ga. June 17, 2026). Again, the property interest derived from sources other than statutory for-cause removal.

### B.    The FBI's Policies and Practices Create a Property Interest in Continued Employment

Like *Ashton* and *Souther*, which identified a property interest in continued FBI employment, and the *Perry* line of cases that identified such interests for other government

19

agencies, current non-probationary FBI employees, too, have a property interest in their continued employment based on the FBI's policies and practices.

Plaintiffs' Complaint describes in detail how the FBI's own policies and practices make clear the circumstances that can give rise to discipline, removal from federal service, or neither. The FBI's current discipline policy clearly specifies which acts of misconduct are subject to progressive discipline, and which acts of misconduct may warrant removal. *See supra* pages 4-5; *see also* Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process, FEDERAL BUREAU OF INVESTIGATION, (effective Jan. 1, 2024) at 1. Under the discipline policy, neither discipline nor removal are permitted absent misconduct. *Id.*

When it comes to "summary removal," which, in the parlance of the disciplinary policy, means expedited removal, for extreme reasons, sometimes carried out without the usual degree of procedural due process, the disciplinary policy establishes clear parameters. Summary removal is only permitted "[w]hen[] (a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent considerations are at stake." Compl. ¶ 89 (quoting OPR Policy Guide at 3). The policy identifies factors and examples that the FBI may consider, including "egregiousness of the misconduct, whether the misconduct is illegal/criminal, overwhelming evidence of the misconduct, or impact on the FBI's reputation." Compl. ¶ 91 (quoting OPR Policy Guide at 4). Examples of misconduct warranting summary termination include "possession of Child Sexual Abuse Material, arrest for criminal conduct, solicitation of commercial sex acts, and theft of Bureau property." *Id.*

The natural reading of this disciplinary policy—consistent with FBI employees' expectations, the FBI's usual policies and practices, and applicable canons of interpretation—is that summary termination of non-probationary employees is only appropriate in response to

20

exigent, egregious, and illegal acts, of the ilk cited therein. Compl. ¶¶ 89-91; *Circuit City Stores v. Adams*, 532 U.S. 105, 114-15 (2001) (canon of interpretation *ejusdem generis* instructs that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words") (citation omitted); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (canon of interpretation *noscitur a sociis*, "it is known by its associates," instructs that the context of the examples should add to the understanding of listed examples). Under the policy's examples, "possession of Child Sexual Abuse Material, arrest for criminal conduct, solicitation of commercial sex acts, and theft of Bureau property," Compl. ¶ 91, are serious, individualized acts of criminal or quasi-criminal misconduct. The residual "compelling or exigent considerations" language reaches only conduct of the same character. *Id. See also Circuit City*, 532 U.S. at 114-15; *Gustafson*, 513 U.S. at 575.

There is nothing in the disciplinary policy—or any other policy or practice by the FBI—to so much as suggest that FBI employment is "at will," and that the Director can remove career employees from federal service at any time for any reason. Defendant Director Patel said as much in a Congressional hearing last year, testifying: "[t]he only way people get terminated at the FBI is if they fail to meet the muster of the job and their duties."[4] To the contrary, there is ample evidence cited in the Complaint of a mutual understanding between the FBI and its employees that they can reasonably rely on continued employment with the FBI, through retirement, absent misconduct. *See supra* pages 4-5.

---

[4] Rebecca Beitsch, *Senators grill Patel in combative hearing: 5 takeaways*, The Hill (Sept. 16, 2025), https://thehill.com/homenews/senate/5506836-kash-patel-senators-hearing-takeaways/.

21

Defendants do not cite *Ashton*—the seminal FBI procedural due process case—in their brief. *See* Def. Br. at ii. They also do not cite *Souther*, which came down just before Defendants' motion. *Id.* Neither do Defendants consider the line of cases following the Supreme Court's holding in *Perry*, that "the existence of rules and understandings, promulgated and fostered by state officials" can "justify [an employee's] legitimate claim of entitlement to continued employment absent 'sufficient cause.'" *Perry*, 408 U.S. at 602–03.

Also absent from Defendants' motion is any invocation of the D.C. Circuit's decision in *Langeman v. Garland* to dispute Plaintiffs' property interest in their continued employment; but this time, Defendants' omission of D.C. Circuit caselaw is for good reason. 88 F.4th 289, 294 (D.C. Cir. 2023). While *Langeman* considered Fifth Amendment property interests in the FBI employment context, Langeman's claim was inapposite to Plaintiffs'. In *Langeman*, the D.C. Circuit affirmed that an FBI employee who had been interviewed by the Department of Justice Office of the Inspector General as part of an investigation into job performance-related misconduct did not have a statutory-type Fifth Amendment property interest in continued FBI employment that derived from a 1997 memorandum issued by then-Director Louis Freeh, "Standards of Conduct Disciplinary Matters—Revision of the FBI's Disciplinary Process" (the "Freeh Memorandum"), which purportedly preserved "the FBI Director's discretion to summarily terminate employees." *Id.* at 294.

But here, the Freeh Memorandum no longer controls FBI terminations; it has been supplanted by the 2024 disciplinary policy. *See* Compl. ¶¶ 73-75. And, Langeman based his property interest claim on the unavailing supposition that the Freeh Memorandum functioned like a statute, placing substantive limits on official discretion akin to "for cause" removal protections. But the true nature of the property interest in continued FBI employment is different: it derives

22

from the FBI's policies and practices, and not a technical constraint on discretion.  Of course, the D.C. Circuit did not have occasion to consider the *Ashton* or *Perry* line of cases in evaluating Langeman's claims, and neither case is discussed or cited in the D.C. Circuit opinion.  In any event, Defendants have not invoked *Langeman* in the context of Plaintiffs' Fifth Amendment property interest in continued employment.  This argument has been waived.

At bottom, FBI employment is highly protected and regulated.  Absent misconduct, FBI employees typically spend their careers with the Bureau, until mandatory retirement, in pursuit of the pension that the FBI advertises to prospective hires.  Compl. ¶¶ 134-136.  No FBI employee expects to be fired at any time for any reason.  Such capriciousness and instability would frustrate the FBI's ability to achieve its law enforcement mission and to attract and retain top personnel.  It would also signal to the thousands of career FBI employees that they have no protection from the political winds of change, nor the sometimes powerful, connected, and high-profile subjects of their investigation.  Compl. ¶ 37.  There is nothing in FBI policy or practice to give credence to Defendants' unsupported claim that FBI employees serve "at will."  *See Esparraguera v. Department of the Army*, 101 F.4th 28, 39 (D.C. Cir. 2024) ("whether a property interest exists is not defined by the procedures provided for its deprivation.") (internal citations and quotation marks omitted).  Defendants' motion to dismiss Plaintiffs' deprivation of property interest claim should be denied.

### III.    PLAINTIFFS STATED FIFTH AMENDMENT DEPRIVATION OF LIBERTY INTEREST CLAIMS

Government employees possess a "constitutionally protected liberty interest in professional reputation" under the Fifth Amendment.  *Doe v. U.S. Dep't of Just.*, 753 F.2d 1092, 1104 (D.C. Cir. 1985).  "[A]n individual's liberty interest is impaired when the government acts to injure his or her good name, reputation, honor or integrity, or imposes a stigma that effectively

forecloses his or her future employment opportunities." *Id.* at 1105; *Bd. of Regents*, 408 U.S. at 573. Plaintiffs' liberty interest claims are not contingent on this Court finding that they also have a property interest in their employment. "The liberty clause," in contrast to the property clause, "protects reputation, not job tenure, in the government employment context." *Jefferson v. Harris*, 170 F. Supp. 3d 194, 210 (D.D.C. 2016) (internal citations and quotation marks omitted).

Plaintiffs allege that Defendants violated their Fifth Amendment liberty interests under "reputation plus" and "stigma plus" theories by impugning their character and injuring their professional reputations while removing them from federal service, without due process. *See* Compl. ¶¶ 217-227. The Complaint alleges numerous instances of the Defendants engaging in such conduct. *See supra* pp. 7-11. The only reasonable inference that can be drawn, especially at the motion to dismiss phase, is that these accusations impaired their ability to pursue their chosen professions in law enforcement or obtain subsequent employment. *Id.*

### A.     Plaintiffs Stated a "Reputation Plus" Liberty Interest Claim

To state a reputation-plus claim, a plaintiff must show that, in connection with her termination, the (1) government-employer's defamatory statements caused harm "beyond reputation, such as loss of present government employment"; (2) actual stigmatization of reputation, such as charges of "dishonesty" or "unprofessional conduct"; and (3) "hamper[ing]" of future employment prospects. *Jefferson*, 170 F. Supp. 3d at 205 (quoting *Doe*, 753 F.2d at 1111) (cleaned up). Here, Plaintiffs allege that Defendants' statements tarnished their reputations as highly competent, ethical law enforcement officers, and made it difficult for them to secure future employment, particularly in the field where they had expertise.

*First*, Defendants claim that the only actionable statements were uttered on the same day as Plaintiffs' terminations—on October 7, 2025, for Plaintiff Ball; October 31, 2025, for Plaintiff

Garman; and November 4, 2025, for Plaintiff Toleman—because defamatory statements must accompany the terminations. Def. Br. at 12. But Defendants cite no authority for a "same-day" rule, and courts evaluating "reputation-plus" claims have declined to impose any fixed temporal proximity to the employment action. *See Orange v. D.C.*, 59 F.3d 1267, 1274 (D.C. Cir. 1995) (noting only that "injury to reputation cannot occur *in the absence of* public disclosure of the allegedly damaging statements") (emphasis added). The Complaint alleges that Defendants engaged in a coordinated, continuing campaign of rolling terminations accompanied by repeated (baseless) public statements justifying the firings as accountability for purported misconduct. Compl. ¶¶ 99–100, 139–42, 154–55. At the pleading stage, this is more than sufficient to meet the "accompanied by" requirement. *See O'Donnell v. Barry,* 148 F.3d 1126, 1140 (D.C. Cir. 1998) (stating that "accompanied by" means "in the *course of* the term of employment") (cleaned up).

*Second*, Defendants argue that Plaintiffs were not defamed because Defendants' statements merely referenced the work that Plaintiffs did, without expressly stating Plaintiffs' names. Def. Br. at 12. But as Defendants seem to concede, a plaintiff "need not be specifically named" where surrounding circumstances leave "no doubt in the mind of the hearer as to his identity." *Id.* (citing *Harmon v. Liss*, 116 A.2d 693, 695 (D.C. 1955)); *cf. Jewell v. Jagadesan*, 2026 WL 686105, at *5 (D.D.C. Mar. 11, 2026) (dismissing liberty claim where plaintiff was not identifiable from public government statements about "wasteful" and "shameful" diversity initiatives, and the termination letter included no such language). And, "[w]here the group or class defamed is small, and each and every member of the group or class is referred to, then any individual member can sue." *Alexis v. District of Columbia*, 77 F. Supp. 2d 35, 41 (D.D.C. 1999) (cleaned up) (quoting *Neiman-Marcus v. Lait*, 13 F.R.D. 311, 315 (S.D.N.Y. 1952)). Here, Defendants did not disparage "the FBI" in the abstract; they targeted "CR-15, the public corruption squad"—a discrete, publicly named unit to

25

which each Plaintiff was assigned—and vowed to find "every single person involved." Compl. ¶¶ 150-153. There is "no doubt in the mind of the hearer" as to who was meant. *Harmon*, 116 A.2d at 695.

That Plaintiffs' names may have entered the public domain via some third party, and not Defendants, does not somehow cure Defendants' defamation. Unlike in *Langeman*, which Defendants invoke here, Plaintiffs allege that Defendants spoke about Plaintiffs using language and context that made it clear who Defendants were defaming. *Compare* Def. Br. at 13-15 (invoking *Langeman*, 88 F.4th at 296) *with* Plaintiffs' allegations. *See supra* pp. 8-11.

*Third*, Defendants argue that their statements "could not have 'injured the plaintiffs in their trade, profession, or community standing, or lowered them in the estimation of the community,'" thus disputing the defamatory nature of their statements. Def. Br. at 13 (cleaned up) (quoting *Farah v. Esquire Mag.*, 736 F.3d 528, 533-34 (D.C. Cir. 2013) (stating defamation standard)). Central to an inquiry into defamation is the context in which the statements were published, including the "broader social context"—a consideration Defendants omit from their analysis. *See Farah*, 736 F.3d at 535. The Complaint alleges that for law enforcement officers, false accusations of "weaponizing" the government, lacking impartiality, and acting corruptly or unethically are paradigmatic charges of professional dishonesty and unfitness that go to inherent character, not situational performance. *See* Compl. ¶¶ 145, 196, 203, 222.

Defendants' reliance on *Mazaleski v. Treusdell*, 562 F.2d 701, 714 (D.C. Cir. 1977), and *Harrison v. Bowen*, 815 F.2d 1505, 1518 (D.C. Cir. 1987), *see* Def. Br. at 14, is wholly misplaced: both involved run-of-the mill terminations for unsatisfactory job performance. By contrast, allegations of misconduct or dishonesty that speak to an employee's fundamental character and general fitness implicate a protected liberty interest in professional reputation. *Jefferson*, 170 F.

26

Supp. 3d at 205; *Doe*, 753 F.2d at 1105.  The Court cannot credit Defendants' attempts to recast Plaintiffs' allegations on a motion to dismiss.

*Fourth*, Defendants argue that their statements have not caused harm to any interest beyond reputation.  Each Plaintiff—former federal law enforcement officers—has pleaded with specificity how Defendants' false and defamatory statements have foreclosed employment opportunities.  *See supra* pp. 9-11.  Plaintiffs were cut off from federal law-enforcement opportunities and forced into replacement work that was lower paid, less stable, or outside their field.  Compl. ¶¶ 172-203; *Bd. of Regents*, 408 U.S. at 573 (inability to seek public employment would be liberty deprivation); *Kartseva v. Dep't of State*, 37 F.3d 1524, 1527 (D.C. Cir. 1994) (foreclosure of opportunity to seek any public contracts would be liberty deprivation).

Defendants' contention that Plaintiffs suffered no cognizable harm because they eventually found other work misstates the standard.  The question is not whether a stigmatized employee can find any job, but whether the government's action "foreclos[ed] [her] freedom to take advantage of other employment opportunities" in her chosen field.  *O'Donnell*, 148 F.3d at 1140.  Plaintiffs pleaded exactly that: Careers in federal law enforcement are now closed to them, Compl. ¶¶ 177-178, and they were driven into lower-paid, less stable work outside the field they spent their careers mastering, *id*. ¶¶ 182-183, 190-191.

It is axiomatic that career law enforcement officers will have difficulty finding other positions in law enforcement when the federal government employer engages in a public campaign to label them "unethical, corrupt," or enemies in the course of removing them from government service.  Plaintiffs' reputation-plus claim should proceed to discovery.

### B.    Plaintiffs Stated a "Stigma Plus" Liberty Interest Claim

The Complaint's allegations independently satisfy a stigma-plus basis for a Fifth Amendment deprivation-of-liberty claim.  A "stigma-plus" basis for a Fifth Amendment claim

27

requires showing a "governmental imposition of 'a continuing stigma or other disability arising from official action' that 'foreclosed the plaintiff's freedom to take advantage of other employment opportunities.'" *Jefferson*, 170 F. Supp. 3d at 205 (quoting *O'Donnell*, 148 F.3d at 1140).  Unlike the "reputation-plus" claim, no "official speech" is required for a stigma-plus claim; all that is required is a "continuing stigma or disability," *O'Donnell,* 148 F.3d at 1140.

Government action constraining future employment opportunities "must involve a tangible change in status" for the employee.  *Kartseva*, 37 F.3d at 1527.  Plaintiffs may satisfy the "tangible change in status" requirement by plausibly alleging either a formal or automatic exclusion from future government employment—such as "a binding determination to disqualify" them—or government action that, even without formal disqualification, has the "broad effect of largely precluding" them from pursuing their chosen career.  *Jefferson*, 170 F. Supp. 3d at 205 (quoting *Kartseva*, 37 F.3d at 1528-29).  Here, Plaintiffs have done so.  They alleged that they were removed from federal service due to purported corrupt, unethical, and politicized misconduct, thereby foreclosing them from future government opportunities.  *See supra* pp. 7-11.

Defendants argue that Plaintiffs' stigma-plus claim should be dismissed because Plaintiffs have not been stigmatized and are capable of securing other employment in the federal government.  *See* Def. Br. at 17.  But Plaintiffs' termination letters expressly state that they are "removed *from the federal service* . . . effective immediately."  Compl. ¶ 174 (emphasis added). The letters—and accompanying public statements by Defendants—convey that Plaintiffs are "unsuitable" for any position within the federal government and future federal and law-enforcement employment.  Compl. ¶¶ 196, 226; *see also Kartseva*, 37 F.3d at 1529 (disqualifying plaintiff "from a predetermined class of contracts or jobs with agencies" is formal disqualification from future opportunities).  Plaintiffs spent years building specialized FBI careers and had an

expectation of spending their careers in FBI service, which is "unique" with "no comparators." Compl. ¶¶ 33, 200-201. Defendants' suppositions that Plaintiffs can return to federal law enforcement service strain credulity, particularly at the pleading stage, where Plaintiffs have the benefit of all reasonable inferences.

## IV. PLAINTIFFS STATED AN *ULTRA VIRES* AND LEGAL NULLITY CLAIM

Equitable actions, including *ultra vires* claims, have "long been recognized as the proper means" to challenge unconstitutional actions of federal officers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n. 2 (2010) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)). "Legal nullity" is the order that Plaintiffs seek should the Court grant Plaintiffs' *ultra vires* claim. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90 (1949) (ultra vires actions "may be made the object of [a judicial decree declaring them a legal nullity]").

Plaintiffs allege that Defendant Patel's invocation of Article II to remove Plaintiffs from federal service exceeded the scope of his Constitutional authority. Compl. ¶ 231. To the extent that Defendants' employment actions were based on Defendant Patel's exercise of Article II authority, Plaintiffs seek an order declaring them *ultra vires* and a legal nullity. Defendants seek to dismiss Plaintiffs' *ultra vires* claim on two grounds, one concerning the proper bases for an *ultra vires* challenge, and the other concerning the scope of Article II. Both arguments misapprehend Plaintiffs' claim. They also lack the factual predicate they seem to rely upon, and have no support in the case law. We address each in turn.

*First*, Defendants misconstrue Plaintiffs' *ultra vires* claim as somehow seeking an end-run around the Civil Service Reform Act's ("CSRA") jurisdictional bar. Def. Br. at 19-20. But it is self-evident from the text of the Complaint that Plaintiffs' *ultra vires* claim seeks to do no such

29

thing: it solely concerns Defendants' exercise of Article II removal power. It is purely a Constitutional claim. Compl. ¶¶ 228-235. The CSRA does not bar Plaintiff's *ultra vires* claim. *See Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (rejecting statutory limitation to *ultra vires* in case concerning violation of the Constitution); *McCabe v. Barr*, 490 F. Supp. 3d 198, 211 (D.D.C. 2020) (denying motion to dismiss *ultra vires* claim premised on constitutional violation).[5]

*Second*, Defendants argue, in general terms, that the President may remove Executive Branch employees under Article II, and that his subordinates could also exercise such authority. Def. Br. at 19-20. But Defendants have not applied those abstract statements to Plaintiffs' claim, and perhaps for good reason. At this pleading stage, there is no support for the proposition that the President had any involvement whatsoever in the decision by Defendants to remove Plaintiffs from federal service. Defendants' argument presupposes that it was the President who sought to remove Plaintiffs from federal service and not Defendant Patel (not pleaded in the Complaint), that the President conferred his Article II removal authority to Director Patel—because surely Defendants do not contend that Article II removal powers automatically extend to every principal in the Executive Branch, whether the President authorizes it or not (also not pleaded in the Complaint), and that Defendant Patel was actually invoking Article II removal authority when removing Plaintiffs from federal service.

Even if the record were what Defendants attempt to conjure up, they still have no support for their novel Article II position: that any line federal employee is removable at any time and for any reason. The key separation of powers concern that animates Presidential removal authority is

---

[5] Defendants cite *Changji Esquel Textile*, 40 F.4th 716, 721 (D.C. Cir. 2022) and similar cases for the proposition that *ultra vires* claims are limited to seeking redress for exercise of authority in excess of statute, and not the Constitution. But *Changji* did not involve Constitutional questions, and the opinion did not discuss the propriety of Constitutional claims in *ultra vires* review. *Id*. at 721. In any case, Defendants misconstrue the basis for Plaintiffs' claim.

accountability of senior officials, such as principal officers and certain inferior officers, who wield the President's authority. *See Trump v. Slaughter*, 609 U.S. __ (2026) (the President must have "assistance of officers he can trust" and that those officers must "remain accountable to the President"). But those same accountability concerns do not extend to line-level government employees and "inferior officers with limited duties and no policymaking or administrative authority," and who work under the supervision and direction of principal and/or senior officers. *Seila Law LLC v. CFPB*, 591 U.S. 197, 218 (2020). Article II removal power does not extend to these employees and thus, they may avail themselves of removal protections —whether they lie in the Bill of Rights, as for Plaintiffs—or statute, as the Pendleton Act of 1883 or the Civil Service Reform Act, which undergird much of the professional civil service system.

Defendants' motion to dismiss Plaintiffs' *ultra vires* claim should be denied.

## V.    PLAINTIFFS STATED A CLAIM FOR DECLARATORY RELIEF

Plaintiffs assert the Declaratory Judgment Act as the remedial vehicle for constitutional violations alleged in the Complaint. This pleading form is routine. *See, e.g.*, *Comm. on Judiciary, U.S. House of Reps. v. Miers*, 558 F. Supp. 2d 53, 81–82 (D.D.C. 2008) (permitting House Committee to bring Declaratory Judgment Action to enforce Congressional subpoena because "the Constitution is the source of the right allegedly violated . . . ."); *C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (Declaratory Judgement Act as separate count where "judicially remediable right" exists elsewhere) (quoting *Schilling v. Rogers*, 363 U.S. 666, 677 (1960)); *Seized Prop. Recovery, Corp.*, 502 F. Supp. 2d 50, 64 (D.D.C. 2007); *Souther*, Order on Mot. Dismiss, at *26 (permitting Declaratory Judgment Act claim in analogous FBI termination case where alleged constitutional violations provided independent causes of action for declaratory relief).

31

Defendants argue that asserting a "separate declaratory judgment 'count' is a misnomer" because the Declaratory Judgment Act "does not give rise to a cause of action or create an independent source of federal jurisdiction." Def. Br. at 22 (citing *Metz v. BAE Sys. Tech. Sols. & Servs.*, 774 F.3d 18, 25 n.8 (D.C. Cir. 2014)). But that framing is incomplete. While the Declaratory Judgment Act does not itself create "an independent source of federal jurisdiction," *C&E Servs., Inc. of Wash.*, 310 F.3d at 201 (quoting *Schilling*, 363 U.S. at 677), it is the relief that a plaintiff can seek for redress of a "cause of action through which the Court may exercise subject matter jurisdiction," *Seized Prop. Recovery, Corp.*, 502 F. Supp. 2d at 64. Defendants' motion should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss the Complaint.

Dated: July 28, 2026
New York, New York

Respectfully Submitted,

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

PETERS BROVNER LLP

  /s/ Daniel M. Eisenberg
Andrew G. Celli, Jr.*
Matthew D. Brinckerhoff*
Daniel M. Eisenberg
Rachael Wyant*

One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
acelli@ecbawm.com
mbrinckerhoff@ecbawm.com
deisenberg@ecbawm.com
rwyant@ecbawm.com

*Attorneys for Plaintiffs*
**admitted pro hac vice*

  /s/ Lesley Allison Brovner
Lesley Allison Brovner*
Mark G. Peters*

139 Fulton St., Suite 132
New York, New York 10038
(917) 639-3270
mpeters@petersbrovner.com
lbrovner@petersbrovner.com

*Attorneys for Plaintiffs*