# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN DOE 1, *et al.*,

      *Plaintiffs,*

    v.

KASHYAP P. PATEL, *et al.*,

      *Defendants.*

Civil Case No. 1:26-cv-00959-JMC

JAMIE GARMAN, *et al.*,

      *Plaintiffs,*

    v.

KASHYAP P. PATEL, *et al.*,

      *Defendants.*

Civil Case No. 1:26-cv-1086-JMC

**[PROPOSED] BRIEF OF *AMICI CURIAE* FIRST AMENDMENT SCHOLARS IN
SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Anna Baldwin
Dana Paikowsky
Arianna Khan
Brendan T. Nigro
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
abaldwin@campaignlegalcenter.org

David A. Schulz
   *Counsel of Record*
Christina Lee
John Langford
MEDIA FREEDOM &
  INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
(212) 850-6103
david.schulz@yale.edu

*Counsel for First Amendment Scholars as
Amici Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iii

INTERESTS OF AMICI CURIAE....................................................................................1

BACKGROUND AND SUMMARY OF ARGUMENT....................................................2

ARGUMENT......................................................................................................................3

    I.   THE FIRST AMENDMENT PROHIBITS THE GOVERNMENT FROM FIRING LINE FBI EMPLOYEES FOR THEIR PERCEIVED POLITICAL BELIEFS AND ASSOCIATIONS ........................................................................................................3

    II.  AT THE MOTION TO DISMISS STAGE, PLAINTIFFS NEED ONLY ALLEGE A PRIMA FACIE CASE OF RETALIATION, A BURDEN THEY EASILY CARRY ...........8

        A.  Plaintiffs Sufficiently Allege Patronage Claims That Survive the Government's Motion to Dismiss. .................................................................................................8

        B.  Although Not Yet Ripe, Defendants' Proffered Mt. Healthy Defense Is Improperly Generic and Facially Implausible. ...............................................14

    III. PATRONAGE DISMISSALS ARE ESPECIALLY DANGEROUS IN FEDERAL LAW ENFORCEMENT ............................................................................................15

CONCLUSION ................................................................................................................16

ii

## TABLE OF AUTHORITIES

**Cases**

*Acevedo-Diaz v. Aponte,*
    1 F.3d 62 (1st Cir. 1993)................................................................................15

*Anemone v. Metro. Transp. Auth.,*
    629 F.3d 97 (2d Cir. 2011)............................................................................10

*Anthony v. Sundlun,*
    952 F.2d 603 (1st Cir. 1991).........................................................................12

*Aponte-Santiago v. Lopez-Rivera,*
    957 F.2d 40 (1st Cir. 1992)...........................................................................12

*Bird v. West Valley City,*
    832 F.3d 1188 (10th Cir. 2016)........................................................................6

*Brady v. Fort Bend Cnty.,*
    145 F.3d 691 (5th Cir. 1998)............................................................................8

*Branti v. Finkel,*
    445 U.S. 507 (1980) ......................................................................................3, 5

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ...............................................................................................4

*Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy,*
    367 U.S. 886 (1961) ...........................................................................................3

*Cepero-Rivera v. Fagundo,*
    414 F.3d 124 (1st Cir. 2005).........................................................................11

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ...........................................................................................7

*City Council v. Taxpayers for Vincent,*
    466 U.S. 789 (1984) ...........................................................................................7

*Clark v. Library of Congress,*
    750 F.2d 89 (D.C. Cir. 1984)................................................................................8, 9

*Coogan v. Smyers,*
    134 F.3d 479 (2d Cir. 1998)...................................................................................8

*Davignon v. Hodgson,*
    524 F.3d 91 (1st Cir. 2008). ................................................................................15

*DeCrane v. Eckart,*
    12 F.4th 586 (6th Cir. 2021) .................................................................................6

*Erickson v. Pierce Cnty.,*
    960 F.2d 801 (9th Cir. 1992).................................................................................8

*Estrada-Izquierdo v. Aponte-Roque,*
    850 F.2d 10 (1st Cir. 1988) .................................................................................12

*Galli v. New Jersey Meadowlands Comm'n,*
    490 F.3d 265 (3d Cir. 2007)..................................................................................8

*Heffernan v. City of Paterson, N.J.,*
    578 U.S. 266 (2016) ....................................................................................passim

*Jenner & Block LLP v. U.S. Dep't of Just.,*
    784 F. Supp. 3d 76 (D.D.C. 2025).....................................................................6, 15

*Jones v. Dodson,*
    727 F.2d 1329 (4th Cir. 1984)...............................................................................8

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
    385 U.S. 589 (1967) ..........................................................................................3, 5

*Kreuzer v. Brown,*
    128 F.3d 359 (6th Cir. 1997).................................................................................8

*Lathram v. Snow,*
    336 F.3d 1085 (D.C. Cir. 2003) ...........................................................................13

*LeFande v. District of Columbia,*
    613 F.3d 1155 (D.C. Cir. 2010) ...................................................................................9

*Mahn v. Jefferson Cnty., Mo.,*
    891 F.3d 1093 (8th Cir. 2018)......................................................................................8

*McCabe v. Sharrett,*
    12 F.3d 1558 (11th Cir. 1994)......................................................................................8

*Media Matters for Am. v. Fed. Trade Comm'n,*
    No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ......................................12

*Mt. Healthy City School District Board of Education v. Doyle ("Mt. Healthy"),*
    429 U.S. 274 (1977) ............................................................................................8, 9, 11

*N. Mississippi Commc'ns, Inc. v. Jones,*
    951 F.2d 652 (5th Cir. 1992).......................................................................................12

*Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson,*
    357 U.S. 449 (1958) ......................................................................................................4

*Nat'l Rifle Ass'n of Am. v. Vullo,*
    144 F.4th 376 (2d Cir. 2025).......................................................................................10

*Nat'l Council of Prison Locs. v. Fed. Bureau of Prisons,*
    No. 3:25-CV-1907 (VDO), 2026 WL 1146301 (D. Conn. Apr. 28, 2026) .................10

*O'Hare Truck Serv., Inc. v. City of Northlake,*
    518 U.S. 712 (1996) .................................................................................................5, 6

*Padilla-Garcia v. Guillermo Rodriguez,*
    212 F.3d 69 (1st Cir. 2000)...........................................................................................8

*Palmore v. Hornberger,*
    813 F. App'x 68 (3d Cir. 2020)...................................................................................10

*Patkus v. Sangamon-Cass Consortium,*
    769 F.2d 1251 (7th Cir. 1985)................................................................................8, 12

*Perry v. Sindermann,*
   408 U.S. 593 (1972) ....................................................................................4

*Pinson v. United States Dep't of Just.,*
   246 F. Supp. 3d 211 (D.D.C. 2017) ...............................................10, 13, 14

*Rodriguez-Reyes v. Molina-Rodriguez,*
   711 F.3d 49 (1st Cir. 2013) .........................................................................11

*Rutan v. Republican Party of Ill.,*
   497 U.S. 62 (1990) ...........................................................................3, 5, 6, 7

*Speiser v. Randall,*
   357 U.S. 513 (1958) ....................................................................................4

*Spurlin v. Floyd Cnty.,*
   No. 25-11242, 2025 WL 3122288 (11th Cir. 2025) (per curiam)...................6

*Thompson v. District of Columbia,*
   832 F.3d 339 (D.C. Cir. 2016) ....................................................................9

*Trump v. Slaughter,*
   609 U.S. __ (2026) ......................................................................................7

*United Pub. Workers of Am. (C.I.O.) v. Mitchell,*
   330 U.S. 75 (1947) ...................................................................................3, 4

*Velez-Rivera v. Agosto-Alicea,*
   437 F.3d 145 (1st Cir. 2006) .......................................................................11

*W. Va. State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ...............................................................................3, 4

*Wagner v. Wheeler,*
   13 F.3d 86 (4th Cir. 1993)...........................................................................12

*Walton v. Powell,*
   821 F.3d 1204 (10th Cir. 2016).....................................................................8

*Wieman v. Updegraff,*
   344 U.S. 183 (1952) ................................................................................................3

*Wilburn v. Robinson,*
   480 F.3d 1140 (D.C. Cir. 2007) ..............................................................................9

*Williams v. Johnson,*
   537 F. Supp. 2d 141 (D.D.C. 2008) .......................................................................10

*Wooley v. Maynard,*
   430 U.S. 705 (1977) ................................................................................................3


**Other Authorities**

Elena Kagan, *Private Speech, Public Purpose: The Role of Government Motive in First
   Amendment Doctrine,*
   63 U. Chi. L. Rev. 413 (1996) ................................................................................7

FBI, OPR, *Office of Professional Responsibility Policy Guide* (Sept. 8, 2021), § 4.6.4 ..............13

Katherine Shaw, *Partisanship Creep,*
   118 Nw. U. L. Rev. 1563 (2024) .............................................................................6

U.S. Const. amend. I ...................................................................................................3

**INTERESTS OF AMICI CURIAE**

*Amici curiae* are scholars of First Amendment law. These scholars have studied, written on, and/or litigated issues concerning First Amendment retaliation and the Supreme Court's political patronage doctrine. *Amici* submit this brief to assist the Court in resolving the government's motion to dismiss the Plaintiffs' First Amendment claims in the above-captioned cases.

All parties have consented to *amici*'s motion for leave to submit this brief. Identity and affiliation of the *amici*, who are participating in their individual capacities and not as representatives of the institutions with which they are affiliated, appear below:

Jack M. Balkin
Knight Professor of Constitutional Law and the First Amendment
Yale Law School

Heidi Kitrosser
William W. Gurley Professor of Law
Northwestern Pritzker School of Law

Christina Koningisor
Harry & Lillian Hastings Research Chair and Professor of Law
University of California School of Law, San Francisco

Genevieve Lakier
Professor of Law and Herbert & Marjorie Fried Teaching Scholar
The University of Chicago Law School

Gregory P. Magarian
Thomas and Karole Green Professor of Law
Washington University in St. Louis School of Law

Burt Neuborne
Norman Dorsen Professor of Civil Liberties Emeritus
New York University School of Law

Francesca Procaccini
Associate Professor of Law
Vanderbilt Law School

## BACKGROUND AND SUMMARY OF ARGUMENT

In April 2022, the Federal Bureau of Investigation ("FBI") began investigating efforts to undermine the 2020 election in an investigation dubbed "Operation Arctic Frost." Garman Compl. ¶¶ 101–05; Doe Compl. ¶¶ 63–69. It was approved by the FBI's Washington Field Office Chief Division Counsel, FBI General Counsel, the FBI Director, and the Attorney General, and it was led by a special counsel appointed by the Attorney General. Garman Compl. ¶¶ 103–04; Doe Compl. ¶ 63. The FBI's work led to an indictment of President Trump in August 2023 and a superseding indictment in August 2024. Garman Compl. ¶¶ 106–07.

Before he was elected to a second term, President Trump threatened to gut the FBI if reelected. Garman Compl. ¶ 115; Doe Compl. ¶ 71. Reelected, President Trump and those appointed to high-level positions in the Department of Justice threatened to fire FBI employees who participated in Operation Arctic Frost because they were "Democrats," "RINOs," and generally disloyal to him. Garman Compl. ¶¶ 115–22, 131–38; Doe Compl. ¶¶ 71, 80, 83, 88, 115–18. Ultimately, the Trump Administration summarily fired more than fifty FBI employees who happened to be assigned to Operation Arctic Frost, accusing them of "weaponizing" government by simply carrying out their duties. Garman Compl. ¶¶ 138, 140; Doe Compl. ¶ 95. Plaintiffs, terminated FBI employees, filed these two lawsuits, asserting, among other claims, that their terminations violate the First Amendment because they were fired based on their perceived political beliefs and affiliations.

The undersigned *amici* submit this brief to assist the Court in evaluating the government's motion to dismiss Plaintiffs' First Amendment claims in both suits. *Amici* describe the background First Amendment prohibition on political patronage practices generally and the origins of that bedrock prohibition. *Amici* then explain how the Supreme Court's *Mt. Healthy* burden-shifting framework applies on a motion to dismiss in a typical patronage dismissal case, showing why

Plaintiffs surely survive Defendants' motion to dismiss here. Finally, *amici* briefly describe how the politicization of federal law enforcement alleged in this case raises First Amendment concerns more pressing than those raised by a typical patronage dismissal case, underscoring the strength of Plaintiffs' First Amendment claims.

## ARGUMENT

**I.      THE FIRST AMENDMENT PROHIBITS THE GOVERNMENT FROM FIRING LINE FBI EMPLOYEES FOR THEIR PERCEIVED POLITICAL BELIEFS AND ASSOCIATIONS**

In a long line of cases dating back to 1947, the Supreme Court has repeatedly made clear and held that conditioning government employment on an individual's perceived political beliefs and associations generally violates the First Amendment. *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 268 (2016); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 69 (1990); *Branti v. Finkel*, 445 U.S. 507, 513–16 (1980); *Elrod v. Burns*, 427 U.S. 347, 356–57 (1976); *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 100 (1947); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967); *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 897 (1961); *Wieman v. Updegraff*, 344 U.S. 183 (1952). The derivation of the rule is straightforward.

The First Amendment protects political beliefs and associations. It explicitly prohibits the government from abridging the freedoms of speech and assembly. U.S. Const. amend. I. By protecting speech, the First Amendment necessarily protects the freedom of belief and "individual freedom of mind." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The First Amendment also protects the freedom of association because "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958); *see also Buckley v.*

*Valeo*, 424 U.S. 1, 15 (1976). While these cognate freedoms protect belief, speech, association, and assembly on all manner of topics, "*political* belief and association constitute the core of those activities protected by the First Amendment." *Elrod*, 427 U.S. at 356 (emphasis added).

The First Amendment's protections for political belief and association prohibit the government from dictating political beliefs and association directly or indirectly. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. The government cannot directly order individuals to confess particular political beliefs or refrain from particular political associations. *Id*. The First Amendment also prohibits indirect compulsions. Key here, the government cannot punish individuals for their protected activity, lest it be permitted to indirectly accomplish a result which the Constitution forbids. *See, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Speiser v. Randall*, 357 U.S. 513, 518 (1958).

The most obvious and well-recognized unconstitutional condition or punishment is the provision or denial of employment because of an individual's political beliefs or associations. Well before First Amendment doctrine fully blossomed, the Supreme Court observed that "[n]one would deny" that Congress is foreclosed from "enact[ing] a regulation providing that no Republican . . . shall be appointed to federal office." *United Pub. Workers of Am. (C.I.O.)*, 330 U.S. at 100. In *Elrod v. Burns*, the Court elaborated that "the practice of patronage" is prohibited both because of "the restraint it places on [employees'] freedoms of belief and association," and because it distorts "[t]he free functioning of the electoral process" those freedoms aim to facilitate, insulating the incumbent party from political challengers. 427 U.S. at 355–56. Political patronage "is inimical to

the process which undergirds our system of government and is at war with the deeper traditions of democracy embodied in the First Amendment." *Id.* at 357 (internal quotation marks omitted).[1]

Patronage practices that coerce association with a political party generally violate the First Amendment. *See, e.g., Elrod*, 427 U.S. at 356–57 (firing Republicans); *Branti*, 445 U.S. at 513–16 (attempting to fire a Republican); *Rutan*, 497 U.S. at 69 (firing and demoting Democrats); *Keyishian*, 385 U.S. at 604 (firing individuals who refused to sign a certificate stating they were not Communists).[2] So, too, do patronage practices that compel association with, or support for, a particular individual. *See, e.g., O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 715–16 (1996); *Heffernan*, 578 U.S. at 272. "With a few exceptions, the Constitution prohibits a government employer from discharging or demoting an employee because the employee supports a particular political candidate." *Heffernan*, 578 U.S. at 270. In *O'Hare*, for example, the Supreme Court found that a tow truck operator's free association rights were violated when, after refusing

---

[1] The rule against patronage practices extends far beyond patronage dismissals and refusals to hire, which are only the most blunt and unconstitutional form of prohibited patronage practices. In *Rutan v. Republican Party of Illinois*, the Court extended the holdings of *Elrod* and *Branti* to cover a broad range of employment decisions, such as promotion, transfer, and recall. 497 U.S. 62, 65 (1990).

[2] This general prohibition does not apply to high-level policymaking positions where party affiliation is an appropriate requirement for the effective performance of the office involved. *Branti*, 445 U.S. at 518; *Elrod*, 427 U.S. at 375 (Stewart, J., concurring). However, the government in this case appears to concede that the Plaintiffs—former FBI agents—do not fall into this *Elrod-Branti* exception. Defs.' Comb. Mem. Supp. Mot. Dismiss Doe & Garman Compls. Lack of Subject-Matter Jurisdiction & Failure State Claim Relief at 4–6, *Garman v. Patel*, No. 26-cv-1086 (D.D.C. June 18, 2026), ECF No. 28 ("Gov't MTD"). Nor could the government prove otherwise: political loyalty tests would "undermine, rather than promote, the effective performance" of federal law enforcement officials, who must remain non-partisan. *Branti*, 445 U.S. at 519–20; Garman Compl. ¶¶ 28, 37–50; Doe Compl. ¶¶ 62, 69.

5

to make a campaign contribution for the mayor's re-election, the tow truck was removed from the local government's tow truck service list. 518 U.S. at 715–16.[3]

Notably, the government violates the First Amendment when it terminates an employee because of their perceived political beliefs and associations, even when it is mistaken about those beliefs and associations, *Heffernan*, 578 U.S. at 270, and even when it fails to coerce an employee to forgo their beliefs and associations, *Rutan*, 497 U.S. at 71. Retaliating against one employee for their perceived beliefs and associations risks chilling both the targeted employee's and other employees' freedoms of belief and association. *Id.* Because that is true regardless of the actual political beliefs and affiliation of the terminated employee and whatever the impact on the terminated employee, the First Amendment is violated any time the government terminates an employee based on their perceived beliefs and associations. *Heffernan*, 578 U.S. at 273–74.[4]

In other words, alleging that one was dismissed premised on an impermissible government motive grounded in partisan retaliation based on an employee's perceived political beliefs and

---

[3] For more on the origins of the Supreme Court's political patronage doctrine, *see* Katherine Shaw, *Partisanship Creep*, 118 Nw. U. L. Rev. 1563, 1593–98 (2024).

[4] Indeed, in the closely related line of cases regarding retaliatory firings based on an employee's speech and other protected activity, employees need not have engaged in any conduct at all to state a claim if the government retaliates against them for perceived conduct that would be protected. *See, e.g.*, *Spurlin v. Floyd Cnty.*, No. 25-11242, 2025 WL 3122288, at *5–6 (11th Cir. 2025) (per curiam); *DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021); *Bird v. West Valley City*, 832 F.3d 1188, 1212 (10th Cir. 2016); *cf. Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 115 (D.D.C. 2025) (citing *Heffernan* to note that a retaliatory executive order against law firms who engage in protected advocacy "casts a chill over the whole of the legal profession, leaving lawyers around the country weighing the necessity of vigorous representation against the peril of crossing the federal government"). For example, in *Spurlin*, the court found that a plaintiff could state a claim for retaliation if the employee plaintiff's speech was a matter of public concern where plaintiff was fired on the suspicion that she submitted an anonymous complaint, when someone else had actually written the complaint. 2025 WL 3122288, at *4–6. A defendant's mistaken belief therefore does not render a plaintiff's speech or conduct unprotected.

associations is sufficient to state a claim under *Elrod*'s political patronage doctrine, regardless of whether an employee holds those beliefs or associations and/or engaged in any other protected activity. *See Heffernan*, 578 U.S. at 275 (Thomas, J., dissenting) ("Today the Court holds that a public employee may bring a federal lawsuit for money damages alleging a violation of a constitutional right that he concedes he did not exercise.").[5] It is an impermissible partisan motive held by the government that is at the core of the First Amendment claims here. Accordingly, this Court's task is to evaluate whether the motivation behind Plaintiffs' dismissal was either (1) a perceived "failure to affiliate with and support the Republican Party," *see Rutan*, 497 U.S. at 76, disloyalty to President Trump, and/or to hold the Administration's desired belief about the illegitimacy of election-related investigations, or (2) because Plaintiffs "weaponized law enforcement and performed their duties in a politicized manner," *see* Gov't MTD at 5.

\* \* \*

If, as Plaintiffs in both cases allege, the real reason the government terminated their employment is because it perceived Plaintiffs to be insufficiently supportive of President Trump or the Republican Party, or because it perceived them to be associated with the Democratic Party, the government violated the First Amendment.[6]

---

[5] Analyzing government motive, and attempting to smoke out impermissibly speech-coercive motives, is common across First Amendment doctrine. *See, e.g., Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (analyzing whether law "was designed to suppress certain ideas that the City finds distasteful"); Elena Kagan, *Private Speech, Public Purpose: The Role of Government Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 414 (1996) ("[T]he application of First Amendment law is best understood and most readily explained as a kind of motive-hunting.").

[6] Nor does the Supreme Court's decision in *Trump v. Slaughter*, 609 U.S. __ (2026), alter the First Amendment prohibition on patronage practices. *Slaughter* concerns the extent to which legislation enacted through bicameralism and presentment may restrict the President's control over executive branch employees; it says nothing about whether the President may leverage Article II control over the executive branch to burden or restrict employees' First Amendment rights. Eight decades of Supreme Court precedent makes clear that the President cannot do that, except with

## II. AT THE MOTION TO DISMISS STAGE, PLAINTIFFS NEED ONLY ALLEGE A PRIMA FACIE CASE OF RETALIATION, A BURDEN THEY EASILY CARRY

### A. Plaintiffs Sufficiently Allege Patronage Claims That Survive the Government's Motion to Dismiss.

Political patronage claims, like ordinary First Amendment retaliation claims, are governed by the burden-shifting framework laid out by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle* ("*Mt. Healthy*"), 429 U.S. 274 (1977). *See Clark v. Library of Congress*, 750 F.2d 89, 101–02 (D.C. Cir. 1984).[7] Under the *Mt. Healthy* framework, a plaintiff bears the initial burden of demonstrating a prima facie case of retaliation by demonstrating that their "conduct was constitutionally protected, and that this conduct was a 'substantial factor' or to put it in other words, that it was a 'motivating factor' in the government's actions towards the plaintiff." *Mt. Healthy*, 429 U.S. at 287. If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the government to prove that it would have reached the same decision "even in the absence of the protected conduct." *Id.*

The *Mt. Healthy* burden-shifting regime accommodates substantive and procedural concerns unique to unconstitutional motive cases. Substantively, it strikes a balance between employees' First Amendment rights and the government's legitimate interests in supervising

---

respect to high-level policymaking officials. *Slaughter* is also narrowly centered on the principal officer context, as Slaughter was Commissioner of the independent Federal Trade Commission.

[7] Every other Circuit also applies the *Mt. Healthy* burden-shifting framework in political patronage cases. *See, e.g.*, *Padilla-Garcia v. Guillermo Rodriguez*, 212 F.3d 69, 74 (1st Cir. 2000); *Coogan v. Smyers*, 134 F.3d 479, 484 (2d Cir. 1998); *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 271–72 (3d Cir. 2007); *Jones v. Dodson*, 727 F.2d 1329, 1335 (4th Cir. 1984); *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 712 (5th Cir. 1998); *Kreuzer v. Brown*, 128 F.3d 359, 363 (6th Cir. 1997); *Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1259 (7th Cir. 1985); *Mahn v. Jefferson Cnty., Mo.*, 891 F.3d 1093, 1097 (8th Cir. 2018); *Erickson v. Pierce Cnty.*, 960 F.2d 801, 804–05 (9th Cir. 1992); *Walton v. Powell*, 821 F.3d 1204, 1211–12 (10th Cir. 2016); *McCabe v. Sharrett*, 12 F.3d 1558, 1565 n.8 (11th Cir. 1994).

employees. By prohibiting the government from punishing employees because of their protected speech, the test safeguards employees' First Amendment rights of political belief and association; by permitting the government to demonstrate that it would have taken the same action irrespective of any protected conduct, the test ensures employees cannot insulate themselves from being fired or otherwise punished for legitimate reasons when they also happen to have engaged in protected conduct. *See id.* at 286.

Procedurally, the burden-shifting test accounts for the evidentiary asymmetry in unconstitutional animus cases. While plaintiffs typically have evidence of the impact of a firing and the circumstances surrounding it, they almost always lack direct evidence of a defendant's actual reasoning. The test accordingly allows a plaintiff to establish a prima facie case of retaliation by alleging circumstantial evidence of retaliation, *see Clark*, 750 F.2d at 101, at which point the government, which is generally in the "best position to prove an alternative, permissible justification for its adverse" action, bears the burden of demonstrating by a preponderance of the evidence that it would have taken the same action, *Thompson v. District of Columbia*, 832 F.3d 339, 347 (D.C. Cir. 2016).

The evidentiary asymmetry is especially stark at the motion-to-dismiss stage, prior to discovery. To *amici*'s knowledge, neither the D.C. Circuit nor this Court has specifically articulated how the *Mt. Healthy* test applies at the motion-to-dismiss stage, but both have essentially deployed the first half of the *Mt. Healthy* test. In cases alleging retaliation based on an employee's speech, for example, the D.C. Circuit assesses whether the plaintiff's speech is protected by the First Amendment—i.e., it has worked to determine whether plaintiffs allege they were engaged in protected conduct. *E.g.*, *LeFande v. District of Columbia*, 613 F.3d 1155, 1159–62 (D.C. Cir. 2010); *Wilburn v. Robinson*, 480 F.3d 1140, 1149–51 (D.C. Cir. 2007). Even more clearly, this

9

Court has held that when a public-employee plaintiff alleges that they engaged in protected conduct and that the protected conduct was a motivating factor in adverse action, no more is needed to survive a motion to dismiss. *E.g.*, *Pinson v. United States Dep't of Just.*, 246 F. Supp. 3d 211, 229–30 (D.D.C. 2017), *overruled on other grounds on reconsideration sub nom. Pinson v. U.S. Dep't of Just.*, 514 F. Supp. 3d 232 (D.D.C. 2021); *Williams v. Johnson*, 537 F. Supp. 2d 141, 149–50 (D.D.C. 2008). That remains true even when the government proffers an "objectively valid reason" for the adverse action in moving to dismiss a complaint because "[t]he Court must still consider the possibility that the objectively valid reason was a sham and that the true motivation was retaliation" following discovery. *Pinson*, 246 F. Supp. 3d at 229.

The Second Circuit has explicitly adopted this approach. At the motion-to-dismiss stage, the Second Circuit has instructed courts to deploy the first half of the *Mt. Healthy* burden-shifting test: a plaintiff must allege a prima facie case of retaliation under *Mt. Healthy*; if they meet that burden, the analysis ends, and the burden only shifts to the government at the close of discovery, once there is a record on which the parties can meaningfully interrogate the government's actual motivations. *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 F.4th 376, 387–88 (2d Cir. 2025); *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 117 (2d Cir. 2011); *Nat'l Council of Prison Locs. v. Fed. Bureau of Prisons*, No. 3:25-CV-1907 (VDO), 2026 WL 1146301, at *7–8 (D. Conn. Apr. 28, 2026). As the Second Circuit has explained, "*Mt. Healthy* defenses"—i.e., the second half of the test—"are best resolved at the summary judgment stage, when there is sufficient factual material from which to adequately scrutinize not only the challenged decisions but also the proffered reasons supporting them." *Vullo*, 144 F.4th at 388 n.2 (citing *Anemone*, 629 F.3d at 117–20); *see also Anemone*, 629 F.3d at 117–20; *see also Palmore v. Hornberger*, 813 F. App'x 68, 71 (3d Cir. 2020) (internal quotation marks omitted) (explaining that a plaintiff need only allege that unconstitutional animus

10

was a substantial or motivating factor, beyond which point "[i]t makes little sense to apply [the burden-shifting framework] at the pleading stage").

The First Circuit has adopted an even more plaintiff-friendly approach, suggesting that plaintiffs need not even make out a prima facie case of retaliation under the first half of the *Mt. Healthy* test to survive a motion to dismiss. Under this approach, a plaintiff need only allege a non-speculative claim of retaliation. *See, e.g.*, *Velez-Rivera v. Agosto-Alicea*, 437 F.3d 145, 151 (1st Cir. 2006); *see also Cepero-Rivera v. Fagundo*, 414 F.3d 124, 128 (1st Cir. 2005) (internal citations omitted).[8]

Assuming the first half of the *Mt. Healthy* test applies here, Plaintiffs must allege facts that give rise to a plausible claim that (1) Plaintiffs engaged in protected conduct; and (2) Plaintiffs' protected conduct was a motivating factor in their terminations. *Mt. Healthy*, 429 U.S. at 285–86. In political patronage claims, the first prong is almost always satisfied because, with the exception of high-level policymaking employees, an individual's political beliefs and associations are nearly always protected, meaning that retribution based on perceived beliefs and associations violates the First Amendment. *See Elrod*, 427 U.S. at 367 ("Limiting patronage dismissals to policymaking positions is sufficient to achieve th[e] governmental end" of securing the "political loyalty" necessary to ensure "that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate."). As for alleging that an employee's beliefs or associations were a motivating factor, courts look to the timing of the adverse employment effect, whether the political leanings of the

---

[8] Perhaps blurring any real distinction between the prima-facie pleading standard and non-speculative pleading standard, the First Circuit has also cited the *Iqbal* pleading standard in a patronage case, while noting that the elements of a prima facie case are "part of the background against which a plausibility determination should be made." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir. 2013).

plaintiff were put at issue in circumstantial evidence, the manner of the dismissal, and the government employer's hostility to plaintiffs' political views. *See Anthony v. Sundlun*, 952 F.2d 603, 606 (1st Cir. 1991); *Aponte-Santiago v. Lopez-Rivera*, 957 F.2d 40, 43 (1st Cir. 1992); *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 69 (1st Cir. 1993); *Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1259 (7th Cir. 1985); *Wagner v. Wheeler*, 13 F.3d 86, 90–91 (4th Cir. 1993); *Estrada-Izquierdo v. Aponte-Roque*, 850 F.2d 10, 15 (1st Cir. 1988); *N. Mississippi Commc'ns, Inc. v. Jones*, 951 F.2d 652, 655 (5th Cir. 1992). These considerations closely track those in other kinds of First Amendment retaliation cases. *See Media Matters for Am. v. Fed. Trade Comm'n*, No. 25-5302, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 23, 2025).

Plaintiffs more than surmount the bar here. Plaintiffs allege they were fired "because of their perceived political affiliation, without legitimate investigation, finding of misconduct, pre-termination notice of charges to the employees, an opportunity for the employees to present a defense, and/or any compelling or exigent circumstances." Garman Compl. ¶ 98; *see also* Doe Compl. ¶¶ 83, 86, 95. And they allege myriad public statements evincing Defendants' perception that Plaintiffs were either Democrats or insufficiently loyal to either the Republican Party or President Trump and a chain of causation leading from promises to fire Plaintiffs on that basis up through the actual terminations. Garman Compl. ¶¶ 115, 122, 123, 130–32, 134, 148–53, 156–63; Doe Compl. ¶¶ 83, 88, 115–19. To take but one example, the Garman Plaintiffs allege that "on or about August 5, 2025, Defendant Patel told then-FBI Assistant Director Brian J. Driscoll that 'all FBI employees who they identified had worked on the cases against President Trump would be removed from their jobs,' and that he needed to fire agents who worked on cases against President Trump in order to keep his own position" because "the FBI tried to put the president in jail and he hasn't forgotten it." Garman Compl. ¶¶ 135–36. Lest there be any doubt about the partisan motive,

12

the same plaintiffs allege that Patel viewed these plaintiffs as the "Radical Left Lunatics" President Trump dislikes. *Id.* ¶ 156. This is exactly the kind of evidence that ordinarily establishes a prima facie case of retaliation. *Cf. Pinson*, 246 F. Supp. 3d at 229.

Furthermore, the (lack of any meaningful) process by which Plaintiffs were dismissed provides compelling circumstantial evidence of retaliation. Each of over fifty Plaintiffs was fired pursuant to the FBI Director's "summary dismissal" authority, which the Bureau itself describes as an "extraordinary remedy to be exercised in compelling or exigent circumstances." *See* FBI, OPR, *Office of Professional Responsibility Policy Guide* (Sept. 8, 2021), §4.6.4; Garman Compl. ¶¶ 140, 172–180; Doe Compl. ¶¶ 95, 108. The summary dismissal process eliminates ordinary opportunities for the accused to review the administrative inquiry file, prepare a written response, make an oral presentation in one's defense, or pursue an internal appeal. *See* Garman Compl. ¶ 84. The stated reasons underlying Plaintiffs' dismissals were cursory, *see id*. ¶ 174; Doe Compl. ¶ 95, as no specific FBI policies were cited as having been violated and no factual specificity was provided as to *how* Plaintiffs had allegedly weaponized the Bureau. *See* Garman Compl. ¶ 174; Doe Compl. ¶ 95.

Plaintiffs were not provided with specific allegations of the investigative actions they took which purportedly led to the "political weaponization of the government," and supervisors delivering the news of their firing were unable to detail *any* alleged misconduct. *See, e.g.*, Doe Compl. ¶¶ 94, 110; Garman Compl. ¶¶ 173, 180, 186. In the closely related Title VII context, courts routinely hold that a lack of explanation for decisions and departures from prior practice are circumstantial evidence of pretext. *See, e.g., Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003). Here, Plaintiffs are long-tenured employees with exemplary professional records. *See* Garman Compl. ¶¶ 4–9; Doe Compl. ¶¶ 10–22. The lack of explanation for their firings and the

lack of process by which to contend such firing was improper support a reasonable inference that the government's motive was partisan.[9]

Taken as true and viewed in the light most favorable to Plaintiffs, the hostility by Defendants towards Plaintiffs, the timing of the investigations and firings, and the political nature of Defendants' comments throughout the investigation more than meet the bar of alleging that Defendants' unconstitutional animus towards Plaintiffs was a motivating factor in their terminations.[10]

### B. Although Not Yet Ripe, Defendants' Proffered Mt. Healthy Defense Is Improperly Generic and Facially Implausible.

In its motion to dismiss, the government argues that Plaintiffs were fired not because of their perceived political affiliation but because they "weaponized" their law enforcement posts. Gov't MTD at 5. As noted above, whether this is *in fact* why the government fired Plaintiffs is an inquiry that must await factual development. *Pinson*, 246 F. Supp. 3d at 229 (explaining that, following discovery, "[t]he Court must still consider the possibility that the objectively valid reason was a sham and that the true motivation was retaliation"). Were it otherwise, government

---

[9] Defendants assert it is "irrelevant" that more employee-protective disciplinary procedures exist to adjudicate and punish misconduct under the Bureau's internal guidelines. *See* Gov't MTD at 10. But even if this Court accepted the unconstrained version of summary dismissal authority Defendants proffer (it should not, for reasons that Plaintiffs explain), Defendants' *choice* to use summary dismissal proceedings supports a reasonable inference that Defendants' actual reason for dismissing Arctic Frost investigators is unstated: They believe the agents insufficiently loyal to the President and his party. The avoidance of any meaningful process that would require Defendants to explain their allegations with specificity or enable Plaintiffs to counter such allegations makes it plausible that Defendants possess ulterior motives.

[10] Because Plaintiffs meet the higher bar of establishing a prima facie case of patronage dismissal, they necessarily surmount the lower bar of alleging a facially plausible, non-speculative claim of retaliation under the First Circuit's more lenient approach.

defendants could always avoid retaliation claims by using magic words to launder unconstitutional animus.

But to preview an initial, obvious deficiency in the "weaponization" defense, the government cannot rely on overbroad justifications to rebut a prima facie case of retaliation, lest general justifications (e.g., the need to take austerity measures) "mask individual dismissals which were purely discriminatory." *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 68 (1st Cir. 1993); *see id.* ("[B]lunt instruments make crude scalpels, and the *Mt. Healthy* defense requires individualized scrutiny by the jury with a view to whether a particular plaintiff's position would have been eliminated under [Defendant's] austerity program *but for* the plaintiff's [political party] affiliation."). Instead, the government will be required to demonstrate that each individual employee would have been dismissed regardless of their perceived political beliefs. *Id.* Relatedly, should it turn out that the government selectively enforced its weaponization terminations, that will undercut any *Mt. Healthy* defense. *Davignon v. Hodgson*, 524 F.3d 91, 107 (1st Cir. 2008).

The most Orwellian feature of this case is the doublespeak nature of the termination letters Plaintiffs received. Defendants, in what appears to be a weaponization and politicization of *Defendants'* posts, fired Plaintiffs for supposedly "weaponizing" and "politicizing" government by following orders and conducting an investigation to which they were assigned. On its face, Defendants' proffered rationale for their terminations is dubious, to say the least.

## III. PATRONAGE DISMISSALS ARE ESPECIALLY DANGEROUS IN FEDERAL LAW ENFORCEMENT

Zooming out, Plaintiffs' terminations send a chilling message not only to the Plaintiffs but to all federal law enforcement. If the terminations are allowed to stand, every employee working for federal law enforcement will be discouraged not only from exercising their First Amendment rights, *Heffernan*, 578 U.S. at 273; *Jenner & Block LLP*, 784 F. Supp. 3d at 115, but from carrying

out investigations and other law enforcement activity that implicates President Trump and the party currently in power. It risks not only broadly suffocating employees' core First Amendment freedoms and not only disrupting the "free functioning of the electoral process" by insulating the party currently in power, *Elrod*, 427 U.S. at 356, but distorting and politicizing the rule of law itself. The First Amendment and other constitutional harms that would flow from an FBI conditioned to target the political enemies of the President and refuse to investigate the President and his allies are obvious and dangerous. Nowhere must courts be more vigilant and prepared to smoke out unconstitutional political patronage reprisals than here.

## CONCLUSION

For the reasons above, this Court should deny Defendants' Consolidated Motion to Dismiss.

Dated: July 29, 2026

Respectfully submitted,

Anna Baldwin
Dana Paikowsky
Arianna Khan
Brendan T. Nigro
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
abaldwin@campaignlegalcenter.org

/s/ David A. Schulz
David A. Schulz
   *Counsel of Record*
Christina Lee
John Langford
MEDIA FREEDOM &
  INFORMATION ACCESS CLINIC
YALE LAW SCHOOL[11]
127 Wall Street
New Haven, CT 06511
(212) 850-6103
david.schulz@yale.edu

*Counsel for First Amendment Scholars as Amici Curiae*

---

[11] The views expressed herein do not purport to represent the institutional views of Yale Law School, if any. No party's counsel authored this brief in whole or in part.

16