UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

-------------------------------------------------------------------------x
JAMIE GARMAN, *et al.*,

> Plaintiffs,

    – against –                                        No. 26-cv-1086 (JMC)

KASHYAP P. PATEL, *et al.*,

> Defendant.

-------------------------------------------------------------------------x
-------------------------------------------------------------------------x
JOHN DOE 1, *et al.*,

> Plaintiffs,

    – against –                                        No. 26-cv-0959 (JMC)

KASHYAP P. PATEL, *et al.*,

> Defendant.

-------------------------------------------------------------------------x

---

**BRIEF OF LAWYERS FOR THE RULE OF LAW, INC.
AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' COMPLAINTS AND
IN OPPOSITION TO THE MOTION TO DISMISS**

---

**LAWYERS FOR THE RULE OF LAW, INC.**
Ilana Haramati, Esq.*
Meister Seelig & Schuster PLLC
125 Park Ave, Suite 700
New York, NY 10017
Phone: (646) 860-3130
ih@mss-pllc.com
\**Pro hac vice* application to be filed

Nina J. Ginsberg, Esq.
D.C. Bar No. 251496
Greenspun Shapiro Ginsberg & Yang PC
3955 Chain Bridge Road/2nd Floor
Fairfax, Virginia 22030
Phone: (703) 352-0100
Fax: (703) 591-7268
njg@greenspunlaw.com

*Counsel for Amici Curiae
Lawyers for the Rule of Law, Inc.*

## TABLE OF CONTENTS

I.      INTEREST OF AMICI CURIAE ....................................................................................... 1

II.     DUE PROCESS SAFEGUARDS ALL OTHER CONSTITUTIONAL RIGHTS............. 3

        A.      Constitutional Due Process is Central to Protecting Individuals' Rights From
                Arbitrary or Malevolent Government Action ......................................................... 3

        B.      Criminal Defendants, Many of the Individuals that Amici Do, Have, and Will
                Represent, Are Particularly Reliant on Due Process Protections .......................... 4

III.    DUE PROCESS FOR FBI AGENTS SERVES TO PROTECT AGAINST IMPROPERLY
        POLITICIZED LAW ENFORCEMENT ACTIONS AND PROSECUTIONS................. 7

        A.      Political Firings With Neither Constitutional Nor Due Process Protections Will
                Only Encourage Use of Law Enforcement as a Political Tool .............................. 7

        B.      The Fulton County, Georgia 2020 Election Investigation: A Case Study of a
                Political Investigation Furthered by Summary Dismissal of FBI Employees ...... 10

        C.      Dismissed ICE and CBP Prosecutions: A Case Study in the Results of Politicized
                Law Enforcement Actions and Prosecutions ......................................................... 13

IV.     CONCLUSION................................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Hela v. Biden*,
   66 F.4th 217 (D.C. Cir. 2023)..................................................................................... 3

*Brady v. Maryland*,
   373 U.S. 83 (1963) ....................................................................................................... 5

*Buffington v. McDonough*,
   143 S. Ct. 14 (2022)................................................................................................... 8, 9

*Chicago Headline Club v. Noem*,
   No. 25-CV- 12173 (N.D. Ill. Nov. 20, 2025) ........................................................... 16

*Ferguson v. State of Ga.*,
   365 U.S. 570 (1961) ..................................................................................................... 6

*Foucha v. Louisiana*,
   504 U.S. 71 (1992) ....................................................................................................... 4

*Fulton County Board of Registration and Elections v. United States*,
   No. 26-cv-02777-WMR (N.D. Ga. Jul. 7, 2026)....................................................... 11

*In re Oliver*,
   333 U.S. 257 (1948) .................................................................................................. 4, 5

*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*,
   No. MC 26-12 (JEB), 2026 WL 710202 (D.D.C. Mar. 13, 2026) ........................... 16

*In re Winship*,
   397 U.S. 358 (1970) ..................................................................................................... 5

*In the Matter of the Search of: The premises located at 5600 Campbellton Fairburn Road,
   Fairburn, Georgia 30213*,
   No. 26-mi-00012 (JPB) (N.D.Ga. Feb. 10, 2026) ..................................................... 11

*Manson v. Brathwaite*,
   432 U.S. 98 (1977) ....................................................................................................... 6

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) .................................................................................................. 3, 4

*Ohio ex rel. Eaton v. Price*,
   364 U.S. 263 (1960) ..................................................................................................... 5

*Pointer v. Texas*,
　380 U.S. 400 (1965) ................................................................................................ 5

*Powell v. State of Ala.*,
　287 U.S. 45 (1932) ................................................................................................. 6

*Richardson v. Frame*,
　165 F.4th 187 (4th Cir. 2026) ................................................................................ 5

*Russell v. United States*,
　369 U.S. 749 (1962) ................................................................................................ 5

*United States v. Abrego Garcia*,
　No. 3:25-CR-00115, 2026 WL 1454303 (M.D. Tenn. May 22, 2026) ................................ 7, 16

*United States v. Banuelos*,
　763 F. Supp. 3d 1 (D.D.C. 2025) ................................................................................ 8

*United States v. Briggs*,
　No. 25-CR-610 (N.D.Ill. Nov. 20, 2025) .................................................................... 16

*United States v. Brooke*,
　No. 23-CR-443 (FB), 2026 WL 111662 (E.D.N.Y. Jan. 15, 2026) ........................................ 7

*United States v. Collins*,
　No. 25-CR-608 (N.D. Ill. Oct. 8, 2025) .................................................................... 15

*United States v. Fuller*,
　No. CR 23-209 (CKK), 2025 WL 511087 (D.D.C. Jan. 10, 2025) ........................................ 5

*United States v. Garcia*,
　No. 25-CR-1289 (S.D.Tx. Jan 12, 2026) .................................................................... 14

*United States v. Levy Armstrong*,
　No. 26-CR-00025-LMP-DLM (D. Mn. Apr. 10, 2026) .......................................................... 17

*United States v. Longoria*,
　No. 25-MJ-00533 (C.D. Cal. 2025) ............................................................................ 15

*United States v. Maxwell*,
　89 F.4th 671 (8th Cir. 2023) .................................................................................... 8

*United States v. Martinez*,
　No. 25-CR-636 (N.D. Ill. Nov. 20, 2025) .................................................................... 15

*United States v. Mazur,*
  No. 25-CR-607 (N.D.Ill. Oct. 7, 2025)................................................................................ 14, 15

*United States v. Salerno*,
  481 U.S. 739 (1987) ..................................................................................................................... 3

**Statutes**

18 U.S.C. § 111 .................................................................................................................................. 14

U.S. Const. Amend. V ....................................................................................................................... 2

U.S. Const. Amend. XIV, Sec. 1 ..................................................................................................... 2

**Other Authorities**

Robert H. Jackson, *The Federal Prosecutor*,
  31 J. Crim. L. & Criminology 3, 5 (1940)......................................................................... 7

## I.    INTEREST OF AMICI CURIAE

*Amici curiae* ("Amici") is Lawyers for the Rule of Law, Inc., a nationwide not-for-profit corporation comprised of hundreds of lawyers including retired judges, former Assistant United States Attorneys, and lifelong criminal defense counsel who have an interest, individually and on behalf of the clients they are representing and will represent, in assuring that the rights guaranteed by our Constitution are supported by our government and our courts.

Many of Amici's members have devoted their careers to representing criminal defendants, ensuring that the Constitution's rights and guarantees protect even the most scorned members of our society.  We have collectively invested hundreds of thousands of hours, and hundreds of years, representing criminal defendants and investigation targets.  Often our work has been directly adverse to federal law enforcement generally, and to the Federal Bureau of Investigation ("FBI") in particular.

The *Garman* Complaint alleges that the Defendants were "attorneys representing adverse parties, in investigations brought by the FBI, through the FBI's career employees."  *Garman*, ECF Doc. 1, Compl. ¶ 2.  The same is true of Amici.  But as lawyers, we have also taken an oath to "support the Constitution of the United States."  *See, e.g.,* Attorney Oath Of Admission To The District Of Columbia Bar.[1]  Thus, while we may seem to be an unconventional group to support former law enforcement officials, as Constitutional actors, we seek to defend against an assault on Constitutional rights—no matter the targets.

And this case is about so much more than the jobs of a handful of law enforcement officials.  It asks whether any of us, members of law enforcement, criminal defendants, and everyone in

---

[1] Available at: https://admissions.dcappeals.gov/atty_fill_oath.

between, can truly rely on Constitutional due process. *See, e.g., Garman*, ECF Doc. 1, Compl. ¶ 2 ("Defendants' mission—in their own words—is retribution. They began their terms of office by compiling lists of FBI employees whom they perceived to be 'enemies'—due to assigned investigative work, private comments, personal friendships, immutable characteristic, or other absurd measure—and publicly initiating mass firings on a rolling basis, without due process."); *Doe*, ECF Doc. 1, Compl. ¶¶ 4-5 ("Between October 31, 2025, and November 4, 2025, FBI Director Kashyap "Kash" Patel summarily fired each Plaintiff. No internal investigation, notice, or hearing preceded their firings. Nor were Plaintiffs presented with any evidence purportedly supporting their firings or given an opportunity to appeal.  Through this Complaint, Plaintiffs allege that Defendant Patel terminated their FBI employment based solely on their assignment to Arctic Frost. Defendant Patel, Defendant Pamela J. Bondi, President Trump, and others who urged the agents' firings perceived the agents to be politically opposed to President Trump because of the agents' assignment to Arctic Frost.").

This case tests whether our Constitutional due process rights have the wherewithal to effectively protect society from an aspiring police state.  Do law enforcement agents have due process rights against arbitrary and improper politicized firings?  Is there a heightened need to protect due process rights for law enforcement agents as a bulwark against political pressure in criminal investigations?  If not, would not that jeopardize the Constitutional due process rights of everyone else?  What does it mean for the Constitutional protections of criminal targets and defendants if even law enforcement agents cannot rely on their due process rights?

While the claims are brought by former FBI career employees who were summarily fired from their positions on behalf of a similarly situated "proposed class of former career [FBI] employees," it is not an employment case.  *Garman*, ECF Doc. 1, Compl. at ¶ 1; *see also Doe*,

2

ECF Doc. 1, at 4. It instead interrogates the very strength of our Constitutional due process. Amici urges the Court to allow the Plaintiffs' claims to proceed. They are a means of shielding us all from anti-Constitutional behavior by political actors.

## II.    DUE PROCESS SAFEGUARDS ALL OTHER CONSTITUTIONAL RIGHTS

### A.    Constitutional Due Process is Central to Protecting Individuals' Rights From Arbitrary or Malevolent Government Action

Due Process is a foundational value of our Constitutional order—so important that its protections are enshrined twice in the Constitution's text. *See* U.S. Const. Amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law"); U.S. Const. Amend. XIV, Sec. 1 ("nor shall any State deprive any person of life, liberty, or property, without due process of law").

Over the decades of our constitutional history, the Supreme Court has laid out the basic tenets of due process, emphasizing its central role protecting all other rights: "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976) (quotation marks and citations omitted). Due process protections ensure that government decisions are made on proper bases, and serve to protect against arbitrary or malevolent exercises of government power. *See Al-Hela v. Biden*, 66 F.4th 217, 242 (D.C. Cir. 2023) (due process "'prevents the government from engaging in conduct that shocks the conscience, or interferes with rights implicit in the concept of ordered liberty;'" it "bars certain arbitrary, wrongful government actions.") (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)) .

To be effective, at a minimum, due process requires a meaningful opportunity to be heard: "The essence of due process is the requirement that a person in jeopardy of serious loss (be given)

notice of the case against him and opportunity to meet it," and "to insure that they are given a meaningful opportunity to present their case." *Mathews*, 424 U.S. at 348–49  (quotation marks and citations omitted); *id.* at 322-23 ("[t]he right to be heard before being condemned to suffer grievous loss of any kind," whether or not it "involve[s] the stigma and hardships of a criminal conviction, is a principle basic to our society.") (quotation marks and citations omitted; emphasis added).

That is true of Plaintiffs as well.  Protecting their "meaningful" right to be heard before losing everything they have worked towards in their careers is the very essence of due process. *See id.* at 323 ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.").

### B.    Criminal Defendants, Many of the Individuals that Amici Do, Have, and Will Represent, Are Particularly Reliant on Due Process Protections

The Constitutional questions in this case are of central import to Amici who have routinely sought to vindicate the rights of criminal targes and defendants, society's cast offs.  People who find themselves on the wrong end of criminal inquiries by the FBI or other law enforcement require due process protections most.  At times, adequate process can be the only thing preventing a person under law enforcement scrutiny from being locked away in a jail cell.  And it is that same due process that protects defendants and targets against arbitrary prosecution.

Indeed, although the protections afforded by the Constitution's due process clauses are universal, those protections are particularly crucial to criminal targets and defendants, whose very liberty is at stake. *See, e.g., Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.  It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.  We have always been careful not to

4

minimize the importance and fundamental nature of the individual's right to liberty.") (quotation marks and citations omitted).

Criminal targets' and defendants' most fundamental rights are largely rooted in due process, for example:

- *Indictment's Notice Requirement* – A criminal defendant's right that the indictment or charging document provide notice of the criminal charges they face is a basic requirements of due process. *See Richardson v. Frame*, 165 F.4th 187, 192 (4th Cir. 2026) ("The Due Process Clause of the Fourteenth Amendment requires that a criminal defendant receive 'reasonable notice of a charge against him.' Reasonable notice 'sufficiently apprises the defendant of what he must be prepared to meet' " such that he has a meaningful opportunity to defend himself at trial.") (quoting *In re Oliver*, 333 U.S. 257, 273 (1948); *Russell v. United States*, 369 U.S. 749, 763 (1962))) (other quotation marks and citations omitted).

- *Protections Against Prosecutors Burying Exculpatory or Impeachment Evidence Per Brady v. Maryland* – A criminal defendant's right to disclosure of exculpatory evidence in the possession of law enforcement is protected by due process: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

- *Warrant Requirement and Protections Against Unreasonable Searches and Seizures* – A criminal defendant or investigation's target's "privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause." *Ohio ex rel. Eaton v. Price*, 364 U.S. 263, 274 (1960) (quotation marks and citations omitted).

- *Trial by Impartial Jury of One's Peers* – A criminal defendant's right to trial by an impartial jury of one's peers is rooted in "a basic requirement of due process." *See United States v. Fuller*, No. CR 23-209 (CKK), 2025 WL 511087, at *2 (D.D.C. Jan. 10, 2025).

- *Confrontation of Witnesses and Cross-Examination* – A criminal defendant's "right of confrontation and cross-examination" of witnesses against them is core to the "guarantee of due process of law." *Pointer v. Texas*, 380 U.S. 400, 405 (1965) ("the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.").

- *Conviction Only By Proof Beyond a Reasonable Doubt* – A criminal defendant's right that criminal conviction is only permitted by "proof beyond a reasonable doubt is among the essentials of due process and fair treatment." *See In re Winship*, 397 U.S. 358, 359 (1970) (quotation marks omitted).

5

- **_Right to Counsel_** – A criminal defendant's right to counsel is a universal due process protection required in courts throughout the country. *See, e.g., Ferguson v. State of Ga.*, 365 U.S. 570, 572 (1961) ("the guiding hand of counsel at every step in the proceedings against him" is "within the requirements of due process"). In a practical sense, the right to counsel is a bulwark for defendants' other due process rights, only emphasizing the import of those protections for the criminally accused. *See Powell v. State of Ala.*, 287 U.S. 45, 68-69, 71 (1932) ("The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. . . . Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.").

And these are only examples. Many other rights and protections available to criminal targets and defendants are process-based. Criminal defendants and, by extension many of Amici's members as their counsel, thus have real interest in preserving due process protections for all. Nothing is more dangerous than relaxing due process requirements—without it, the "high standard of fundamental fairness" to which everyone is entitled "whatever [their] personal characteristics," is all but meaningless. *See, e.g., Manson v. Brathwaite*, 432 U.S. 98, 128 (1977) (Marshall, J., dissenting) ("'Equal justice under law' mean[s] that the existence of constitutional violations did not depend on the race, sex, religion, nationality, or likely guilt . . .").

Due process is the only way to ensure that the state is prosecuting the right crimes for the right reasons, or, indeed, firing the right people for the right reasons. And that is the very value at stake in the Plaintiffs' claims. The Plaintiffs experienced targeted firings for perceived political beliefs protected by the First Amendment, shredding their Constitutional and due process rights in the process. *See, e.g., Garman*, ECF Doc. 1, Compl. ¶¶ 2, 204-39, *Doe*, ECF Doc. 1, Compl. ¶¶ 4, 7. 80-114. Permitting that to stand without recourse would undermine Constitutional due process protections more broadly. If FBI agents cannot rely on their Constitutional protections, who can?

6

**III.    DUE PROCESS FOR FBI AGENTS SERVES TO PROTECT AGAINST IMPROPERLY POLITICIZED LAW ENFORCEMENT ACTIONS AND PROSECUTIONS**

**A.    Political Firings With Neither Constitutional Nor Due Process Protections Will Only Encourage Use of Law Enforcement as a Political Tool**

Beyond the universal due process rights at stake, there is, perhaps, a more immediate problem with blessing summary politicized firing of FBI agents like the Plaintiffs: it will only incentivize agents to acquiesce to political pressures to target the administration's perceived political critics for investigation and prosecution.  That is antithetical to the rule of law.  *See, e.g., United States v. Abrego Garcia*, No. 3:25-CR-00115, 2026 WL 1454303, at *1 (M.D. Tenn. May 22, 2026) ("Then-Attorney General Robert H. Jackson warned his fellow prosecutors long ago of the danger of picking the person first and the crime second. "Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted.") (quoting Robert H. Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3, 5 (1940)); *United States v. Brooke*, No. 23-CR-443 (FB), 2026 WL 111662, at *1 (E.D.N.Y. Jan. 15, 2026) (the government's "obligation . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done").  Modern federal law enforcement rules, guidelines, practice, and traditions have been built to protect against this very danger.

While the FBI's remit is broad, its authority is strictly cabined by both the rule of law, and individuals' Constitutional rights.  *See, e.g., The Attorney General's Guidelines For Domestic FBI Operations* ("*FBI Guidelines*"), at 5 (describing the FBI as "the primary investigative agency of the federal government," with a "responsibility to investigate all violations of federal law that are not exclusively assigned to another federal agency.").[2]  The *FBI Guidelines* are unequivocal that

---

[2] Available at: https://www.justice.gov/archive/opa/docs/guidelines.pdf.

the FBI has a responsibility to only "utiliz[e] . . . all authorities and investigative methods, **consistent with the Constitution and laws of the United States**" as:

> [I]t is axiomatic that the FBI must conduct its investigations and other activities in a **lawful and reasonable manner that respects liberty and privacy** and avoids unnecessary intrusions into the lives of law-abiding people. The purpose of these Guidelines, therefore, is to establish consistent policy in such matters. They will enable the FBI to perform its duties with effectiveness, certainty, and confidence, and will provide the American people with a firm assurance that the FBI is acting **properly under the law**.

*Id.* (emphasis added)*; accord id.* at 6 ("These Guidelines also incorporate effective oversight measures involving many Department of Justice and FBI components, which have been adopted to ensure that all FBI activities are conducted in a manner consistent with law and policy."); *see also Justice Manual*, § 1-8.100 ("The rule of law depends upon the evenhanded administration of justice. The legal judgments of the Department of Justice must be impartial and insulated from political influence. It is imperative that the Department's investigatory and prosecutorial powers be exercised free from partisan consideration. It is a fundamental duty of every employee of the Department to ensure that these principles are upheld in all of the Department's legal endeavors.").[3]

The very lodestar of criminal justice is that it is non-partisan, pursued "without fear or favor." *See, e.g., United States v. Banuelos*, 763 F. Supp. 3d 1, 2 (D.D.C. 2025) ("judges in this district have administered justice without fear or favor"); *United States v. Maxwell*, 89 F.4th 671, 679 (8th Cir. 2023) ("The district court . . . instructed the jury to "take this case and give it your most careful consideration, and then without fear or favor, prejudice or bias of any kind, return a verdict" based on the evidence and the jury instructions."); *accord Buffington v. McDonough*, 143

---

[3] Available at: https://www.justice.gov/jm/jm-1-8000-congressional-relations.

S. Ct. 14, 16 (2022) (Gorsuch, J., dissenting) ("From the beginning of the Republic, the American people have rightly expected our courts to resolve disputes about their rights and duties under law without fear or favor to any party—the Executive Branch included.").

Due process protections for agents' employment are an important safeguard against political interference with the FBI's work, transforming that mantra into a reality. In addition to the obviously detrimental impact on FBI agents personally, *see, e.g., Garman*, ECF Doc. 1, Compl. ¶¶ 172-203, *Doe*, ECF Doc. 1, Compl. ¶¶ 120-28, dismantling due process protections for FBI employees can have a corrosive effect on the justice system broadly. In Amici's view, there are three clear ways in which at will and politicized firings, with no due process protections for agents can further warp law enforcement into a political tool:

*First*, permitting political actors to fire any FBI employee for political reasons, including because they are resistant to criminal targeting of political critics, may only hasten political prosecutions;

*Second*, more insidious yet, however, those firings can have a chilling effect on agents' willingness to resist political interference in law enforcement work. Individual agents seeking to protect their jobs and stations may simply acquiesce after seeing the high cost paid by their peers who remained steadfast to their oaths to uphold the Constitution; and

*Third* and finally, a culture of political pressure and political targeting may only attract those who are politically aligned with the administration, or otherwise inclined to abuses of power. *See, e.g.,* Associated Press, "ICE's hiring spree led to influx of recruits with questionable qualifications, investigation shows," *The Guardian* (Apr. 17, 2026) ("Rapid recruitment and expansion by US Immigration and Customs Enforcement (ICE) has led to an influx of employees with questionable qualifications, an investigation has found. . . . They include characteristics such

9

as two bankruptcies and six law enforcement jobs in three years, an allegation of lying in a police report to justify a felony charge against an innocent woman – an incident that led to a $75,000 settlement and criticism of the recruit's integrity").[4]

We have already witnessed the impact of siccing pliant law enforcement officials on the administration's political critics. *See, e.g.,* Peter Charalambous, Benjamin Siegel, Alexander Mallin, Katherine Faulders, and Elizabeth Schulze, "Here's a list of the individuals, including James Comey, targeted by the Trump administration," *ABC* (Jul. 10, 2026) (listing more than two dozen politically motivated prosecutions and investigations since January 2025).[5]  The perverse incentive structure created by at will political removal, scrubbed of any meaningful due process, can only further corrode the FBI.  Law enforcement "without fear or favor" will recede, likely replaced by collaboration with political prosecutions.

**B.    The Fulton County, Georgia 2020 Election Investigation: A Case Study of a Political Investigation Furthered by Summary Dismissal of FBI Employees**

Recent events involving a politically-motivated investigation into Georgia's conduct of the 2020 election, provide a clear lens for this analysis.  In January 2026, the FBI searched election offices in Fulton County, Georgia, seizing many hundreds of boxes of ballots.  *See* Nick Corasaniti, Alan Feuer, Dustin Volz, and Richard Fausset, "F.B.I. Assigns Scores of Analysts to Examine Election Records in Georgia," *The New York Times* (Jul. 2, 2026)  ("In January, the F.B.I. raided an election warehouse in Fulton, seizing more than 600 boxes of election materials — including

---

[4]    Available   at:   https://www.theguardian.com/us-news/2026/apr/17/ice-immigration-agents-backgrounds.

[5]    Available   at:   https://abcnews.com/US/list-individuals-including-lisa-cook-targeted-trump-administration/story?id=124968309.

original ballots from the 2020 election").[6]  The investigation is transparently political: recent reporting describes it as "a 'priority' investigation related to the 2020 election in Fulton County, Ga., a reflection of President Trump's ongoing push to prove his baseless claims that the 2020 election there was rigged." *Id.*  It has also left unemployed several FBI personnel whose fealty to the value of non-partisan investigations outweighed their fear for their jobs.  But the investigation apparently continues nonetheless, corroding the rule of law in the process.

Although a magistrate judge signed a search warrant permitting the initial search in Fulton County,[7] a district court halted aspects of the investigation just this month.  Recognizing the political impetus of the investigation, the district court quashed a broad grand jury subpoena to the Fulton County Board of Registration and Elections because it did not actually seek evidence of a legitimately prosecutable crime.  *See Fulton County Board of Registration and Elections v. United States*, No. 26-cv-02777-WMR, ECF Doc. 37, at 4 (N.D. Ga. Jul. 7, 2026) ("These records," sought "even if they lead to the DOJ finding individuals who worked for Fulton County in the 2020 Election who support the theory that the 2020 Election was not fair, would not lead to information that could be used to charge anyone with anything, at least not any viable charge."); *see also id.* at 2-3 ("it has long been the view of the current President of the United States, . . . that he was denied re-election to a second consecutive term in 2020 due to election fraud . . . . Thus, perhaps it makes sense that the DOJ, now unquestionably under the current President's control, is seeking to identify

---

[6] Available at: https://www.nytimes.com/2026/07/02/us/politics/fbi-georgia-fulton-county-2020-election.html.

[7] *See In the Matter of the Search of: The premises located at 5600 Campbellton Fairburn Road, Fairburn, Georgia 30213*, No. 26-mi-00012 (JPB) (N.D.Ga. Feb. 10, 2026).

11

individuals who might possess information or opinions in support of his claim that the 2020 Election was not legitimate.").

Because of the nakedly political basis of the investigation, the FBI Special Agent ("SA") in Charge of the Atlanta Field Office "was reportedly removed from his post after questioning the Trump administration's renewed interest in investigating the role of Fulton County, Georgia, in the 2020 election." *See* Sara Braun, "Atlanta FBI boss reportedly ousted after questioning DoJ's renewed interest in 2020 election," *The Guardian* (Jan. 30, 2026) ("The agent, Paul W Brown, had expressed concerns around the unsubstantiated allegations of voter fraud in Fulton county, which have been perpetuated by Donald Trump since he was defeated by Joe Biden in the 2020 election . . . News of Brown's ouster came after the justice department on Thursday executed a search warrant and seized records from the Fulton county elections office in the Atlanta area.").[8]  More recently, additional FBI agents similarly refused to participate in the investigation, reportedly telling colleagues "they did not believe the investigation was justified under FBI and Justice Department policies." *See* Ken Dilanian, "FBI analysts fired after refusing to join Georgia 2020 election probe," *MS Now* (Jul. 11, 2026).[9]  When the agents sought to maintain their professional integrity, they were summarily fired. *See id.*  There is no evidence in the public reporting that they received a shred of due process prior to their firings.[10]

---

[8]  Available at: https://www.theguardian.com/us-news/2026/jan/30/atlanta-fbi-boss-reportedly-ousted-fulton-county.

[9] Available at: https://www.ms.now/news/fbi-kash-patel-trump-georgia-2020-election.

[10] And these firings have not been isolated.  In addition to the allegations the Plaintiffs detail in the Complaints of the Defendants' "public campaign to oust Plaintiffs from federal service," *Garman*, Compl. ¶ 1, the Department of Justice has fired or pushed out lawyers for upholding their oaths as well.  *See, e.g., Doe*, ECF Doc. 1, Compl. ¶¶ 4-7.  For example, Erez Reuveni, a 15-year veteran of the Justice Department, was summarily fired for truthfully alerting the court that an

And, based on publicly available reporting, after clearing the inconvenient obstacles posed by dissenting FBI agents, the political investigations now continues unabated with the help of an "army of 260 investigative analysts" from the FBI. *See* Corasaniti, at al., "F.B.I. Assigns Scores of Analysts to Examine Election Records in Georgia," *The New York Times*.  Perhaps seeing the grievous personal consequences that political forces could so easily wreak on their colleagues— career FBI employees evidently fired with no due process protections—other FBI agents simply went along.  The Georgia election investigation thus remains a cautionary tale: if agents who steadfastly maintain their principles can be summarily terminated without process, that may only grease the wheels of political targeting by law enforcement.

C.    **Dismissed ICE and CBP Prosecutions: A Case Study in the Results of Politicized Law Enforcement Actions and Prosecutions**

The recent pressures from political actors to increase immigration arrests, and the aggressive tactics used by law enforcement in response, may provide the most widespread set of examples of political pressures' ability to corrupt law enforcement behavior.  *See, e.g.,* Hamed Aleaziz, "Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down," *The New York*

---

immigrant was erroneously deported to a prison in El Salvador.  *See* Carrie Johnson*,* "Fired Justice Department lawyer accuses agency of planning to defy court orders," *NPR WNYC* (Jun. 24, 2025) available at: https://www.npr.org/2025/06/24/g-s1-74316/justice-department-immigration-whistleblower, ("The lawyer, Erez Reuveni, previously won awards and commendations over nearly 15 years at the Justice Department, including from Republican appointees in the first Trump administration. But he was put on leave and then fired in April after he told a federal judge an immigrant had been deported in error"); *see also* Danny Hakim, "Failed Immigration Cases Leave Chicago Prosecutor's Office Reeling," *The New York Times* (Jul. 19, 2026), available at: https://www.nytimes.com/2026/07/19/us/immigration-chicago-prosecutors.html?smid=nytcore-ios-share, ("The U.S. attorney's office in Chicago  . . . brought a wave of doomed cases that accused protesters and immigrants of assaulting federal officers. That accelerated an exodus of veteran prosecutors, some of whom felt they'd been wrongly pressured into pursuing the charges, former prosecutors said in interviews. . . . Prosecutors said in interviews that their colleagues at times were crying in their offices, distraught about the cases they were being pressured to pursue.").

*Times* (Jul. 1, 2026) ("ICE officials were told that the White House wanted an increase in arrests. . . ICE officials had been told that 2,000 arrests a day was the new standard for enforcement.").[11] Recent failed prosecutions—predicated on Immigration and Customs Enforcement ("ICE") and Customs and Border Patrol ("CBP") agents' inaccurate recitations of the underlying incidents, and other federal law enforcement misconduct—represent a concerning harbinger of what could happen to the FBI if agents' due process rights are not protected.

In *United States v. Garcia*, No. 25-cr-1289 (S.D.Tx. Jan 12, 2026), because of agent misconduct, the court dismissed pending criminal charges of assaulting or impeding federal law enforcement under 18 U.S.C. § 111 related to a border crossing. The case was brought against a backdrop of political pressure for increased immigration enforcement. The defendant was a U.S. citizen who arrived at a border crossing with a minor child, and allegedly attempted to interfere with agents' questioning of the child. At the time of her arrest, agents ordered the defendant to delete evidence of her interactions with CBP. The court found that was a "purposeful" effort by the agents to interfere with the defendant's "access[]" to evidence in her case. *Id.* That agent "misconduct" was an act of "bad faith on the part of the Government," "amount[ing] to a constitutional due process violation." *Garcia*, No. 25-cr-1289, ECF Doc. 41, at 8-9, 11. The district court thus dismissed the charges.

In *United States v. Mazur*, the government dismissed all criminal charges because a federal law enforcement agent made false statements in the sworn affidavits initiating the criminal case. *See United States v. Mazur*, No. 25-cr-607, ECF Doc. 11 (N.D.Ill. Oct. 7, 2025). Specifically, a federal law enforcement agent swore out a criminal complaint asserting that video evidence

---

[11] Available at: https://www.nytimes.com/2026/07/01/us/politics/ice-immigrant-arrests-surge.html.

corroborated that the protestor had assaulted an officer.  But it did not.  The government was forced to dismiss the charges because the underlying law enforcement statements were simply false.  *Id.*

*Mazur* was not an isolated case.  Scores of recent criminal charges involving ICE and CBP actions have collapsed because of federal agent misstatements under oath, or other misconduct. *See United States v. Martinez*, No. 25-cr-636, ECF Doc. 70 (N.D. Ill. Nov. 20, 2025) (dismissing indictment against protestors charged with ramming agent's vehicle; agents shot one of the protestors five time, and sent the car allegedly rammed by the defendants for repair prior to permitting its inspection by the defense in advance of trial); *United States v. Collins*, No. 25-cr-608, ECF Doc. 26 (N.D. Ill. Oct. 8, 2025) (government dismissed criminal charges against a protestor with prejudice after a grand jury had "declined to return an indictment"; apparently, the grand jury rejected the federal agents' statements under oath that there was corroboration that the defendants' assaulted an officer); *United-States v. Longoria*, No. 25-mj-00533 (C.D. Cal. 2025) (dismissing criminal complaint charging the defendant for assaulting officers with his car, apparently because of agent misconduct; the defendant was driving his truck when two unmarked vehicles driven by Homeland Security officers blocked him in. When the defendant failed to roll down his window, the masked officers smashed the window and fired multiple shots into the vehicle as the defendant tried to pull away).[12]

---

[12] A recent analysis by the *New York Times* confirms the same:

> [A] close examination of those cases reveals that in its rush to meet White House demands for deportations, federal law enforcement has engaged in extensive misconduct — ranging from attacking protesters to destroying evidence and misrepresenting facts in court.

> The New York Times found that the Trump administration has filed assault charges against more than 550 people who were caught in its immigration dragnet — far more than previously known. Of the more than 400 cases resolved so far, nearly

15

Sworn statements made by some federal immigration enforcement agents, including in prosecuting the administration's political critics engaged in protests, have been found "unreliable;" their "candor . . . open to question." *United States v. Briggs*, No. 25-cr-610, ECF Doc. 43, at 6 (N.D.Ill. Nov. 20, 2025) (highlighting "the extraordinary judicial determinations that DHS sworn declarations are unreliable, that the candor of its agents is open to question, and that sworn testimony of its CBP chief contained knowing falsehoods"); *Chicago Headline Club v. Noem*, No. 25-CV- 12173, ECF Doc. 281, (N.D. Ill. Nov. 20, 2025) (regarding the testimony of then-Customs and Border Patrol Chief Greg Bovino: "Bovino admitted in his deposition that he lied multiple times about the events that occurred in Little Village [Illinois] that prompted him to throw tear gas at protesters;" some of those same events led to criminal detentions and prosecutions).

Political pressures on federal law enforcement agencies, through firings, politicized hirings, and public statements[13] have already wrought troubling results in dozens of individual

---

half have unraveled: Juries acquitted defendants, judges threw out charges, or prosecutors withdrew them.

Mike McIntire, Danny Hakim, Alexandra Berzon, Jazmine Ulloa, and Lauren McCarthy, "They Were Charged With Assaulting ICE Agents. The Cases Are Crumbling," *The New York Times*, available at: https://www.nytimes.com/2026/07/18/us/ice-assaults-protesters.html?smid=nytcore-ios-share.

[13] Notably, public smearing as a predicate to the adverse criminal or employment action has become a trend in this administration. *See, e.g., Abrego Garcia*, No. 3:25-CR-00115, 2026 WL 1454303, at *4 (political actors in the Executive Branch began "a public-facing campaign" seeking to "t[ie] Abrego to" criminal allegation, which ultimately led to the indictment later dismissed as vindictive prosecution); *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, No. MC 26-12 (JEB), 2026 WL 710202, at *9 (D.D.C. Mar. 13, 2026) (quashing grand jury subpoena regarding the federal reserve, noting the numerous instances in which the President of the United States had personally impugned the Chairman of the Federal Reserve prior to initiating the investigation, and explaining: "the President spent years essentially asking if no one will rid him of this troublesome Fed Chair. He then suggested a specific line of investigation into him, which had been proposed by a political appointee with no role in law enforcement, who hinted that it could be a way to remove Powell. The President's appointed prosecutor promptly complied. Those

16

criminal cases.  Fortunately, to date, many of those cases have collapsed and been dismissed, as district courts throughout the country have protected criminal defendants' rights.

But allowing the FBI to become a thoroughly political enforcement apparatus, by permitting career employees' firings at will and without process, can only accelerate the rate of spurious political prosecutions.  Eroding FBI employees' due process protections will incentivize compliance with politically-motivated investigations.  And weakened due process protections for some, will likely weaken the due process protections for criminal targets as well.  Safeguarding FBI agents' Constitutional and due process rights is a key to protecting due process more broadly.

---

facts strongly imply that this investigation was launched for an improper purpose, as were the resulting subpoenas."); *see also United States v. Levy Armstrong*, No. 26-cr-00025-LMP-DLM, ECF Doc. 491, Def. Don Lemon's Mot. For Disclosure of Grand Jury Materials, at 8  (D. Mn. Apr. 10, 2026) (during and prior to the prosecution, political appointees, "high-ranking Department of Justice (DOJ) officials were making inflammatory public statements," against the defendant "Officials made these statements in violation of federal regulations, the Justice Manual, and the rules of professional responsibility") (citations omitted).  It is true here as well.  According to the *Garman* Complaint: "the first time [Plaintiffs'] names entered the public consciousness was when a senior government official falsely accused them on television or social media of being corrupt, biased, or unethical for doing the lawful work that they were assigned."  *Garman*, Compl. at ¶ 2; *see also id.* ¶¶ 143-68, *Doe*, Compl. ¶¶ 115-19.

## IV.    CONCLUSION

The Court should, therefore, permit Plaintiffs to pursue the remedies they seek in the

Complaints, and deny the motion to dismiss.

Dated: July 31, 2026                         Respectfully submitted,
      New York, New York

                LAWYERS FOR THE RULE OF LAW, INC.

By:          /s/ Ilana Haramati

Ilana Haramati, Esq.*
Meister Seelig & Schuster PLLC
125 Park Ave, Suite 700
New York, NY 10017
Phone: (646) 860-3130
ih@mss-pllc.com
*Pro hac vice application to be filed

Nina J. Ginsberg, Esq.
D.C. Bar No. 251496
Greenspun Shapiro Ginsberg & Yang PC
3955 Chain Bridge Road/2nd Floor
Fairfax, Virginia 22030
Phone: (703) 352-0100
Fax: (703) 591-7268
njg@greenspunlaw.com

*Counsel for Amici Curiae Lawyers for the Rule of Law. Inc.*

## CERTIFICATE PURSUANT TO LOCAL RULE 7(o)

Pursuant to Rule 7(o) of the Rules of the District Court of the District of Columbia, an opportunity to object to the filing of a proposed *Amici Curiae* brief has been provided and received by all counsel appearing in this case. Counsel for both parties have consented to the filing of the proposed Amicis Curiae Brief.

_____/s/ Ilana Haramati*_____

*\*Pro hac vice* application to be filed