**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JAMIE GARMAN, BLAIRE TOLEMAN, and MICHELLE BALL, on behalf of themselves and all similarly situated,

Plaintiffs,

v.

KASHYAP P. PATEL in his official capacity as Director of the Federal Bureau of Investigation, FEDERAL BUREAU OF INVESTIGATION, TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, and U.S. DEPARTMENT OF JUSTICE,

Defendants.

Case No. 1:26-cv-01086-JMC

# AMICUS CURIAE BRIEF OF JUSTICE CONNECTION AND 38 FORMER FBI PERSONNEL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Seth P. Waxman (D.C. Bar No. 257337)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
Seth.Waxman@wilmerhale.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rules 7(o)(5) and 26.1 and Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), I, counsel of record for Amicus Curiae Justice Connection, certify that, to the best of my knowledge and belief, Justice Connection has no parent companies, subsidiaries, affiliates, or companies which own at least 10% of its stock which have any outstanding securities in the hands of the public.

Dated: August 3, 2026

Respectfully submitted,

/s/ Seth P. Waxman

Seth P. Waxman (D.C. Bar No. 257337)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
Seth.Waxman@wilmerhale.com

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE ....................1
INTRODUCTION ....................2
ARGUMENT ....................4
I. For Nearly 150 Years, Congress Has Reformed Federal Civil Service To Eliminate Partisanship ....................4
A. The Pendleton Act Established Merit-Based Civil Service To End The Spoils System ....................4
B. The Lloyd-La Follette Act And The Hatch Act Further Restricted Political Influence To Preserve The Integrity Of Federal Service ....................5
C. The Civil Service Reform Act Codified Merit Principles And Protections Against Political Retaliation ....................6
D. The 1993 Hatch Act Amendments Confirm Congress's Special Concern For Maintaining Apolitical Federal Law Enforcement ....................8
II. The FBI Can Function Fairly Only If It Is Apolitical ....................9
A. Statutes, Regulations, and Policies Establish an Apolitical FBI Workforce ....................10
B. The FBI Cannot Function Properly If Political Considerations Play Any Role In Personnel Or Investigatory Decisions ....................12
III. An Apolitical FBI Protects Individual Constitutional Rights ....................16
A. The Due Process Clause Shields Against Selective Prosecution Based on Political Views ....................16
B. The First Amendment Bars Punishment For Expressing Political Beliefs ....................17
C. The Fourth Amendment Prohibits Searches or Seizures Based on Political Views, Cabining Executive Discretion ....................20
CONCLUSION ....................21

# TABLE OF AUTHORITIES

Page(s)

## CASES


*Cohen v. California*,
403 U.S. 15 (1971) .......... 19

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
447 U.S. 530 (1980) .......... 19

*Delaware v. Prouse*,
440 U.S. 648 (1979) .......... 21

*Gonzalez v. Trevino*,
602 U.S. 653 (2024) .......... 18

*Lozman v. City of Riviera Beach*,
585 U.S. 88 (2018) .......... 18

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) .......... 18

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) .......... 19

*Smith v. Nixon*,
606 F.2d 1183 (D.C. Cir. 1979) .......... 21

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 19

*Texas v. Johnson*,
491 U.S. 397 (1989) .......... 19

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) .......... 19

*United States v. Berrios*,
501 F.2d 1207 (2d Cir. 1974) .......... 17

*United States v. Eichman*,
496 U.S. 310 (1990) .......... 19

*United States v. Hastings*,
126 F.3d 310 (4th Cir. 1997) .......... 17

*United States v. Marcum*,
16 F.3d 559 (4th Cir. 1994) .......... 17

*United States v. United States District Court for Eastern District of Michigan*,
407 U.S. 297 (1972) ....................................................................................................21

*Virginia v. Black*,
538 U.S. 343 (2003) ....................................................................................................19

**CONSTITUTIONS**

U.S. Const. amend. I ......................................................................................17, 18, 19, 20

U.S. Const. amend. IV ..........................................................................................................17, 21

**STATUTES**

5 U.S.C. § 2301 ....................................................................................................................8

5 U.S.C. § 2302 ....................................................................................................................8

5 U.S.C. § 7323 ....................................................................................................................9

8 U.S.C. § 1103 ....................................................................................................................15

18 U.S.C. § 595 ....................................................................................................................16

28 U.S.C. §§ 531-540(D) ......................................................................................................15

Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111 (1978) (codified as
amended in scattered sections of 5 U.S.C.). ..............................................................3, 7, 8, 9

Hatch Act, Pub. L. No. 76-252, 53 Stat. 1147 (1939) (codified as amended at 5
U.S.C. §§ 1501-1508, 7321-7326)..........................................................................3, 6, 7, 9, 10

Hatch Act Reform Amendments, Pub. L. No. 103-94, 107 Stat. 1001 (1993)
(codified as amended in scattered sections of 5 U.S.C.)...........................................5, 9, 10

Lloyd-La Follette Act, Pub. L. No. 62-336, 37 Stat. 539 (1912)..........................................3, 6

Pendleton Act, Pub. L. No. 47-27, 22 Stat. 403 (1883) ..................................................3, 5, 6, 8

**RULES**

D.D.C. Local Rule 7 ..............................................................................................................3

Fed. R. App. P. 29 ..................................................................................................................3

**REGULATIONS**

5 C.F.R. § 2635.101 ........................................................................................................12, 13

## LEGISLATIVE HISTORY

139 Cong. Rec. 15789 (1993) .....10

*Hearing on S. 185 Before the S. Comm. on Gov. Affairs*, 103rd Cong. (1993) (statement of Sen. William V. Roth, Jr.) .....9

S. Rep. 112-23 (2011) .....12

S. Rep. No. 47-576 (1882) .....6

S. Rep. No. 93-1213 (1974) .....11

S. Rep. No. 95-969 (1978) .....8

## OTHER AUTHORITIES

Andrew Kent, Susan Hennessey & Matthew Kahn, Why Did Congress Set a Ten-Year Term for the FBI Director?, *Lawfare* (May 17, 2017), https://www.lawfaremedia.org/article/why-did-congress-set-ten-year-term-fbi-director .....11

Cynthia Brown & Jack Maskell, Cong. Rsch. Serv., R444469, *Hatch Act Restrictions on Federal Employees' Political Activities in the Digital Age* (2016) ..... 6-7

Dep't of Just., Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Domestic Security/Terrorism Investigations, https://www.justice.gov/archives/ag/attorney-generals-guidelines-general-crimes-racketeering-enterprise-and-domestic .....20

Doug Bock Clark & Jen Fifield, *FBI's Search of Georgia Election Center Is "Dangerous," Experts Warn*, Pro Publica (Jan. 29, 2026), https://www.propublica.org/article/fbi-fulton-county-voting-records-search-warrant .....16

Doug Bock Clark & Jen Fifield, *Inside Trump's Effort to "Take Over" the Midterm Elections*, ProPublica (Apr. 13, 2026), https://www.propublica.org/article/trump-midterm-elections-takeover ..... 16-17

Emily Bazelon & Rachel Poser, "Inside Kash Patel's FBI: Meltdowns, Chaos, Vendettas," *N.Y. Times* (Jan. 22, 2026), https://www.nytimes.com/interactive/2026/01/22/magazine/trump-kash-patel-fbi-agents.html .....14, 16, 20

FBI Vault, FBI Ethics & Integrity Program Policy Directive & Policy Guide 7-1, https://vault.fbi.gov/fbi-ethics-and-integrity-program-policy-guide ("Policy Guide") .....10, 11, 12, 13

Fed. Bureau of Investigation, *Directors, Then and Now*, https://www.fbi.gov/history/directors (last visited July 31, 2026) ....................................12

Katherine Shaw, *Partisanship Creep*, 118 Nw. U. L. Rev. 1563 (2024) ....................................5, 8

Mark Rivera, Barb Markoff, Christine Tressel, & Tom Jones, *FBI reassignments to immigration enforcement may impact counterterrorism, corruption investigations*, ABC7 Chicago (Oct. 14, 2025), https://abc7chicago.com/post/fbi-agents-reassignments-us-immigration-enforcement-donald-trump-may-impact-counterterrorism-corruption-investigations/18007962/ ..........................................................................................16

Office of Personnel Management, Table Builder (May 2026), https://data.opm.gov/explore-data/data/table-builder .......................................................13

Robert H. Jackson, Att'y Gen., Address at the Second Annual Conference of United States Attorneys: The Federal Prosecutor (Apr. 1, 1940), https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf ..........................................................................................................7

Shannon D. Azzaro, *The Hatch Act Modernization Act: Putting the Government Back inPolitics*, 42 Fordham Urb. L.J. 781 (2015) ...........................................................6

U.S. Dep't of Just., Federal Bureau of Investigation, https://www.justice.gov/doj/federal-bureau-investigation................................................10

## INTEREST OF AMICI CURIAE

Justice Connection provides direct support to the Department of Justice's apolitical career workforce. As a network of alumni of DOJ, including the FBI, the organization connects current and recent employees with pro bono legal representation, mental health counseling, employment assistance, and media support. It also advocates for the integrity of DOJ's mission-critical work and speaks out in defense of the rule of law. Justice Connection operates as an independent 501(c)(3) organization.

In 2026, Justice Connection launched the FBI Support Network, an initiative dedicated to supporting current and former FBI employees affected by politically motivated personnel actions. Through the FBI Support Network, Justice Connection provides direct assistance to FBI agents and other Bureau personnel who have been terminated, threatened with adverse action, or otherwise harmed as a result of retaliatory campaigns like the one alleged in Plaintiffs' Complaint. The FBI Support Network also serves as a coordinating body for former employees who seek to speak publicly in defense of the Bureau's apolitical mission and the rule of law.

The former FBI personnel, whose names, titles, and years of service are listed in Exhibit A (the "Former FBI Amici"), are retired or former Special Agents and other personnel of the FBI. Collectively, the Former FBI Amici have served the Bureau for hundreds of years across presidential administrations of both parties and have carried out a wide range of responsibilities related to counterterrorism, counterintelligence, public corruption, organized crime, and cybercrime. They submit this brief because they have a direct and informed interest in ensuring

that the FBI remains the apolitical, merit-based law enforcement agency that Congress designed and that they dedicated their careers to serving.[1]

## INTRODUCTION

In early 2025, the Federal Bureau of Investigation began threatening and removing career agents and other personnel whom the current Administration perceived as insufficiently loyal to its political priorities. Those actions, as alleged in the Complaint, were not based on merit, misconduct, or the neutral administration of the civil service. Instead, they were driven by political retribution and an effort to reshape the Bureau into an instrument of partisan control. That effort is incompatible with the design of the modern federal civil service, the mission and policies of the FBI, and the constitutional principles that require federal law enforcement to remain independent of partisan considerations.

For over a century, Congress has acted to ensure that federal employment—and especially federal law-enforcement service—does not turn on political loyalty. As just a few examples, the Pendleton Act, the Lloyd-La Follette Act, the Civil Service Reform Act, and the Hatch Act reflect a consistent legislative judgment that the fair administration of federal law depends upon a professional workforce insulated from partisan pressure. Congress's decision in 1993 to preserve heightened restrictions for FBI personnel and other law-enforcement officers underscores the point: where government officials wield investigative and coercive power, even the appearance of partisan influence is intolerable. The politically motivated termination of career FBI personnel

[1] Pursuant to D.D.C. Local Rule 7(o)(5) (incorporating Fed. R. App. P. 29(a)(4)), counsel for *amici curiae* certify that no counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person—other than *amici curiae*, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

thus strikes at the statutory and institutional framework Congress assiduously built to prevent federal law enforcement from becoming an arm of political power.

This framework exists for compelling reasons. The FBI can function only if its personnel understand that they are answerable to the Constitution and laws of the United States above all else, including the political preferences of any particular Administration. The Bureau's chartering statute, rules and policies governing leadership and line agents, and longstanding internal norms reflect the principle that investigations must proceed "without fear or favor" and without regard to partisan advantage. If personnel may be fired, threatened, or sidelined because they participated in investigations later deemed politically inconvenient, the result will be a workforce chilled into compliance, deterred from pursuing sensitive matters, barred from carrying out long-term and complex investigations, and selected based on loyalty rather than judgment. Such a Bureau cannot effectively investigate crime, ensure public safety, or maintain public confidence in the evenhanded enforcement of the law.

Plaintiffs' allegations describe not only unlawful personnel actions but also a profound threat to the statutory, structural, and constitutional safeguards that preserve apolitical federal law enforcement. A politicized FBI creates the risk that the government's investigative powers will be directed at citizens because of their speech, associations, political activity, or perceived disloyalty to those in power. The Constitution is designed to prevent precisely this kind of abuse. These protections mean little, however, if the agency charged with investigating and initiating enforcement action is itself subjected to partisan purges and political command. The Court should therefore reject Defendants' effort to dismiss this case.

# ARGUMENT

## I. For Nearly 150 Years, Congress Has Reformed Federal Civil Service To Eliminate Partisanship

For well over a century, Congress has enacted and refined a statutory framework designed to insulate federal civil service from political influence. That framework reflects a consistent judgment: that the fair and effective administration of federal law depends on a professional, merit-based workforce—especially in law enforcement, where even the appearance of partisan bias can undermine public trust and the rule of law. From the Pendleton Act of 1883 through the Hatch Act Amendments of 1993, and on many occasions in between, Congress has acted to prevent political patronage and to safeguard the neutrality of federal employees. That longstanding legislative history underscores that the politically motivated termination of career FBI personnel contravenes the framework Congress designed.

### A. The Pendleton Act Established Merit-Based Civil Service To End The Spoils System

Congress first addressed the dangers of a politicized federal workforce in the late nineteenth century. In the decades following the Founding, the "spoils system" permitted newly elected administrations to distribute government jobs based on political loyalty rather than merit. That system not only produced inefficiency and instability but also undermined expertise, morale, and the quality of government service. *See* Katherine Shaw, *Partisanship Creep*, 118 Nw. U. L. Rev. 1563, 1573-1574 (2024). Recognizing these problems, Congress enacted the Pendleton Act of 1883, which replaced patronage with a merit-based hiring system for covered employees. *See* Pub. L. No. 47-27, 22 Stat. 403. The Act established (among other things) competitive examinations and protections against removal for political reasons. *Id.* §§ 2, 7.

Congress made clear that eliminating the spoils system was its goal. In a report accompanying the bill, the Senate Committee on Civil Service and Retrenchment condemned the system as a fundamental corruption of government service. The Committee found that "political influences and compensations have come to dominate and to subordinate all other considerations" in federal appointments and that "the distribution of official spoils has come to be the lawful prerogative of political ascendency." S. Rep. No. 47-576, at iv (1882). That state of affairs, the Committee concluded, was "an absolute departure from the purposes for which official positions in the government were created"—one that "prostitutes the appointing power to ignoble ends and degrades the service of the State." *Id.* In other words, a federal workforce selected and retained on the basis of political loyalty was not merely inefficient; it was incompatible with the proper functioning of government.

### B. The Lloyd-La Follette Act And The Hatch Act Further Restricted Political Influence To Preserve The Integrity Of Federal Service

Congress expanded the Pendleton Act's protections multiple times in the first half of the twentieth century. In 1912, Congress enacted the Lloyd-La Follette Act, which prohibited the removal of federal employees without cause. *See* Pub. L. No. 62-336, § 6, 37 Stat. 539, 555 (1912). Then, amid allegations that the Democratic Party had used Works Progress Administration employees for political purposes during the 1938 congressional elections, Congress passed the Hatch Act in 1939. *See* Pub. L. No. 76-252, 53 Stat. 1147 (1939) (codified as amended at 5 U.S.C. §§ 1501-1508, 7321-7326); *see also* Shannon D. Azzaro, *The Hatch Act Modernization Act: Putting the Government Back in Politics*, 42 Fordham Urb. L.J. 781, 790 (2015) (describing the Act's background). The Hatch Act responded to the danger that federal employees could be subjected to "coercion by higher level, politically appointed supervisors" who would compel "political activities against their will." Cynthia Brown & Jack Maskell, Cong. Rsch. Serv.,

R444469, *Hatch Act Restrictions on Federal Employees' Political Activities in the Digital Age* 1 (2016). To minimize that danger, the Act prohibited federal executive branch employees—including FBI personnel—from taking "any active part in political management or in political campaigns," while also preserving their "right to vote as they may choose and to express their opinions on all political subjects." § 9(a), 53 Stat. 1148.

The risks addressed by the Hatch Act were especially acute in law enforcement. In a speech delivered a year after the Hatch Act's enactment, then Attorney General (and future Nuremberg prosecutor and Supreme Court Justice) Robert Jackson praised the new law and remarked on the "tremendous" discretion given to those charged with investigating and prosecuting violations of federal law. *See* Robert H. Jackson, Att'y Gen., Address at the Second Annual Conference of United States Attorneys: The Federal Prosecutor, at 1 (Apr. 1, 1940), https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf. Given the powers of federal law enforcement, he maintained, "[o]nly by extreme care can we protect the spirit as well as the letter of our civil liberties." *Id.* at 6.

Jackson's admonition thus reinforced the judgment Congress had codified the year before—that the extraordinary discretion entrusted to federal law enforcement demands correspondingly rigorous safeguards against political influence.

### C. The Civil Service Reform Act Codified Merit Principles And Protections Against Political Retaliation

Later in the twentieth century, Congress reaffirmed and strengthened these principles by passing the Civil Service Reform Act of 1978 (CSRA) in the aftermath of the Watergate scandal. *See* Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.). The CSRA consolidated prior civil service protections into a comprehensive statutory framework governing federal employment, with particular emphasis on merit-based decision-making and

protection from political coercion. *See* Shaw, *Partisanship Creep*, 118 Nw. U. L. Rev. at 1577-1578. Though the Act generally exempted the FBI and other federal law enforcement agencies, 5 U.S.C. § 2302(a)(2)(C)(ii)(I), its articulation of "merit principles" reiterated that federal personnel decisions should be made "without regard to political affiliation" and that employees should be protected from "arbitrary action, personal favoritism, or coercion for partisan political purposes." 5 U.S.C. § 2301(b)(2), (b)(8). The Act prohibited discrimination based on political affiliation and retaliation for protected conduct. *See id.* § 2302(b)(1)(E).

The CSRA's legislative history confirms that Congress understood itself to be building on the same anti-patronage principles it had progressively codified since the Pendleton Act. A Senate Report accompanying the bill explained that the modern civil service system was "the product of an earlier reform, which, in protest against the 19th century spoils system, promised a workforce in which employees were selected and advanced on the basis of competence rather than political or personal favoritism." S. Rep. No. 95-969, at 2-3 (1978). The Report acknowledged that there is sometimes "a tension between protections established to insure that employees are hired and fired solely on the basis of their ability, and the need of managers and policymakers to have flexibility to perform their jobs." *Id.* at 4. But that tension should be resolved from "the standpoint of the public." *Id.* Specifically, "the 'rights of employees' to be selected and removed only on the basis of their competence are concomitant with the public's need to have its business conducted competently." *Id.* And "the need for federal executives to manage their personnel responsibilities effectively can only be justified by the benefit derived by the public from such management flexibility." *Id.*

The CSRA therefore again reflected Congress's steady judgment that political neutrality is not merely a matter of employee protection but is indeed essential to the proper functioning of the federal government in the public interest.

### D. The 1993 Hatch Act Amendments Confirm Congress's Special Concern For Maintaining Apolitical Federal Law Enforcement

Congress revisited the Hatch Act in 1993 to relax certain restrictions on certain federal employees' off-duty political activity. *See* Hatch Act Reform Amendments of 1993, Pub. L. No. 103-94, 107 Stat. 1001 (codified as amended in scattered sections of 5 U.S.C.). In doing so, however, Congress made a critical exception: it declined to relax those restrictions for particular categories of employees, including FBI agents and other personnel in law enforcement and intelligence. *See* 5 U.S.C. § 7323(b)(2).

The legislative record makes clear that this decision was deliberate and grounded in Congress's assessment of the unique role of federal law enforcement and intelligence. After the House of Representatives passed a version of the bill that would have relaxed restrictions for federal law-enforcement employees, the Senate pushed back. At a hearing where the legislation was considered, Senator William Roth (R-DE) pressed the Clinton Administration's representative, asking, "You don't see any difference between the FBI and say, [General Services Administration] employees?" *Hearing on S. 185 Before the S. Comm. on Gov. Affairs*, 103rd Cong. 14 (1993) (statement of Sen. William V. Roth, Jr.). When the bill came to the floor, the Senate passed by voice vote an amendment that retained restrictions on political activities of FBI personnel and other federal law enforcement. Speaking in favor of the amendment, Senator Roth explained:

> The Senate must provide assurance to the American public that some of our Government's most sensitive work is not tainted by partisan political appearances. Even if the reality is different, in politics,

> perception is reality and the change advocated in these views is necessary to ensure that certain sensitive decisions do not even have the appearance of partisan influence.

139 Cong. Rec. 15789 (1993). Senator John Glenn (D-OH), Chair of the Senate Committee on Governmental Affairs, concurred. *Id.* The House later agreed to the version of the bill as amended by the Senate, and President Clinton signed it into law.

As a result, the 1993 amendments to the Hatch Act confirmed what the prior century-plus of legislation had established. Even as Congress expanded the expressive freedoms of federal employees generally, it reaffirmed on a bipartisan basis that stricter limits remain necessary for those entrusted with enforcing the law. That recognition—that the popular legitimacy and functioning of federal law enforcement depend on its insulation from partisan politics—confirmed the legislative judgment sustained across more than a century and by political actors from both parties and is directly at odds with politically motivated terminations of career FBI personnel.

## II. The FBI Can Function Fairly Only If It Is Apolitical

The FBI's mission is "to protect the American people and uphold the Constitution." U.S. Dep't of Just., Federal Bureau of Investigation, https://www.justice.gov/doj/federal-bureau-investigation. To accomplish this mission, "impartiality in the performance of [its] investigatory and law enforcement functions is of critical importance." FBI Vault, FBI Ethics & Integrity Program Policy Directive & Policy Guide 7-1, https://vault.fbi.gov/fbi-ethics-and-integrity-program-policy-guide ("Policy Guide"). That impartiality cannot be maintained if political considerations affect personnel decisions. The chilling and culling effects of firing or otherwise disciplining employees for political reasons necessarily creates a body of agents with fealty not to the mission, but to the personal whims of their superiors, either out of fear or by choice.

Those effects are compounded because FBI personnel accept the rigors and sacrifices of service in reliance on the understanding that faithful, merit-based performance will be rewarded with continued employment and eventually a secure retirement. Terminating personnel for political reasons shatters that understanding and deters the commitment to long-term public service on which the Bureau depends.

**A. Statutes, Regulations, and Policies Establish an Apolitical FBI Workforce**

To ensure an apolitical workforce, myriad "rules, statutes and regulations governing participation by FBI employees in the political process attempt to balance [their] rights to personally partake in that process with [their] duty to carry out [the] official FBI mission in an objective and unbiased manner." Policy Guide at 7-1. These restrictions "have one fundamental purpose: to ensure that every U.S. citizen can be confident in the integrity of the Federal Government and those in its employ." *Id.* at 3-1. Any attempt to politicize the FBI, including by engaging in politically motivated personnel decisions, frustrates the ability of the Bureau to carry out its mission.

Indeed, an apolitical workforce—from top to bottom—is part and parcel of the FBI. At the top, the FBI Director is appointed to a ten-year term "to insulate the Director ... from undue pressure being exerted upon [them] from superiors in the Executive Branch." S. Rep. No. 93-1213 at 1, 3 (1974). Absent such protection, the directorship would run the risk of "infringing individual rights and serving partisan or personal ambitions." *Id.*; *see also* Andrew Kent, Susan Hennessey & Matthew Kahn, Why Did Congress Set a Ten-Year Term for the FBI Director?, *Lawfare* (May 17, 2017), https://www.lawfaremedia.org/article/why-did-congress-set-ten-year-term-fbi-director.

Historically, Presidents have respected the apolitical nature of the FBI, even at its highest levels, and the Director's political allegiances have not traditionally been a criterion for selection.

Indeed, there have been numerous occasions where Presidents have chosen individuals from the opposite political party to serve as their Bureau chiefs. For example, Jimmy Carter nominated not one, but two Republicans to head the FBI during his presidency; Bill Clinton nominated Republican Louis Freeh; and Republican Robert Mueller served as Bureau chief under both George W. Bush and Barack Obama. *See* Fed. Bureau of Investigation, *Directors, Then and Now*, https://www.fbi.gov/history/directors (last visited July 31, 2026). So, too, has Congress recognized that the choice of an FBI Director is beyond the reach of party politics. For instance, when then-President Obama asked Congress to extend Robert Mueller's term by two years out of national security concerns created by the contemporaneous departures of the Secretary of Defense and Director of the CIA, the Senate passed bipartisan legislation to do so, co-sponsored by Democrats Dianne Feinstein and Patrick Leahy and Republicans Chuck Grassley and Saxby Chambliss. *See* S. Rep. 112-23, at 3-5 (2011).

The agency's apoliticality is not limited to its leadership; the policies and practices FBI personnel are required to follow make clear that political considerations would fundamentally frustrate and corrupt the agency's ability to function efficiently and ethically. When employees join the Bureau, they are required to swear to support and defend the Constitution. *See, e.g.*, 5 C.F.R. § 2635.101(a) ("Each employee has a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain."); *see also* Policy Guide at 3-5 (identifying "[r]igorous obedience to the Constitution of the United States" as a core value of the FBI). And this dedication to the rule of law is protected by ethical regulations that reinforce the agency's commitment to objectivity. For example, FBI personnel must "act impartially" and endeavor to avoid even the appearance of violating ethical standards to "ensure that every citizen can have complete confidence in the integrity of the Federal

Government." 5 C.F.R. § 2635.101(a)(b)(8). "FBI employees must never use their FBI title or position in any way to advance any particular partisan activity." Policy Guide at 7-1.

At bottom, to carry out its role as a federal law enforcement agency, the FBI must "treat similarly situated people and entities in the same manner" and "enforce the law and meet . . . other mission requirements without fear or favor." *Id.* at 4-89.

### B. The FBI Cannot Function Properly If Political Considerations Play Any Role In Personnel Or Investigatory Decisions

Ensuring the FBI remains apolitical at all levels is necessary to ensure the agency has a continuous workforce that can do its job without concern for currying favor. Absent this dedicated, impartial body of personnel, the FBI would lose its capacity to effectively conduct long-term investigations and to act as an oversight entity for both political parties. Day-to-day functions would also suffer were personnel made to fear political retribution.

<u>Long-Term Investigations:</u> A politicized FBI would likely lead to regular turnover of agents whenever a different political party came to power—something evident from the most recent change in administrations, after which over 1,400 agents have left the Bureau. *See* Off. of Pers. Mgmt., Table Builder (May 2026), https://data.opm.gov/explore-data/data/table-builder. As amici's experience confirms, workforce continuity in the FBI is critical to the agency's success because many of the FBI's most important and complex investigations necessarily extend beyond a single presidential term. Infiltrating criminal organizations, for example, can require years of undercover work and relationship-building. And cases involving informants or vulnerable victims depend on trust that agents cultivate over extended periods that cannot simply be transferred to a replacement. If the Bureau's workforce were subject to political turnover, these long-term efforts—and the public safety interests they serve—would be severely undermined.

Impartial Investigations of Elected Officials: An apolitical workforce also enables the Bureau to conduct sensitive investigations implicating partisan public officials. This ensures that public corruption laws are evenly enforced, which in turn reinforces the agency's credibility with the public. The need for such investigations is not hypothetical. For example, shortly before the current Administration took office, the FBI simultaneously investigated then-current President Joe Biden and then-former President Donald Trump for potentially mishandling classified documents. *See* Emily Bazelon & Rachel Poser, "Inside Kash Patel's FBI: Meltdowns, Chaos, Vendettas," *N.Y. Times* (Jan. 22, 2026), https://www.nytimes.com/interactive/2026/01/22/magazine/trump-kash-patel-fbi-agents.html ("A Year Inside"). As David Sundberg, *amicus curiae* and former assistant director in charge of the Washington field office, explained, "To do that, you need leadership that believes in the nonpartisan independence of the agency." *Id.*

Conduct of Agents: To the extent agents are distracted by fear of losing their jobs due to political retribution, Americans are put at risk. As John Sullivan, *amicus curiae* and a former FBI section chief in the intelligence division, recently explained, "having [FBI] folks scared about losing their jobs" should "sound the alarm about how this affects Americans' safety." Bazelon & Poser, A Year Inside. He continued, "[W]e have stopped stuff Americans will never know about…. [T]housands of attacks stopped over a few years is normal. That depends, though, on people doing the work." *Id.*

The fear that would hamper the work of FBI personnel should continued employment depend on political loyalty is multiplied by dynamics particular to the Bureau. *First*, Special Agents have no discretion to turn down assignments. This practice is sound: It ensures that the law enforcement and national security priorities of the United States are set not by line agents but instead by those in agency leadership. In doing so, it safeguards that the vast investigatory and

enforcement powers of the FBI are wielded in a just, proportionate, and consistent manner rather than at the whims of an individual agent. In turn, among other benefits, there is consistency across investigations, and agency resources are properly allocated. It also gives personnel confidence to carry out the work to which they are assigned. If personnel risk later being penalized by a subsequent administration for having taken on an investigation directed by the current one, personnel would be placed in an untenable position: fearing discipline from a current administration for not carrying out an investigation while fearing reprisal from a future one if they do.

*Second*, personnel who dedicate their professional lives to fulfilling the demanding and sometimes risky mission of the FBI do so with an expectation: that personnel who fulfill their duties will enjoy continued employment and ultimately receive the retirement benefits promised in exchange for a certain number of years of their service. Politically motivated terminations betray that expectation and undermine the Bureau's ability to attract and retain personnel willing to dedicate their careers to apolitical public service.

<u>Scope of FBI Responsibilities:</u> The risks to the FBI's operations that a politicized workforce presents are not limited to ones that undermine its ability to carry out its responsibilities; they also include an improper and unlawful expansion of FBI operations beyond the scope for which it is traditionally responsible.

Take immigration enforcement as an example. The FBI has no independent, statutory authorization to engage in immigration enforcement. *See* 28 U.S.C. §§ 531-540(D). Instead, the Secretary of Homeland Security must authorize FBI employees to engage in such activity. *See* 8 U.S.C. § 1103(a)(4). To effectuate its immigration policy, the current Administration has directed the FBI to support and join Immigration and Customs Enforcement officers when

conducting raids and making arrests. *See* Bazelon & Poser, A Year Inside. Indeed, some agents have been ordered to devote a third of their time to immigration enforcement. *See id*. The problem presented by this type of activity is not only that it extends the FBI's role beyond its traditional bounds; it also redirects agency resources away from critical work that the FBI is tasked with carrying out, such as investigating, deterring, and prosecuting transnational gangs, foreign spies, terrorism, and cyberattacks. *See* Mark Rivera, Barb Markoff, Christine Tressel, & Tom Jones, *FBI reassignments to immigration enforcement may impact counterterrorism, corruption investigations*, ABC7 Chicago (Oct. 14, 2025), https://abc7chicago.com/post/fbi-agents-reassignments-us-immigration-enforcement-donald-trump-may-impact-counterterrorism-corruption-investigations/18007962/. This shift in resources puts Americans at risk.

Elections too are at risk. Recently, for example, FBI agents were directed to seize 2020 election ballots from Fulton County, Georgia—an unprecedented action for the agency. *See* Doug Bock Clark & Jen Fifield, *FBI's Search of Georgia Election Center Is "Dangerous," Experts Warn*, Pro Publica (Jan. 29, 2026), https://www.propublica.org/article/fbi-fulton-county-voting-records-search-warrant. This direction—which one expert has labeled a "dramatic escalation in the Trump administration's efforts to expand federal control over our country's historically state-run election infrastructure," *id.*—defied any number of laws, policies, and norms, including that elections are run by States and that federal employees are prohibited from using their "official authority for the purpose of interfering with, or affecting" a federal election. 18 U.S.C. § 595. To no surprise, it met resistance from career FBI agents, including Paul Brown, the head of the FBI's Atlanta Field Office. *See* Doug Bock Clark & Jen Fifield, *Inside Trump's Effort to "Take Over" the Midterm Elections*, ProPublica (Apr. 13, 2026), https://www.propublica.org/article/trump-midterm-

elections-takeover. After Brown retired, the ballots were seized pursuant to an affidavit that cited a report that Brown had rejected. *See id.*

As this recent history shows, an FBI workforce staffed based on political loyalty can lead the Bureau to expand its operations beyond appropriate bounds.

## III. An Apolitical FBI Protects Individual Constitutional Rights

The Constitution protects the rights of American citizens to engage in political speech and action, including speech that is critical of—or even directly opposed to—the policies and priorities of the incumbent administration. These guarantees are foundational to democratic governance, ensuring that political dissent can be expressed without fear of reprisal from the State. A politicized federal law enforcement agency presents a direct threat to those guarantees. An FBI that investigates individuals based on their political beliefs and expression risks violating citizens' constitutional rights to engage in political speech and action. The Due Process Clause, the First Amendment, and the Fourth Amendment, each of which independently limit the exercise of executive power, underscore why federal law enforcement must remain rigorously apolitical.

### A. The Due Process Clause Shields Against Selective Prosecution Based on Political Views

The Constitution's Due Process Clause prohibits the government from exercising prosecutorial authority against its citizens on the basis of their political beliefs. *See United States v. Hastings*, 126 F.3d 310, 313 (4th Cir. 1997) ("A prosecution [] cannot be motivated by a suspect's exercise of constitutional rights through participation in political activity." (citing *United States v. Marcum*, 16 F.3d 559, 602 (4th Cir. 1994)); *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974)). A non-partisan federal law enforcement agency is necessary to ensure that its agents do not pursue investigations, arrests, or prosecutions based on a suspect's political affiliations.

The Supreme Court has rejected the retaliatory use of the criminal process against individuals who criticize or express opposing views to those in the government. For example, in *Lozman v. City of Riviera Beach*, the Court allowed the claims of a plaintiff—who was arrested at a city meeting—to proceed, even though the arrest was supported by probable cause. 585 U.S. 88, 97-100 (2018). The plaintiff alleged that he was arrested, in part, due to an official policy "to intimidate him in retaliation for his criticisms of city officials." *Id.* at 99-100. Allowing the claim to proceed, the Court reasoned that official retaliatory policies are "particularly troubling and potent" and require "adequate avenues of redress" because "there may be little practical recourse when the government itself orchestrates the retaliation." *Id.* at 100; *see also Gonzalez v. Trevino*, 602 U.S. 653, 655-658 (2024) (vacating dismissal of plaintiff's retaliatory-arrest claim where officers had "declined to arrest" others for the same conduct who were "not engaged in the same sort of protected speech" in which plaintiff had engaged).

Prosecutorial discretion must remain politically neutral, as the Due Process Clause prohibits it from being deployed to punish dissent or privilege favored viewpoints. A politicized FBI would remove that safeguard by allowing partisan objectives to influence investigative referrals and charging decisions, undermining the constitutional guarantee of fair and evenhanded enforcement.

**B. The First Amendment Bars Punishment For Expressing Political Beliefs**

The First Amendment also prohibits the government from targeting individuals based on their political beliefs and their expression of those beliefs. Indeed, political speech occupies the "highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (citation omitted). A politicized FBI risks converting protected political expression into a trigger for governmental scrutiny.

The Supreme Court has repeatedly held that the First Amendment protects speech that is political in nature from all forms of government suppression. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969) (holding that students who wore armbands in protest of the Vietnam War were engaged in conduct protected under the First Amendment); *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 532-533 (1980) (striking down a New York Public Service Commission order prohibiting utility companies from sending bill inserts that express "opinions or viewpoints on controversial issues of public policy"). The Court has emphasized that even deeply offensive speech on public issues is protected from suppression by the government. *See, e.g.*, *Cohen v. California*, 403 U.S. 15, 25-26 (1971) (holding that public display of an antiwar slogan containing vulgar language was protected under the First Amendment); *Snyder v. Phelps*, 562 U.S. 443, 451-453, 458 (2011) (noting that speech on "matters of public concern" lies at the heart of First Amendment protection even when deeply hurtful). Indeed, the Court recently reiterated this principle, holding that the government may not use its regulatory authority to "suppress disfavored speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188-190 (2024).

The Court has also extended this principle to expressive conduct, even where such conduct is "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (holding that flag burning is protected political expression); *see also, e.g.*, *United States v. Eichman*, 496 U.S. 310, 317-319 (1990) (invalidating a statute prohibiting the destruction of the flag); *Virginia v. Black*, 538 U.S. 343, 358-366 (2003) (holding that a ban on cross burnings not done with the purpose to intimidate is impermissible because even though cross burning may "arouse[] a sense of anger or hatred among the vast majority of citizens" there to see it, "this sense of anger or hatred is not sufficient to ban all cross burnings").

In light of these precedents, it comes as no surprise that the Attorney General Guidelines for FBI investigations direct that the FBI shall not conduct an investigation "based solely on activities protected by the First Amendment or on the lawful exercise of any other rights secured by the Constitution or laws of the United States," including (among other things) the expression of a political view. Dep't of Just., Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Domestic Security/Terrorism Investigations, https://www.justice.gov/archives/ag/attorney-generals-guidelines-general-crimes-racketeering-enterprise-and-domestic (last visited July 31, 2026).

The risk that a politicized FBI presents to First Amendment rights has already materialized under the current Administration. For instance, former Supervisory Intelligence Analyst Jill Fields has explained that she was "ordered to have members of [her] team run a preassessment on some anti-ICE protesters who allegedly had impeded an immigration arrest," even though "F.B.I. policy says that an investigation can't be opened based on First Amendment-protected activity." Bazelon & Poser, A Year Inside. After the investigative team analyzed the video and determined that the protesters had done nothing criminal, Fields was told the investigative team had to open an investigation anyway. *Id.*

Without a workforce composed of apolitical employees, the First Amendment's protection of political expression is at risk.

### C. The Fourth Amendment Prohibits Searches or Seizures Based on Political Views, Cabining Executive Discretion

The same principles apply to protections afforded by the Fourth Amendment. Under the Fourth Amendment, investigative activity premised on a person's political views or associations, rather than legitimate law-enforcement objectives, exceeds constitutional bounds. A politicized FBI weakens the Fourth Amendment's protections by allowing partisan considerations to shape agents' decisions about whom to investigate, surveil, or detain.

The Fourth Amendment's prohibition on politically motivated searches and seizures is established by the requirement—consistently reiterated by the Supreme Court—that searches and seizures must be "reasonable," which imposes meaningful constraints on executive discretion. For example, in *United States v. United States District Court for Eastern District of Michigan*, the Supreme Court rejected warrantless domestic-security surveillance, warning that Fourth Amendment protections cannot be preserved if such activity is conducted "solely within the discretion of the Executive Branch." 407 U.S. 297, 316-317 (1972); *see also Delaware v. Prouse*, 440 U.S. 648, 661 (1979) ("[S]tandardless and unconstrained discretion is the evil the Court has discerned when … it has insisted that the discretion of the official in the field be circumscribed." (citations omitted)). The D.C. Circuit has applied these principles to limit investigations into government critics and protesters to the extent they were targeted for political reasons. *See Smith v. Nixon*, 606 F.2d 1183, 1189 (D.C. Cir. 1979) ("Obviously, the choice of the target for surveillance must be defensible and cannot be based on the sort of 'political' reasons that Smith claims led to the surveillance of his family.").

These precedents underscore that the Fourth Amendment demands a politically neutral law-enforcement agency to safeguard the constitutional line between lawful investigation and impermissible, politically driven intrusion.

## CONCLUSION

For the foregoing reasons and those explained in the Plaintiffs' Opposition to the Motion to Dismiss, the Court should deny Defendants' Motion to Dismiss.

Dated: August 3, 2026

Respectfully submitted,

/s/ Seth P. Waxman

Seth P. Waxman (D.C. Bar No. 257337)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
Seth.Waxman@wilmerhale.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief conforms to the requirements of LCvR 5.4, complies with the requirements set forth in Fed. R. App. P. 29(a)(4), and does not exceed 25 pages in length.

Dated: August 3, 2026

Respectfully submitted,

/s/ Seth P. Waxman

Seth P. Waxman (D.C. Bar No. 257337)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
Seth.Waxman@wilmerhale.com

*Counsel for Amici Curiae*