**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE 1, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KASHYAP P. PATEL, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-00959-JMC |
| JAMIE GARMAN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KASHYAP P. PATEL, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-1086-JMC |

**Defendants' Combined Reply in Support of Their Motions to Dismiss the *Doe* and *Garman* Complaints for Lack of Subject-Matter Jurisdiction and Failure to State a Claim for Relief**

BRETT A. SHUMATE
Assistant Attorney General

CHRISTOPHER HALL
Assistant Branch Director

ISAAC C. BELFER (D.C. Bar No. 1014909)
Trial Attorney
Federal Programs Branch
Civil Division
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
(202) 305-7134
(202) 514-8742 (fax)
Isaac.C.Belfer@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION ........................................ 1

ARGUMENT ........................................ 2

I. Plaintiffs Fail to State a First Amendment Claim ........................................ 2

II. Plaintiffs Fail to State a Fifth Amendment Claim Based on Deprivation of a Property Interest ........................................ 5

III. Plaintiffs Fail to State a Fifth Amendment Claim Based on Deprivation of a Liberty Interest ........................................ 12

A. Plaintiffs' "Reputation Plus" Theory Fails ........................................ 12

B. Plaintiffs' "Stigma Plus" Theory Fails ........................................ 16

IV. The *Garman* Plaintiffs Have Narrowed Their *Ultra Vires* Claim to a Constitutional Challenge, But It Still Fails ........................................ 19

V. The *Garman* Plaintiffs' Declaratory Judgment Act Claim Should Be Dismissed ........................................ 20

CONCLUSION ........................................ 21

## TABLE OF AUTHORITIES

**Cases**

*Acevedo-Diaz v. Aponte*,
1 F.3d 62 (1st Cir. 1993) ........ 4

*Alexis v. District of Columbia*,
77 F. Supp. 2d 35 (D.D.C. 1999) ........ 13, 14

*Ashton v. Civiletti*,
613 F.2d 923 (D.C. Cir. 1979) ........ 7, 11

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) ........ 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 2, 5

*Bloch v. Powell*,
348 F.3d 1060 (D.C. Cir. 2003) ........ 6, 7

*Brady v. Off. of Sergeant at Arms*,
520 F.3d 490 (D.C. Cir. 2008) ........ 4

*Cir. City Stores, Inc. v. Adams*,
532 U.S. 105 (2001) ........ 9

*Crooks v. Mabus*,
845 F.3d 412 (D.C. Cir. 2016) ........ 6, 7

*Doe v. U.S. Department of Justice*,
753 F.2d 1092 (D.C. Cir. 1985) ........ 15

*Esparraguera v. Dep't of the Army*,
101 F.4th 28 (D.C. Cir. 2024) ........ 7, 11

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ........ 20

*Garrow v. Gramm*,
856 F.2d 203 (D.C. Cir. 1988) ........ 5

**Hall v. Ford*,
856 F.2d 255 (D.C. Cir. 1988) ........ 5, 6

*Harmon v. Liss*,
116 A.2d 693 (D.C. 1955) ........ 13

**Jefferson v. Harris*,
170 F. Supp. 3d 194 (D.D.C. 2016) ........ *passim*

**Kartseva v. U.S. Dep't of State*,
37 F.3d 1524 (D.C. Cir. 1994) ........ *passim*

*Ky. Dep't of Corr. v. Thompson*,
490 U.S. 454 (1989) ........ 6, 7

**Langeman v. Garland*,
88 F.4th 289 (D.C. Cir. 2023) ........ *passim*

**Mazaleski v. Treusdell*,
562 F.2d 701 (D.C. Cir. 1977) ........ 14, 15, 16

**McCormick v. District of Columbia*,
752 F.3d 980 (D.C. Cir. 2014) ........ 12

*Metz v. BAE Sys. Tech. Sols. & Servs.*,
774 F.3d 18 (D.C. Cir. 2014) ........ 21

**O'Donnell v. Barry*,
148 F.3d 1126 (D.C. Cir. 1998) ........ *passim*

*Perry v. Sindermann*,
408 U.S. 593 (1972) ........ 11

*Printz v. United States*,
521 U.S. 898 (1997) ........ 20

*Rodriguez-Reyes v. Molina-Rodriguez*,
711 F.3d 49 (1st Cir. 2013) ........ 5

*Samantar v. Yousuf*,
560 U.S. 305 (2010) ........ 9

*Sebelius v. Cloer*,
569 U.S. 369 (2013) ........ 8

*Stovell v. James*,
810 F. Supp. 2d 237 (D.D.C. 2011) ........ 13

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ........ 20

*United States v. Texas*,
599 U.S. 670 (2023) ........ 20

*Wilbur v. United States ex rel. Barton*,
46 F.2d 217 (D.C. Cir. 1930) .......... 20

**Statutes**

5 U.S.C. § 7321 .......... 11

**Other Authorities**

Exec. Order No. 14,147, *Ending the Weaponization of the Federal Government*,
90 Fed. Reg. 8235 (Jan. 20, 2025) .......... 17

Mem. from the Attorney General to All Department Employees, *Restoring the Integrity and Credibility of the Department of Justice* (Feb. 5, 2025), https://perma.cc/JM2P-GGEB .......... 17

## INTRODUCTION

In their opening brief, Defendants explained that the *Doe* and *Garman* Complaints do not plausibly allege that Plaintiffs' summary dismissals were unconstitutional. Plaintiffs' oppositions fail to show otherwise. At bottom, although Plaintiffs disagree with their dismissals, they have not shown they were dismissed because of perceived disloyalty to the President, that they had a property interest in continued employment at the Federal Bureau of Investigation ("FBI"), or that their dismissals deprived them of a liberty interest. Thus, their claims should be dismissed.

Plaintiffs cannot show a First Amendment violation by speculating that they were removed because of perceived lack of support for the President. The Complaints show Director Patel removed them based on how they performed their assigned duties as FBI agents.

Plaintiffs also fail to show they were deprived of a property interest in violation of the Fifth Amendment. Plaintiffs had no property interest in continued FBI employment because the Director had wide discretion to summarily dismiss them when compelling or exigent considerations were at stake. Plaintiffs' attempts to cabin this discretion are inconsistent with the text of the FBI's summary dismissal policy.

Plaintiffs also fail to show they were deprived of a liberty interest in violation of the Fifth Amendment. They do not state a "reputation plus" claim because the public would not have connected them with Defendants' alleged public statements, so those statements did not stigmatize Plaintiffs' reputations or hamper their future employment prospects. Plaintiffs also fail to state a "stigma plus" claim because Defendants did not formally or automatically exclude them from future government employment opportunities or otherwise preclude them from pursuing their chosen career.

Finally, the *Garman* Plaintiffs have narrowed their *ultra vires* claim to challenging their terminations under Article II of the U.S. Constitution, but that claim still fails. The *Garman*

Plaintiffs further agree that their declaratory judgment count is simply a remedial vehicle for their substantive constitutional counts. Because those substantive counts should all be dismissed for failure to state a claim, the declaratory judgment count should also be dismissed.

## ARGUMENT

### I. Plaintiffs Fail to State a First Amendment Claim

Plaintiffs were removed because of how they performed their assigned duties as FBI agents: they "exercised poor judgment and a lack of impartiality in carrying out duties, leading to the political weaponization of the government." *Doe* Compl., ¶¶ 95–96, 109, ECF No. 1; *Garman* Compl., ¶ 174, ECF No. 1.[1] These stated reasons are consistent with Director Patel's public statements. Mot. 5. Although Plaintiffs speculate that they were removed "based on a perception that [they] were not political supporters of President Trump," *Doe* Compl. ¶ 132; *see Garman* Compl. ¶¶ 1, 208–09, their factual allegations do not bear this out and "have not nudged [Plaintiffs' theory] across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Mot. 4–6.

Plaintiffs' oppositions do not overcome this defect. None of the allegations they cite (*e.g.*, *Doe* Opp. 15–16, ECF No. 19) suggests that Defendants dismissed Plaintiffs because of perceived disloyalty to the President. *See, e.g.*, *Doe* Compl. ¶¶ 70–72 (not mentioning Arctic Frost or Plaintiffs), 83 (explaining that several agents assigned to Arctic Frost were removed based on their "weaponize[d]" and "politiciz[ed]" work, but not saying anything about alleged disloyalty to the President (second alteration in original)), 88 (referring to senior DOJ officials

[1] Contrary to Plaintiffs' assertion, Defendants do not agree that Plaintiffs "were fired based solely on their assignment to Arctic Frost." *Doe* Opp. 15, ECF No. 19. Defendants explained that Plaintiffs were dismissed because of how they performed their assigned duties as FBI agents. Mot. 4–6, *Doe* ECF No. 18-1, *Garman* ECF No. 28-1.

who had "signed off on Operation Arctic Frost"), 117 (commenting on an article about a particular FBI agent who allegedly played an early role in the Arctic Frost investigation[2]); *see also Garman* Opp. 7–10, ECF No. 29. Similarly, then-Attorney General Bondi's alleged statement expressing an intent to remove "people in the FBI and also in the Department of Justice who despise Donald Trump," *Doe* Compl. ¶ 80, did not reference Plaintiffs or the group of FBI agents assigned to Arctic Frost. And Director Patel's alleged statement that "the FBI tried to put the president in jail and he hasn't forgotten it," *Garman* Compl. ¶ 136; *Garman* Opp. 16, is consistent with Defendants' explanation that Plaintiffs "exercised poor judgment and a lack of impartiality" in their Arctic Frost work, "leading to the political weaponization of the government," *Doe* Compl. ¶¶ 95–96, 109; *Garman* Compl. ¶ 174. In short, Plaintiffs' allegations suggest neither that Defendants viewed "Plaintiffs' assignment to Arctic Frost" as "proof of political disloyalty to Trump," *Doe* Opp. 16, nor that Plaintiffs were removed based on alleged disloyalty to the President.

Plaintiffs also fail to show that the stated reasons for their dismissals were "pretextual." *Doe* Opp. 17–22; *Garman* Opp. 17. Their allegation that they had not previously "been the subject of any disciplinary action," *Doe* Opp. 16, does not disprove that their work on Arctic Frost "exercised poor judgment and a lack of impartiality," as explained in their summary dismissal letters, *Doe* Compl. ¶¶ 95–96, 109; *Garman* Compl. ¶ 174.[3] Moreover, the FBI's summary dismissal policy does not require a history of disciplinary action before an employee is

[2] Donald Trump (@realDonaldTrump), TRUTH SOCIAL (Jan. 12, 2026 at 16:07 ET), https://truthsocial.com/@realDonaldTrump/posts/115884164936451552 (citing John Solomon & Jerry Dunleavy, *Arctic Frost probe driven early on by anti-Trump FBI agent, claims by liberal outlets, memos show*, JUST THE NEWS (Jan. 12, 2026), https://justthenews.com/government/courts-law/anti-trump-fbi-agent-and-liberal-outlet-claims-heart-controversial-arctic).

[3] These stated reasons for Plaintiffs' removals are not inconsistent with Patel's later statement that the FBI had terminated "corrupt actors." *Doe* Compl. ¶ 118. *Contra Doe* Opp. 20.

removed. *See* Mot. 9–10. Nor does it require an "inquiry or investigation into [employees'] conduct" or require the agency to provide "evidence" or any particular level of "specific[ity]" in explaining the reasons for the summary dismissal. *Doe* Opp. 18–19.

Plaintiffs were duly removed under the FBI's summary dismissal policy; their dismissals did not "fail[] to follow established procedures or criteria." *Garman* Opp. 17 (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008)). Nor was there any "inconsistenc[y]" between the dismissal letters and Plaintiffs' "separation paperwork." *Id.*; *see Doe* Opp. 18. As Defendants' motion explained, "[a]lthough certain Plaintiffs' personnel records reflected that they had been removed based on Director Patel's authority under Article II of the U.S. Constitution, that says nothing about Director Patel's reasons for removing Plaintiffs and is fully consistent with the justification in the summary dismissal letters." Mot. 5 (citing *Doe* Compl. ¶¶ 98–100, 112–13) (cleaned up). Indeed, the dismissal letters themselves cited Article II. *Doe* Compl. ¶¶ 95–96, 109; *Garman* Compl. ¶ 174. Moreover, even if Plaintiffs' allegations raised questions about the stated reasons for their dismissals, Plaintiffs would *also* need to plausibly allege that they were dismissed because of perceived disloyalty to the President. *See, e.g.*, *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 70 (1st Cir. 1993) (plaintiffs met their burden based on "[t]he circumstantial evidence of pretext, coupled with the direct evidence of discriminatory animus"). As discussed above, they have not done so.

The cases Plaintiffs cite in opposition (*see, e.g.*, *Doe* Opp. 16–17; *Garman* Opp. 15) relied on much stronger evidence that the adverse employment action was based on political affiliation. For example, "officials affirmatively sought information about employees' political

affiliations," *Garman* Opp. 15,[4] which is not alleged here. In short, the Complaints fail to render it "plausible" (beyond just "conceivable") that the stated reasons for Plaintiffs' removals were pretextual and that Plaintiffs were removed because of perceived lack of support for President Trump. *Twombly*, 550 U.S. at 570.

## II. Plaintiffs Fail to State a Fifth Amendment Claim Based on Deprivation of a Property Interest

Plaintiffs had no protected property interest in their continued employment at the FBI because they had no "objectively reasonable expectation that [they were] entitled to retain it." *Hall v. Ford*, 856 F.2d 255, 266 (D.C. Cir. 1988). Although a property interest in continued employment might occasionally be created without a statutory for-cause removal provision, *see Doe* Opp. 22–26; *Garman* Opp. 18–19, the D.C. Circuit has observed that "our attention has yet to be called to any case where a court has held that a government employee has a protected property interest in employment where language qualifying discharge for 'cause' or for comparable reasons, is not present." *Garrow v. Gramm*, 856 F.2d 203, 206–07 (D.C. Cir. 1988). Plaintiffs enjoyed no such statutory for-cause removal protection under the Civil Service Reform Act of 1978 or any other statutory scheme, and there is no other potential source of a property interest in their continued employment here either.

The FBI's summary dismissal policy precluded any "objectively reasonable expectation that [Plaintiffs were] entitled to retain" their jobs. *Hall*, 856 F.2d at 266. Under that policy,

---

[4] *See Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 57 (1st Cir. 2013) (complaint plausibly alleged "political animus was a substantial or motivating factor behind the adverse employment actions" where it alleged "the politically charged questioning of [employees], the statements of officials indicating an intent not to renew the contracts of persons affiliated with other political parties, the absence of any nondiscriminatory explanation for the adverse employment actions, the temporal proximity of the regime change to the adverse employment actions, and the replacement of the separated workers with [political] adherents").

"[w]hen: (a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) *other compelling or exigent considerations are at stake*, the Director . . . may summarily dismiss an employee." *Doe* Compl. ¶ 53 (emphasis added); *Garman* Compl. ¶ 89. This provision grants the FBI Director "significant or unfettered discretion in determining whether to" summarily dismiss an employee. *Crooks v. Mabus*, 845 F.3d 412, 419 (D.C. Cir. 2016). Moreover, there is no "explicitly mandatory language" that "limit[s] [this] discretion," i.e., "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Bloch v. Powell*, 348 F.3d 1060, 1069 (D.C. Cir. 2003) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 463 (1989)).[5]

Plaintiffs argue that Defendants apply the wrong standard. They claim that Defendants "elide the distinction between two lines of precedents—one focused on whether a statute or regulation places substantive limits on official discretion, and the other, applicable here, focused on whether the government employer has fostered rules and understandings that create a reasonable expectation that an employee will be fired only for a job-related reason." *Doe* Opp. 24. But Plaintiffs misread the caselaw; there are not "two lines of precedents," but one consistent body of law.

Whether the source of the alleged property interest is a statute, regulation, or other rule or practice, the determinative inquiry is whether the employee has an "objectively reasonable expectation that he is entitled to retain" his job, *Hall*, 856 F.2d at 266, which depends on whether the agency "wields significant or unfettered discretion in determining whether to" dismiss the

[5] To be clear, Defendants' point is not just that the summary dismissal policy itself does not create a property interest in continued employment. *See Doe* Opp. 31. More broadly, Plaintiffs lack *any* property interest in continued employment, based on any source, because the Director has significant discretion to dismiss them under the summary dismissal policy.

employee, *Crooks*, 845 F.3d at 419. One way to determine the scope of the agency's discretion is to ask if a policy "limit[s] discretion by 'explicitly mandatory language,'" *Bloch*, 348 F.3d at 1069 (quoting *Thompson*, 490 U.S. at 463). Another is to ask whether the agency created an "understanding that [an employee] did not hold his position at the whim of his superiors and that he would lose his position only for" particular reasons. *Ashton v. Civiletti*, 613 F.2d 923, 929 (D.C. Cir. 1979). Either way, "discretion [is] the touchstone of the due process analysis." *Bloch*, 348 F.3d at 1069; *see Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) (focusing on "the extent of any substantive limitations on the government's authority to remove" an employee and whether there are "particularized standards or criteria to guide the decisionmakers" (cleaned up)).

Here, Plaintiffs did not have a property interest in continued employment because the Director could summarily dismiss them when "other compelling or exigent considerations are at stake," considering "any factors relevant to the case." *Doe* Compl. ¶¶ 53–54; *Garman* Compl. ¶¶ 89, 91. This is a grant of "significant" and nearly "unfettered discretion." *Crooks*, 845 F.3d at 419. In *Langeman v. Garland*, the D.C. Circuit held that a similar FBI policy, which authorized summary dismissal when "compelling considerations may be at stake," "reserves expansive authority and discretion for FBI leadership to determine the circumstances where an FBI employee may be summarily dismissed." 88 F.4th 289, 295–96 (D.C. Cir. 2023) (cleaned up).[6]

---

[6] Defendants have not "waived" reliance on *Langeman*. *Garman* Opp. 23. Their opening brief cited *Langeman* in discussing Plaintiffs' liberty interest claims. Mot. 13, 15, 17–18. And Defendants' present citation of *Langeman* in the property interest context does not raise a new "argument," but simply presents additional authority in support of their existing argument that the summary dismissal policy gives the FBI Director wide discretion to determine when to dismiss an employee. Mot. 10. Moreover, Plaintiffs discussed *Langeman* in the property interest context, *Doe* Opp. 31–32; *Garman* Opp. 22–23, so are not harmed by Defendants' citing *Langeman* here.

Contrary to Plaintiffs' characterization, Defendants' position is not that the summary dismissal policy authorized the Director to dismiss Plaintiffs "any time for any reason," *Garman* Opp. 17–18, but that it gave the Director wide discretion to dismiss Plaintiffs when "other compelling or exigent considerations are at stake."

Casting about for reasons to suggest that the FBI Director's summary dismissal authority was cabined enough to create a property interest in continued employment, Plaintiffs argue that the broad reference to "other compelling or exigent considerations" is actually limited to a narrower set of defined circumstances. *Doe* Opp. 27–29; *Garman* Opp. 19–23. Tellingly, though, they describe these circumstances in several different ways: "serious, individualized acts of criminal or quasi-criminal misconduct," *Garman* Opp. 20–21; "misconduct (as defined in the Offense Codes)," *Doe* Opp. 27–29; and "job-related reasons." Garman Opp. 17; *Doe* Opp. 26. As discussed below, these attempts to cabin the FBI Director's wide discretion are meritless and cannot overcome the summary dismissal policy's "ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013).

First, citing two canons of statutory construction (*ejusdem generis* and *noscitur a sociis*), Plaintiffs argue that the phrase "other compelling or exigent considerations" should be limited to "serious, individualized acts of criminal or quasi-criminal misconduct," like the examples in the Offense Codes of when summary dismissal is warranted (i.e., "possession of Child Sexual Abuse Material, arrest for criminal conduct, solicitation of commercial sex acts, and theft of Bureau property," *Doe* Opp. Ex. 2, Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process ("Offense Codes") at 4, ECF No. 19-3). *Garman* Opp. 20–21. But even to the extent these canons of statutory construction are relevant outside the statutory context, they are inapplicable here. *Ejusdem generis* counsels that "[w]here general words follow specific

words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (quotations omitted). But here, the term "other compelling or exigent considerations" and the examples of when summary dismissal may be warranted are not part of one enumeration. Moreover, the "examples listed are illustrative, not exhaustive," Offense Codes 4, so they cannot be used to narrow the scope of "other compelling or exigent considerations." Likewise, the *noscitur a sociis* canon, which suggests that "a word may be known by the company it keeps," *Samantar v. Yousuf*, 560 U.S. 305, 317 (2010) (quotations omitted), cannot constrain the meaning of "other compelling or exigent considerations" based on examples that are expressly "illustrative, not exhaustive," Offense Codes 4.

Second, summary dismissal is not limited to "misconduct (as defined in the Offense Codes)." *Doe* Opp. 27–29. The plain text of the summary dismissal policy contains no such limit; the policy broadly allows dismissal when "other compelling or exigent considerations are at stake." Nor is such a limit required by context. Although *Office of Professional Responsibility ("OPR") adjudications* focus on "whether the employee violated an FBI Offense Code," and the summary dismissal policy (OPR Policy Guide § 4.6.4) is nested under "Range of Potential Outcomes in OPR Adjudication" (OPR Policy Guide § 4.6), *see Doe* Opp. 28, summary dismissal is not necessarily the result of an OPR adjudication. *See, e.g.*, *Doe* Opp. Ex. 1, OPR Policy Guide at 7–9, ECF No. 19-2. The summary dismissal policy does not state that it must follow an OPR adjudication, and whereas the listed "potential outcomes for a case pending in OPR" are each determined by OPR, summary dismissals can be—as here—determined by the

Director.[7] *Id.* Ultimately, summary dismissal is an *exception* to the normal disciplinary process for use in "compelling or exigent" circumstances. *Id.*; Offense Codes 3.

Plaintiffs note that, in describing the factors that can inform a summary dismissal decision, the Offense Codes refer to "the misconduct" (e.g., "the egregiousness of the misconduct"). *Id.* at 3–4; *Doe* Opp. 28–29. But "[t]hese factors . . . are illustrative, not exhaustive, and the Bureau retains the discretion to consider any factors relevant to the case." Offense Codes 4. Although summary dismissal *may* respond to misconduct as defined in the Offense Codes, it is not limited to such misconduct.

Finally, Plaintiffs offer a third formulation of the supposed limit on summary dismissal: that "based on FBI policies and practices, [they] reasonably understood that they would be terminated only for a job-related reason." *Doe* Opp. 26; *see Garman* Opp. 17. But that argument is misplaced entirely, because Plaintiffs' dismissal letters explain that they *were* terminated for job-related reasons: "exercis[ing] poor judgment and a lack of impartiality in carrying out duties, leading to the political weaponization of the government." *Doe* Compl. ¶¶ 95–96, 109; *Garman* Compl. ¶ 174.

Even on its own terms, though, Plaintiffs' argument that they "reasonably understood that they would be terminated only for a job-related reason" is both incorrect and unavailing, as FBI leadership possesses "expansive authority and discretion," *Langeman*, 88 F.4th at 295, to summarily dismiss an employee when "other compelling or exigent considerations are at stake." OPR Policy Guide 8. The policy does not limit summary dismissals to "job-related reasons."

---

[7] Plaintiffs note that the summary dismissal policy states employees may not "review the redacted 263 file," which "contains the investigative and adjudicative records of an employee's administrative inquiry." OPR Policy Guide 8, B-1; *see Doe* Opp. 30. That provision recognizes that summary dismissal *may* follow an "administrative inquiry," but there is no *requirement* that summary dismissal follow such an inquiry.

Plaintiffs' cited cases are inapposite. In *Perry v. Sindermann*, a Faculty Guide stated that "[t]he Administration of the College wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work." 408 U.S. 593, 600 (1972). Moreover, other guidelines provided that certain employees "ha[d] some form of job tenure." *Id.* In *Ashton*, the FBI Handbook in place at that time stated that "[y]ou may assume that your position is secure, if you continue to do satisfactory work." 613 F.2d at 929.[8] In *Esparraguera*, the Civil Service Reform Act provided, in relevant part, that a career Senior Executive Service ("SES") employee could be removed from the SES "only based on a finding of less than fully successful executive performance as determined under [a particular statutory section]." 101 F.4th at 34 (cleaned up). Furthermore, "the surrounding statutory provisions . . . confirm[ed] that [this] finding" was "a meaningful constraint," and "detailed regulations" ensured that employees could not "be removed unless they perform poorly on specified metrics." *Id.* at 35–36. Finally, in *Souther v. Patel*, No. 2:25-cv-00150-SCJ, slip op. at 18–19 (N.D. Ga. June 17, 2026), a statute provided that "employees should be encouraged to exercise fully, freely, and without fear of penalty or reprisal . . . their right to participate or to refrain from participating in the political processes of the Nation." 5 U.S.C. § 7321.[9] In contrast to these statutes, regulations, and written policies that constrained employers' ability to remove the plaintiffs in those cases, here the summary dismissal policy granted the Director wide discretion to remove Plaintiffs.

In sum, Plaintiffs lack any property interest in continued FBI employment and thus have

---

[8] Additionally, *Ashton* "decid[ed] nothing with respect to the hearing rights of Bureau employees other than [the] appellant" in that case. 613 F.2d at 931.

[9] Here, Plaintiffs do not claim that this statute protected them from removal.

failed to state a claim for deprivation of a property interest under the Fifth Amendment.

## III. Plaintiffs Fail to State a Fifth Amendment Claim Based on Deprivation of a Liberty Interest

Plaintiffs assert two liberty-interest procedural due process theories: a "reputation plus" theory and a "stigma plus" theory. "[T]he availability of such an action in the case of an at-will employee is at best very narrow," *McCormick v. District of Columbia*, 752 F.3d 980, 987 (D.C. Cir. 2014), and here Plaintiffs fail to plausibly allege either theory.

### A. Plaintiffs' "Reputation Plus" Theory Fails

To state a "reputation plus" claim, "the plaintiff must meet three requirements": (1) "the government's defamation resulted in a harm to some interest beyond reputation, such as a loss of present . . . government employment," and "occurred together" with the adverse employment action; (2) "the government has actually stigmatized his or her reputation"; and (3) "the stigma has hampered future employment prospects." *Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016) (quotations omitted) (alterations in original); *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). Defendants' motion explained why Plaintiffs fail to meet each requirement. Mot. 11–16.

At the outset, the only potentially relevant public statements are those that "occurred together" with, *i.e.*, "accompanied," Plaintiffs' removals. *O'Donnell*, 148 F.3d at 1140; Mot. 12.[10] Plaintiffs cannot evade this requirement by claiming that "Defendants engaged in a coordinated, continuing campaign of rolling terminations accompanied by repeated [] public statements justifying the firings." *Garman* Opp. 25. Plaintiffs must instead show the alleged

[10] The defamation must occur "in the course of the termination of employment," *O'Donnell*, 148 F.3d at 1140, not, as Plaintiffs misquote, "in the course of the term of employment," *Garman* Opp. 25 (emphasis omitted).

public statements "accompanied" *each* of their removals, *O'Donnell*, 148 F.3d at 1140, not simply that the statements occurred in the same broad period and related generally to removals of agents assigned to Arctic Frost.

Defendants' alleged public statements did not "actually stigmatize[] [Plaintiffs'] reputation," *Jefferson*, 170 F. Supp. 3d at 205 (quotations omitted), because the statements did not identify Plaintiffs, and the public could not have understood the statements "as referencing" Plaintiffs. Mot. 12–13 (citing *Stovell v. James*, 810 F. Supp. 2d 237, 248–49 (D.D.C. 2011); *Harmon v. Liss*, 116 A.2d 693, 695 (D.C. 1955); Restatement (Second) of Torts § 564 cmt. a). Likewise, in *Langeman*, the plaintiff's "allegations [were] insufficient to state a reputation-plus claim" because they did not "demonstrat[e] that the FBI actually revealed his identity in any defamatory public statement." 88 F.4th at 296.

Plaintiffs claim "John Doe 1's identity as an Arctic Frost agent was public," *Doe* Opp. 39–40, but that information was not publicized until October 29, 2025, *Doe* Compl. ¶ 89, and Plaintiffs have not identified any subsequent public statements that allegedly defamed him. Although Director Patel allegedly said on January 12, 2026, that "this FBI found the corrupt actors and terminated their employment last year," *Doe* Compl. ¶ 118, the public would not have known whether John Doe 1 had been dismissed, *contra Doe* Opp. 40–41, and likewise would not have known whether he was among the dismissed employees referenced by Director Patel. Similarly, the *Garman* Plaintiffs have not shown the public would have associated them with any allegedly defamatory statements. Mot. 12–14. *Contra Garman* Opp. 26.

"[A] defamatory statement directed at a group or class does not generally give rise to a cause of action on behalf of its individual members." *Alexis v. District of Columbia*, 77 F. Supp. 2d 35, 40 (D.D.C. 1999) (quotations omitted). Plaintiffs cite the "small group" exception to this

rule, which applies when "the group or class is so small that the matter can reasonably be understood to refer to the member." *Id.*; *Doe* Opp. 39–40; *Garman* Opp. 25–26. "[U]nnamed group members generally are not permitted to sue for group defamation if the group has more than 25 members." *Alexis*, 77 F. Supp. 2d at 41. This exception does not apply to John Doe 1 because, as of January 12, 2026, the public did not know he had been dismissed and thus would not have "reasonably . . . understood" Patel's reference to "the corrupt actors [who were] terminated," *Doe* Compl. ¶ 118, to refer to John Doe 1, *Alexis*, 77 F. Supp. 2d at 40. Nor have Plaintiffs alleged that the referenced group has fewer than "25 members." *Alexis*, 77 F. Supp. 2d at 41. Likewise, although Patel publicly referenced the CR-15 squad, to which the *Garman* Plaintiffs had been assigned, *Garman* Opp. 25–26, the *Garman* Plaintiffs have not alleged that, at the time of these statements, the public knew that they had been members of CR-15. Thus, the public would not have "reasonably . . . understood" Patel's reference to CR-15 to refer to the *Garman* Plaintiffs. *Alexis*, 77 F. Supp. 2d at 40. And the *Garman* Plaintiffs have not alleged that CR-15 had fewer than "25 members." *Id.* at 41.

For similar reasons, Plaintiffs have not shown that Defendants' allegedly defamatory statements "hampered [their] future employment prospects," *Jefferson*, 170 F. Supp. 3d at 205 (quotations omitted)—a harm that "must extend beyond a disadvantage or impediment; it must 'foreclos(e) [their] freedom to take advantage of other employment opportunities,'" *Mazaleski v. Treusdell*, 562 F.2d 701, 713 (D.C. Cir. 1977) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)). Patel's "statements to the public" did not convey that John Doe 1 was fired for "weaponization" or "corrupt[ion]," *Doe* Opp. 41, since the public would not have associated Patel's public statements with John Doe 1. Similarly, Defendants' alleged public statements could not have "foreclose[ed] [the *Garman* Plaintiffs'] freedom to take advantage of

other employment opportunities," *Mazaleski*, 562 F.2d at 713 (quotations omitted), because the public would not have understood those statements to refer to the *Garman* Plaintiffs. *See supra* pp. 13–14. *Contra Garman* Opp. 26–27. The facts of *Doe* and *Garman* thus contrast with *Doe v. U.S. Department of Justice*, where the "allegations of unprofessional conduct and dishonesty" that were the basis for the plaintiff's dismissal "were allegedly disseminated to prospective employers, public and private." 753 F.2d 1092, 1111–12 (D.C. Cir. 1985). *Contra Doe* Opp. 41.

Plaintiffs' allegations do not show that "Defendants' defamatory rhetoric has broadly interfered with John Doe 1's ability to find a new law enforcement job." *Doe* Opp. 41 (citing *Doe* Compl. ¶¶ 121–26). The *Doe* Complaint alleges that John Doe 1 failed to get a "position at an independent regulatory organization" because of interview "questions about John Doe 1's firing, including about the contents of the separation letter he received and whether members of the media or Senator Grassley's committee had contacted him," as well as "public reporting about John Doe 1's firing." *Doe* Compl. ¶¶ 124–25. Those reasons are separate from any alleged public defamation of John Doe 1.[11] Similarly, there are no allegations plausibly showing that John Doe 1's failure to get a job at the Securities and Exchange Commission or at an "independent consulting" company resulted from any public statements defaming him. *Id.* ¶¶ 123–26.

As to the *Garman* Plaintiffs, they have not shown they were precluded from seeking future employment in law enforcement, or even federal law enforcement. *See infra* pp. 16–19. *Contra Garman* Opp. 27. And even if their "replacement work [] was lower paid [and] less stable," *Garman* Opp. 27, that does not rise to the level of deprivation of a liberty interest

[11] This point does not require "inferences" from Plaintiffs' allegations, *Doe* Opp. 41–42, but is based on the allegations' plain text.

because it does not show Defendants' alleged statements "foreclos[ed] [the *Garman* Plaintiffs'] freedom to take advantage of other employment opportunities,'" *Mazaleski*, 562 F.2d at 713 (quotations omitted).

In sum, Plaintiffs fail to show a deprivation of a liberty interest based on a "reputation plus" theory.

**B. Plaintiffs' "Stigma Plus" Theory Fails**

To show a governmental action caused "a tangible change in status," as required for a "stigma plus" theory, a plaintiff must show that the governmental action either (1) "'formally or automatically exclude[d]' Plaintiff from future government employment opportunities—*e.g.*, by making 'a binding determination to disqualify' him from further employment," or (2) "seriously affected, if not destroyed" the plaintiff's "ability to pursue his chosen profession." *Jefferson*, 170 F. Supp. 3d at 205 (quoting *Kartseva v. U.S. Dep't of State*, 37 F.3d 1524, 1527–29 (D.C. Cir. 1994); *O'Donnell*, 148 F.3d at 1141–42)). Here, Plaintiffs show neither.

The statement in Plaintiffs' dismissal letters that Plaintiffs were being "removed from the federal service," *Doe* Compl. ¶¶ 95–96, 109; *Garman* Compl. ¶ 174, did not "'formally or automatically exclude[]' Plaintiff[s] from future government employment opportunities." *Jefferson*, 170 F. Supp. 3d at 205 (quoting *Kartseva*, 37 F.3d at 1528–29). *Contra Doe* Opp. 33–34; *Garman* Opp. 28. The statement's "plain language" says nothing about whether Plaintiffs are eligible for "other federal government employment," *Doe* Opp. 33–34, and certainly does not convey any formal determination that Plaintiffs are ineligible for federal employment. Rather, it simply communicates that Plaintiffs are being removed from their federal jobs. Thus, the statement's plain text—without resort to any inferences, *see id.* at 34–35—shows that Plaintiffs were not being "'formally or automatically exclude[d]' . . . from future government employment opportunities." *Jefferson*, 170 F. Supp. 3d at 205 (quoting *Kartseva*, 37 F.3d at 1528–29).

Plaintiffs also cannot show a "stigma plus" claim based on the statement in their dismissal letters that their actions "le[d] to the political weaponization of the government." *Doe* Compl. ¶¶ 95–96, 109; *Garman* Compl. ¶ 174; *see Doe* Opp. 34–36. Contrary to Plaintiffs' argument, Executive Order 14147 and then-Attorney General Bondi's memorandum establishing the Weaponization Working Group did not order the dismissal of employees found to have engaged in weaponization, nor did those documents state that such employees are ineligible for federal employment. *See* Exec. Order No. 14,147, *Ending the Weaponization of the Federal Government*, 90 Fed. Reg. 8235 (Jan. 20, 2025); Mem. from the Attorney General to All Department Employees, *Restoring the Integrity and Credibility of the Department of Justice* (Feb. 5, 2025), https://perma.cc/JM2P-GGEB ("Restoring Integrity Memo."). Although the documents expressed a policy "to identify and take appropriate action to correct past misconduct by the Federal Government related to the weaponization of law enforcement," 90 Fed. Reg. at 8235, neither document specified what such remedial action would be. For example, then-Attorney General Bondi's memorandum did not say that "any federal employee deemed to have engaged in 'weaponization' will be 'root[ed] out,'" *Doe* Opp. 34, but simply referred to "efforts to root out corruption and weaponization." Restoring Integrity Memo. 1. Neither the Executive Order, nor Bondi's memorandum, nor any other statement referenced in the Complaints "'formally or automatically exclude[]' Plaintiff[s] from future government employment opportunities" based on their dismissal letters' reference to weaponization. *Jefferson*, 170 F. Supp. 3d at 205 (quoting *Kartseva*, 37 F.3d at 1528–29). Likewise, Plaintiffs have not plausibly alleged any "'formal[] or automatic[] exclu[sion]' . . . from future government employment opportunities" based on any other characterization of their conduct in Defendants' alleged statements. *Id.* (quoting *Kartseva*, 37 F.3d at 1528–29); *see Garman* Opp. 28.

Importantly, "to demonstrate a status change of this sort, [a plaintiff] must show that her disqualification from future opportunities is automatic or formal, not simply" that she is placed at a "competitive disadvantage relative to other applicants for these positions." *Kartseva*, 37 F.3d at 1529. Thus, even if Plaintiffs have not "succeeded in obtaining alternate federal government employment," *Doe* Opp. 34, and even if their dismissal letters' reference to weaponization makes it harder for them to obtain such employment, that does not show the "'formal[] or automatic[] exclu[sion]' . . . from future government employment opportunities" necessary to show a "status change." *Jefferson*, 170 F. Supp. 3d at 205 (quoting *Kartseva*, 37 F.3d at 1528–29). And even if Plaintiffs had shown they are "excluded from working with the FBI again, . . . it does not necessarily follow that [they] would be unable to find employment with any other federal agency indefinitely; nor is any such exclusion or explicit prohibition present in [their] dismissal letter[s]." *Langeman*, 88 F.4th at 297.

The *Garman* Plaintiffs also invoke the second pathway for showing a status change, *Garman* Opp. 27–29, though the *Doe* Plaintiffs disclaim it, *Doe* Opp. 36. This pathway requires that the governmental action "seriously affected, if not destroyed" the plaintiff's "ability to pursue his chosen profession." *Jefferson*, 170 F. Supp. 3d at 205 (quoting *O'Donnell*, 148 F.3d at 1141–42). Plaintiffs must show the action had "the *broad* effect of largely precluding [them] from pursuing [their] chosen career." *Kartseva*, 37 F.3d at 1528. To make this showing, Plaintiffs must plausibly allege "an attempt to obtain subsequent employment and a rejection for the job resulting from the alleged stigma or disability." *Langeman*, 88 F.4th at 297.

The *Garman* Plaintiffs—each of whom has secured new employment, *Garman* Compl. ¶¶ 176, 183, 189—do not come close to making this showing. They merely claim that their dismissal "letters—and accompanying public statements by Defendants—convey that Plaintiffs

are 'unsuitable' for any position within the federal government and future federal and law-enforcement employment." *Garman* Opp. 28. But Defendants did not publicly disclose Plaintiffs' dismissal letters, and the public would not have understood from Defendants' alleged public statements that those statements referred to Plaintiffs. *See supra* pp. 13–14. Thus, the *Garman* Plaintiffs cannot show that Defendants' alleged actions have had "the *broad* effect of largely precluding [them] from pursuing [their] chosen career." *Kartseva*, 37 F.3d at 1528. Nor have they alleged "an attempt to obtain subsequent employment and a rejection for the job resulting from the alleged stigma or disability." *Langeman*, 88 F.4th at 297.

Because Plaintiffs have failed to state a claim under either a "reputation plus" theory or a "stigma plus" theory, their Fifth Amendment claim based on deprivation of a liberty interest should be dismissed.

## IV. The *Garman* Plaintiffs Have Narrowed Their *Ultra Vires* Claim to a Constitutional Challenge, But It Still Fails

The *Garman* Plaintiffs' opposition makes several important concessions. First, although Count IV of their Complaint refers to "Ultra Vires Action in Violation of Constitutional and Statutory Authority," they now disclaim any challenge based on statutory authority. They explain that their *ultra vires* claim "is purely a Constitutional claim" that "solely concerns Defendants' exercise of Article II removal power." *Garman* Opp. 29–30. They also disclaim a cause of action for "Legal Nullity," as stated in Count IV, explaining that "'[l]egal nullity' is the order that Plaintiffs seek should the Court grant Plaintiffs' *ultra vires* claim." *Id.* at 29.

What remains of Count IV is Plaintiffs' claim that "[t]o the extent that [their] terminations were premised on an invocation of authority under Article II to the United States Constitution, the terminations are *Ultra Vires*." *Garman* Compl. ¶ 231. But the *Garman* Plaintiffs have not plausibly alleged a violation of Article II. Mot. 20–22. They are wrong that the removal authority

under Article II is limited to "senior officials." *Garman* Opp. 30–31 (citing *Trump v. Slaughter*, 146 S. Ct. 2283 (2026)). *Slaughter* held that "the President exercises 'general administrative control of those executing the laws' and thus must be able to 'remov[e] those for whom he [cannot] continue to be responsible.'" 146 S. Ct. at 2301 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–493 (2010)). In particular, he must be able to remove those exercising executive powers. *Id.* at 2301–02. "[I]nvestigative" powers "are quintessentially executive," *id.* at 2302, as is the "authority to enforce federal law," including "mak[ing] arrests," *United States v. Texas*, 599 U.S. 670, 678–79 (2023). Although the *Garman* Plaintiffs argue that applying the Article II removal power here would not further "separation of powers concern[s]" and "accountability concerns," *Garman* Opp. 30–31, these policy arguments cannot overcome Supreme Court precedent establishing that FBI agents fall squarely within the Article II removal authority.

Contrary to the *Garman* Plaintiffs' argument, Defendants do not "presuppose[] that it was the President who sought to remove Plaintiffs from federal service and not Defendant Patel." *Garman* Opp. 30. Defendants explained that the President "as a general matter" has "authority to remove those who assist him in carrying out his duties," *Free Enter. Fund*, 561 U.S. at 513–14, and that the heads of departments—and inferior officers below them—may also properly exercise that power on his behalf. Mot. 21–22 (citing U.S. Const., art. II, § 2, cl. 2; *Printz v. United States*, 521 U.S. 898, 922 (1997); *Wilbur v. United States ex rel. Barton*, 46 F.2d 217, 219 (D.C. Cir. 1930), *aff'd*, 283 U.S. 414 (1931)). Thus, the *Garman* Plaintiffs fail to state an *ultra vires* claim based on Article II.

## V. The *Garman* Plaintiffs' Declaratory Judgment Act Claim Should Be Dismissed

Defendants explained that a separate declaratory judgment "count" is a misnomer because the Declaratory Judgment Act provides for a particular type of remedy in civil cases but

does not give rise to a cause of action or create an independent source of federal jurisdiction. Mot. 22 (citing *Metz v. BAE Sys. Tech. Sols. & Servs.*, 774 F.3d 18, 25 n.8 (D.C. Cir. 2014)). The *Garman* Plaintiffs agree that their declaratory judgment count is not a freestanding cause of action but is "the remedial vehicle for constitutional violations alleged in the Complaint." *Garman* Opp. 31. Thus, even if the Declaratory Judgment Act could be asserted in its own count, it would rise or fall with the *Garman* Plaintiffs' substantive claims. Because all those claims should be dismissed, the declaratory judgment claim should also be dismissed.

## CONCLUSION

For the foregoing reasons, and those stated in Defendants' opening brief, the *Doe* and *Garman* Complaints should both be dismissed.

August 18, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

CHRISTOPHER HALL
Assistant Branch Director

*/s/ Isaac C. Belfer*
ISAAC C. BELFER (D.C. Bar No. 1014909)
Trial Attorney
Federal Programs Branch
Civil Division
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
(202) 305-7134
(202) 514-8742 (fax)
Isaac.C.Belfer@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the CM/ECF system, will be sent via electronic mail to the registered participants as identified on the Notice of Electronic Filing.

August 18, 2026

*/s/ Isaac C. Belfer*
Isaac C. Belfer